Barnes H. Ellis, OSB No. 640325
bhellis@stoel.com
Brad S. Daniels, OSB No. 025178
bsdaniels@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR  97204
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

> Attorneys for Defendants OppenheimerFunds, Inc., OppenheimerFunds
> Distributor, Inc., and OFI Private Investments Inc.

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

| | |
|---|---|
| THE STATE OF OREGON, by and through the OREGON 529 COLLEGE SAVING BOARD AND THE OREGON STATE TREASURER on behalf of the OREGON COLLEGE SAVINGS PLAN TRUST,<br><br>        Plaintiff,<br><br>     v.<br><br>OPPENHEIMERFUNDS, INC., a Colorado corporation; OPPENHEIMERFUNDS DISTRIBUTOR, INC., a New York corporation; and OFI PRIVATE INVESTMENTS INC., a New York corporation,<br><br>        Defendants. | Civil No.<br><br>Marion County Circuit Court Case No. 09C14018<br><br>**NOTICE OF REMOVAL** |

PLEASE TAKE NOTICE THAT Defendants OppenheimerFunds, Inc. ("OFI"),

OppenheimerFunds Distributor, Inc. ("OppenheimerFunds Distributor"), and OFI Private

Investments Inc. ("OFI Private") (collectively "Oppenheimer" or "Defendants") hereby remove

this action from the Circuit Court of the State of Oregon for the County of Marion to the U.S.

Page 1 – **NOTICE OF REMOVAL**

District Court for the District of Oregon. This Notice of Removal demonstrates the following grounds for removal:

1.      Defendants are named in an action now pending in Marion County Circuit Court, *The State of Oregon by and through the Oregon 529 College Savings Board and the Oregon State Treasurer on behalf of the Oregon College Savings Plan Trust v. OppenheimerFunds, Inc. et al.*, Case No. 09C14018 (the "Beneficiary Action"). In general, the Beneficiary Action seeks damages for investment losses suffered by thousands of beneficiaries of the Oregon College Savings Plan Trust and alleges state securities fraud and state common-law claims against Defendants related to their involvement with the Oregon 529 College Savings Network. (*See* Complaint, *The State of Oregon by and through the Oregon 529 College Savings Board and the Oregon State Treasurer on behalf of the Oregon College Savings Plan Trust v. OppenheimerFunds, Inc. et al.*, Case No. 09C14018, Marion County Circuit Court (the "Complaint"), attached as Exhibit A hereto.)

2.      Attached as Exhibit B is a copy of the Summons served on OFI on April 20, 2008. A copy of the Complaint (Exhibit A) was also served on OFI on April 20, 2008.

3.      Attached as Exhibit C is a copy of the Summons served on OppenheimerFunds Distributor on April 20, 2008. A copy of the Complaint (Exhibit A) was also served on OppenheimerFunds Distributor on April 20, 2008.

4.      Attached as Exhibit D is a copy of the Summons served on OFI Private on April 20, 2008. A copy of the Complaint (Exhibit A) was also served on OFI Private on April 20, 2008.

5.      Attached as Exhibit E is a certified copy of the trial court file in the State Action as of approximately 12:00 p.m. on May 13, 2009. Attached as Exhibit F is a copy of the Oregon

Page 2 – **NOTICE OF REMOVAL**

Judicial Information Network docket related to the Beneficiary Action as of approximately 3:00 p.m. on May 14, 2009.

6.      Exhibits A through D constitute all of the process, pleadings, and orders served on Defendants.  Exhibit E constitutes all of the process, pleadings, and orders filed in the Beneficiary Action, contained in the trial court file, and available to Defendants as of May 13, 2009.

7.      Defendants have not yet answered or otherwise responded to the Summons and Complaint.  This Notice of Removal is filed timely within 30 days after service of the Summons and Complaint.

8.      The Beneficiary Action may be removed to this Court pursuant to the provisions of 15 U.S.C. §§ 77p(b) and 78bb(f) because it meets all the requirements of the Securities Litigation Uniform Standards Act:

a.  First, the Beneficiary Action is a covered class action.  Damages are sought on behalf of more than 50 persons, and questions of law or fact common to those persons, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons.

b.  Second, the Beneficiary Action is based on state statutory and common law. Plaintiffs assert claims under the Oregon Securities Law (Or. Rev. Stat. §§ 59.115, 59.135, and 59.137) and state common law claims for breach of contract, breach of fiduciary duty, negligence, and negligent misrepresentation.  (Compl. ¶¶ 105-46.)

Page 3 – **NOTICE OF REMOVAL**

   c.  Third, with respect to all six Claims for Relief in the Beneficiary Action, Plaintiffs have alleged misrepresentations or omissions of a material fact. (*E.g.,* Compl. ¶¶ 6, 106-08, 117, 125-27, 132, 138-39, 143-44.)

   d.  Fourth, Plaintiffs allege that those alleged misrepresentations and omissions were made in connection with the purchase or sale of a covered security, including but not limited to shares of the Oppenheimer Core Bond Fund. (*E.g.,* Compl. ¶¶ 3-6.)

   e.  Fifth, the Beneficiary Action is not brought by a State or political subdivision thereof on its own behalf. 15 U.S.C. §§ 77p(d)(2)(A), 78bb(f)(3)(B)(i). Although the State of Oregon is named in the caption, the action is brought by the trustees of the Oregon College Savings Plan Trust, and the trustees are seeking damages on behalf of the beneficiaries of the Trust. *See* ORS 348.869 ("The State of Oregon has no proprietary interest in the contributions or earnings of the Oregon 529 College Savings Network. Except as otherwise provided by law, the Oregon 529 College Savings Board is the trustee of the contributions and earnings.")

9.    Counsel for Oppenheimer certifies that Oppenheimer will file a copy of this Notice of Removal with the Clerk of the Marion County Circuit Court and give notice to counsel for Plaintiffs. This Notice is signed pursuant to Federal Rule of Civil Procedure 11.

Page 4 – **NOTICE OF REMOVAL**

WHEREFORE, Defendants remove the above-captioned action now pending against

them in the Circuit Court of the State of Oregon for the County of Marion to the U.S. District

Court for the District of Oregon, where it shall proceed.

DATED:  May 15, 2009                    STOEL RIVES LLP

                                        Barnes H. Ellis, OSB No. 640325
                                        bhellis@stoel.com
                                        Brad S. Daniels, OSB No. 025178
                                        bsdaniels@stoel.com
                                        Telephone: (503) 224-3380
                                        Facsimile: (503) 220-2480

                                        Attorneys for Defendants OppenheimerFunds,
                                        Inc., OppenheimerFunds Distributor, Inc., and
                                        OFI Private Investments Inc.

Page 5 – **NOTICE OF REMOVAL**

Portlnd3-1666244.3 0035683-00001

RECEIVED

APR 13 2009

Marion County Circuit Court

A CERTIFIED TRUE COPY
OF ATTORNEYS FOR

1

2

3

4

5

6

7

8

9

10        IN THE CIRCUIT COURT OF THE STATE OF OREGON

11            FOR THE COUNTY OF MARION

12   THE STATE OF OREGON, by and through
     the OREGON 529 COLLEGE SAVINGS
13   BOARD AND THE OREGON STATE
     TREASURER on behalf of the OREGON
14   COLLEGE SAVINGS PLAN TRUST,

15            Plaintiff,

16        v.

17   OPPENHEIMERFUNDS, INC., a Colorado
     corporation; OPPENHEIMERFUNDS
18   DISTRIBUTOR, INC., a New York
     corporation; and OFI PRIVATE
19   INVESTMENTS, INC., a New York
     corporation;

20            Defendants.

21

22

23

24

25

26

Case No. 09C14018

COMPLAINT FOR VIOLATION OF
THE OREGON SECURITIES LAW,
BREACH OF CONTRACT, BREACH
OF FIDUCIARY DUTY,
NEGLIGENCE, AND NEGLIGENT
MISREPRESENTATION

CLAIMS NOT SUBJECT TO
MANDATORY ARBITRATION

JURY TRIAL DEMANDED

EXHIBIT A
PAGE 1 OF 49

1    Plaintiff State of Oregon, by and through the Oregon 529 College Savings Board

2    ("Plaintiff" or the "Oregon Board") and the Oregon State Treasurer on behalf of the Oregon

3    College Savings Plan Trust (the "Oregon Trust") alleges as follows:

4    **I.    INTRODUCTION AND NATURE OF THE ACTION**

5                                            1.

6    The Oregon Board initially hired Defendants OppenheimerFunds, Inc. ("OFI") and

7    OppenheimerFunds Distributor, Inc ("OFDI") pursuant to a Program Management Agreement

8    ("PMA") in June 2004. Pursuant to that agreement, Defendants agreed to provide the Oregon

9    529 College Savings Plan (the "Oregon Plan") with investment and program management

10   services that would benefit families saving for their children's higher education. At some point

11   after that date, OFI may have attempted to delegate or delegated some of its management duties

12   to Defendant OFI Private Investments, Inc. ("OFI Private"). OFI, however, continued to be

13   bound to all of its management duties under the contract and at law.

14                                           2.

15   Pursuant to the PMA, OFI agreed that the investments it recommended for children's

16   college funds would be consistent with the Oregon Board's approved investment policy

17   ("Investment Policy"). It also agreed to update the Oregon Board if there were any material

18   changes to the investments in the Oregon Plan and make necessary changes to the Plan as a

19   result. The Investment Policy made perfectly clear to Defendants that college savings plan

20   beneficiaries who wished to be in an Ultraconservative or Conservative portfolio would be

21   provided conservative investments whose objectives were "income" and "protection of

22   principal" with "minimal growth." Even for those who wished to invest in moderate, balanced

23   and more aggressive portfolios, OFI agreed to provide bond funds that would be conservative

24   investments to protect against the volatility of equity securities in those portfolios.

25

26

Page 1 -   COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 2 OF 49

1                                  3.

2          In addition to duties owed to the Trust by contract, OFI owed fiduciary duties to the Trust

3   as an investment adviser that provided investment advice intended to benefit the Trust and,

4   ultimately, families and children saving for college. Those duties included the duties of care,

5   loyalty, honesty, and full and fair disclosure of all material facts. As discussed at length below,

6   defendants violated their duties to the Trust by, among other things, continuing to recommend

7   and sell the OppenheimerFunds Core Bond Fund ("Core Bond Fund") to all of the Trust

8   portfolios and failing to inform the Board of the substantial changes in risks that the managers of

9   the Core Bond Fund had undertaken by late 2007 or early 2008.

10                                 4.

11         From the outset in 2004, OFI recommended, solicited, and sold the OppenheimerFunds

12  Core Bond Fund (originally presented as the Oppenheimer Bond Fund) to the Oregon Plan's

13  various portfolios. OFI recommended and sold the Core Bond Fund as a straightforward bond

14  fund that invested mainly in high quality corporate bonds with an ancillary focus on government

15  bonds. In 2004 and for the first few years, the Core Bond Fund appeared to be what OFI

16  represented it to be.

17                                 5.

18         Over time, however, and without discussion with the Board, the Core Bond Fund

19  underwent a radical transformation. By late 2007 or early 2008, the Core Bond Fund was no

20  longer a plain bond fund that sought to protect principal, obtain income and minimal growth

21  through corporate and government debt securities. It had become a hedge-fund like investment

22  fund that took extreme risks in a search for speculative large returns. It began, among other

23  things, to sell credit default swaps and other high-risk derivative instruments to Wall Street

24  firms, promising to pay and insure those Wall Street firms if they lost money as a result of

25  defaults in mortgage-backed securities investments. These were high-risk bets that were plainly

26  inappropriate for those saving for college or in college.

Page 2 -   COMPLAINT

EXHIBIT __A__
PAGE __3__ OF __49__

1                                     6.

2        Defendants knowingly failed to disclose the following material facts in violation of their

3    contractual duties and Oregon law:

4            (a) The Core Bond Fund was no longer an appropriate investment for anyone seeking
                 conservative investments or protection of principal because by late 2007 or early
5                2008 it had become a hedge-fund like investment fund that took excessive risks
                 through speculative investment strategies;
6
             (b) The Core Bond Fund was particularly inappropriate for anyone who was in-
7                college or within a few years to college because the risks the fund had undertaken
                 exposed it to substantial losses at a time when families and individuals needed
8                immediate or imminent access to their money;

9            (c) As of late 2007 or early 2008, the Core Bond Fund had engaged in a new strategy
                 of investing in high-risk derivatives (credit default swaps and total return swaps)
10               and mortgage-backed securities that were not designed to protect principal or
                 obtain minimal growth but to achieve outsized returns through extraordinary risks
11               that had the potential for (and ultimately resulted in) staggering losses;

12           (d) The Core Bond Fund was actually managed according to a more aggressive
                 strategy by which it took far greater risks than initially disclosed to the Oregon
13               Board; and,

14           (e) The Core Bond Fund investment managers ignored the warnings of its own risk
                 managers when the Fund exceeded its risk controls and risk budget in April 2008.
15               Rather than adjust its risk downward, the Core Bond Fund changed its risk
                 controls and risk metrics in order to allow it to take even greater risks. In fact,
16               after receiving these warnings from its own risk managers, the OFI portfolio
                 managers decided that they would, in their own words, place "big bets" with the
17               college savings plan's and other investors' money, speculative bets that they knew
                 to be in excess of OFI's risk controls.
18

19                                    7.

20        As the result of its speculation, the Core Bond Fund suffered losses in 2008 and 2009 that

21    OFI itself characterized as "mind-numbing." The Core Bond Fund lost over 35 percent of its

22    value in 2008 and continued to fall precipitously another 10% in the first three months of 2009.

23                                    8.

24        Not until late October of 2008, after the Oregon Trust (and thereby families' college

25    savings accounts) had already lost millions as a result of its investment in the Core Bond Fund,

26    did OFI even begin to suggest to the Oregon Board just a few of the changes in the

Page 3 -   COMPLAINT

EXHIBIT A
PAGE 4 OF 49

1    characteristics of the Fund. Even at that time, however, OFI continued to reassure the Oregon

2    Board and advised it to remain invested in the Core Bond Fund. Despite OFI's assurances, in

3    late 2008 and early 2009, the Oregon Board began an investigation into the Fund. At a meeting

4    in late January 2009, the Oregon Board voted to begin to terminate the Oregon Plan's

5    participation in the Core Bond Fund (and the OppenheimerFunds Limited Term Government

6    Bond) and finalized that plan at a follow-up meeting in February 2009.

7                                                    9.

8           The Oregon Trust's losses are the direct result of Defendants' breach of contractual

9    duties, breach of fiduciary duties owed to the Oregon Trust, negligence, and violations of the

10   Oregon Securities Law.

11                                                   10.

12          The State of Oregon created the Oregon Board and Oregon Trust. The Oregon Treasurer

13   chairs the Oregon Trust. Through this action, the Oregon Board, on behalf of the Oregon Trust,

14   seeks to recover the damages suffered by the Oregon Trust and the many Oregon families who

15   lost substantial amounts of their college savings as the result of Defendants' wrongdoing.

16   **II.    PARTIES**

17                                                   11.

18          The Oregon Board was created to establish, implement and maintain the Oregon 529

19   College Savings Network (the "Oregon 529 Network"). The Oregon Board members are the

20   trustees of the Oregon Trust, which holds the funds invested in the Oregon Plan.

21                                                   12.

22          Defendant OFI is a Colorado corporation with its principal place of business in New

23   York. OFI is a registered investment adviser with the Securities and Exchange Commission

24   ("SEC").

25

26

Page 4 -   COMPLAINT

EXHIBIT A
PAGE 5 OF 49

1                                                13.

2          Defendant OFDI is a New York corporation with its principal place of business in New

3    York. OFDI is a registered broker-dealer with the Financial Industry Regulatory Authority

4    ("FINRA").

5                                                14.

6          Defendant OFI Private is a New York corporation with its principal place of business in

7    New York. OFI Private is a wholly owned subsidiary of OFI and a registered investment adviser

8    with the SEC. Where Plaintiff alleges a violation of OFI's duties arising out of its role as a

9    program manager, such duties are also the duties of defendant OFI Private and, therefore, such

10   references to OFI include OFI Private.

11   **III.    JURISDICTION AND VENUE**

12                                               15.

13         This Court has subject matter jurisdiction over the Oregon Securities Law claims under

14   Article VII, section 9 of the Oregon Constitution.

15                                               16.

16         This Court has personal jurisdiction over Defendants under ORCP 4(J)(2), which

17   provides for personal jurisdiction over any person who engages in conduct in violation of the

18   Oregon Securities Law.

19                                               17.

20         Violations of law occurred in Marion County, Oregon, including the dissemination of

21   materially false and misleading statements complained of herein. Defendants have regular

22   sustained business activity in Marion County.

23                                               18.

24         This Court has jurisdiction over Defendants pursuant to a contractual forum selection

25   clause found at Section 18.9 of the PMA by and between the State of Oregon, acting by and

26   through the Oregon 529 College Savings Board, on the one hand, and Defendants OFI and

Page 5 -   COMPLAINT

EXHIBIT___A___
PAGE__6__OF_49

1    OFDI, on the other hand, dated as of June 4, 2004. Defendant OFI Private may have been or was

2    delegated some duties under that contract and may also be a party thereto. The forum selection

3    clause is binding on each Defendant and provides that any action arising from or relating to the

4    PMA "shall be brought and conducted solely and exclusively within the Circuit Court of Marion

5    County for the State of Oregon ...."

6    IV.    CLAIMS NOT SUBJECT TO REMOVAL FROM STATE COURT

7                                        19.

8         The claims alleged in this Complaint are not subject to removal from state court under the

9    Securities Litigation Uniform Standards Act, 15 USC §77p(d)(2)(A). That statute specifically

10   preserves state-court claims brought, as here, by states and political subdivisions thereof.

11   Further, the claims are not subject to removal under diversity jurisdiction principles because

12   "[t]here is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction."

13   *Moor v. County of Alameda*, 411 US 693, 717, 93 S Ct 1785, 36 L Ed 2d 596 (1973). The

14   United States District Court for the District of Oregon recently held on two separate occasions

15   that the State of Oregon and its entities are not citizens for diversity jurisdiction and, thus,

16   remanded similar state securities law complaints by State entities to State court. *State of Oregon*

17   *by and through the Oregon Public Employee Retirement Board and the Oregon State Treasurer*

18   *on behalf of the Oregon Public Employee Retirement Fund v. Marsh & McLennan Co's, Inc.*,

19   USDC Oregon CV-05-1434PK, Opinion and Order (Jan. 27, 2006); *State of Oregon by and*

20   *through the Oregon Public Employee Retirement Board and the Oregon State Treasurer on*

21   *behalf of the Oregon Public Employee Retirement Fund v. American Int'l; Group, Inc.*, USDC

22   Oregon CV-08-6110-HO, Opinion and Order, (Aug. 20, 2008). As a result, this case will

23   proceed in the Circuit Court of the State of Oregon.

24                                       20.

25        The claims alleged in this Complaint are also not subject to removal from state court

26   pursuant to the forum selection clause found at Section 18.9 of the PMA. The forum selection

Page 6 -   COMPLAINT

EXHIBIT A
PAGE 7 OF 49

1   clause is binding on each Defendant and provides that any action arising from or relating to the

2   PMA "shall be brought and conducted solely and exclusively within the Circuit Court of Marion

3   County for the State of Oregon ...." This action arises from and relates to the PMA.

4   **V.    FACTUAL ALLEGATIONS**

5       **A.    Background of the Oregon 529 College Savings Network**

6                                        21.

7       The Oregon 529 Network was created by the Oregon legislature in 1999 and commenced

8   in January 2001 in order to provide families and others a tax-advantaged opportunity to save for

9   the cost of higher education expenses. A 529 plan (named after Section 529 of the Internal

10  Revenue Code) is an education savings plan designed to encourage families to save in advance

11  for college expenses through the use of tax incentives.  Funds invested in the Oregon Plan by

12  plan participants are placed in the Oregon Trust. The Oregon Trust, in turn, relies on the

13  investment information and services provided by Defendants to invest those funds for the

14  Oregon Trust beneficiaries.

15                                       22.

16      Plan participants make contributions to individual accounts for the benefit of designated

17  beneficiaries whose education expenses may be paid using money from the account. The monies

18  invested in the individual accounts are part of the Oregon Trust. Title to the assets held in the

19  Oregon Trust is vested in the Oregon Board as trustees of the Oregon Trust. The Oregon Board

20  operates the Oregon Trust for the benefit of the designated beneficiaries.

21                                       23.

22      The Oregon 529 Network provides different methods for the investment of funds in the

23  Oregon Plan. There is a "direct-sold" option available directly from the Oregon 529 Network. It

24  includes portfolios of funds that have been assembled and recommended by the Oregon 529

25  Network's investment adviser, Defendant OFI. OFI also manages the underlying funds in each

26  portfolio. The funds in these portfolios are distributed by Defendant OFDI. There is also an

Page 7 -  COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT **A**
PAGE **8** OF **49**

1  "adviser-sold" option that includes nearly identical portfolios but is provided only through

2  financial advisers. The term "Oregon Plan" as used herein refers to both the "direct-sold" and

3  "adviser-sold" investment options.[1]

4                                               24.

5        The Oregon Plan offers plan participants three ways to select the investment approach

6  and type of risk that they as investors want to incur in saving for their children's college: (1) the

7  Lifestyle Option, (2) the Years to College Option, and (3) the Single Fund Portfolio Option. The

8  Single Fund Portfolio Option is not involved in this action because it did not hold investments in

9  the Core Bond Fund.

10                                              25.

11       The Lifestyle Option offers investment portfolios with various levels of risk. The

12  portfolio options are: (1) OppenheimerFunds 100% Equity Portfolio, (2) OppenheimerFunds

13  Aggressive Portfolio, (3) OppenheimerFunds Moderate Portfolio, (4) OppenheimerFunds

14  Balanced Portfolio, (5) OppenheimerFunds Conservative Portfolio, and (6) OppenheimerFunds

15  Ultra Conservative Portfolio. The plan participants choose among the portfolios and their funds

16  remain in the selected portfolio(s) until the participant requests they be moved.

17                                              26.

18       The Years to College Option automatically moves the participant's account to lower risk

19  portfolios as the designated beneficiary nears college. The Years to College Option utilizes five

20  of the portfolios also available in the Lifestyle Option. For accounts whose designated

21  beneficiary is 10-plus years to college, the account is invested in the OppenheimerFunds

22  Aggressive Portfolio (the "Aggressive /10+ Years to College Portfolio"). For accounts whose

23  designated beneficiary is seven to nine years to college, the account is invested in the

24

25  [1] The "direct-sold" option also includes portfolios assembled by Vanguard and the "adviser-
    sold" option includes portfolios assembled by MFS. None of those portfolios or their underlying
26  funds is involved in this action.

Page 8 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 9 OF 49

1    OppenheimerFunds Moderate Portfolio (the "Moderate /7-9 Years to College Portfolio").[2]  For

2    accounts whose designated beneficiary is four to six years to college, the account is invested in

3    the OppenheimerFunds Balanced Portfolio (the "Balanced /4-6 Years to College Portfolio").  For

4    accounts whose designated beneficiary is one to three years to college, the account is invested in

5    the OppenheimerFunds Conservative Portfolio (the "Conservative /1-3 Years to College

6    Portfolio"), and for accounts whose designated beneficiary is in college, the account is invested

7    in the OppenheimerFunds Ultra Conservative Portfolio (the "Ultra Conservative/In College

8    Portfolio").  In the appropriate years, the funds are moved between the portfolios on the first

9    business day of August.

10                                         27.

11          The more conservative portfolios have always been represented by Defendants as having

12   objectives of "income and protection of principal" and "preservation of capital."  As discussed

13   further below, these portfolios were never intended to take hedge-fund like risks or strive to

14   obtain high-risk returns that might expose someone in college or nearly in college to substantial

15   losses at exactly the time that they intend to use their money.  As was abundantly clear to

16   Defendants, those in college or nearly in college cannot afford to take huge risks with money that

17   will be used either immediately or imminently.  Further, all of the portfolios were to have

18   conservative investments, including the Core Bond Fund, within them.

19   **B.    The Oregon Board hires OFI as a fiduciary to provide investment advice to**
          **the Oregon Trust according to the Oregon Trust investment policy and**
20        **applicable law.**

21                                         28.

22          The Oregon Board engages a professional investment adviser and program manager to

23   advise the Board and invest Oregon Trust assets.  The Oregon Board relies on the investment

24   adviser to provide it with recommendations that are consistent with the Board approved

25   _____

26   [2] The length of some of the Years to College Portfolios in the adviser-sold plan was extended in
     April 2008.

Page 9 -  COMPLAINT

EXHIBIT **A**
PAGE **10** OF **49**

1    Investment Policy and to invest the college savings plan money accordingly. On November 13,

2    2003, the Oregon Board voted to replace Strong Capital Management, Inc. as a program manager

3    for the Oregon 529 Network. The Oregon Board interviewed numerous potential program

4    managers before choosing OFI. On February 17, 2004, the Oregon Board voted to select OFI as

5    program manager for the Oregon Plan.

6                                       29.

7          In making the decision to select OFI as the program manager, the Oregon Board relied

8    upon information provided to it by Defendants including, among other things, representations by

9    OFI that it would recommend investment funds for the various plan portfolios that were

10   consistent with the investment objectives of each portfolio.

11                                      30.

12         In addition, OFI presented the Oregon Board with a proposal in which it said that it was a

13   client-focused firm offering excellent investment management and award winning customer

14   service. OFI described itself as well respected and represented that it operated with integrity.

15   The Oregon Board relied upon these representations in voting to select OFI as the program

16   manager.

17                                      31.

18         Subsequently, the Oregon Board, on behalf of the Oregon Trust, entered into the PMA

19   dated June 4, 2004, with Defendants OFI and OFDI. Pursuant to the PMA, OFI became the

20   Program Manager for the Oregon Plan and OFDI (a registered broker-dealer) became the

21   distributor for the Oregon Plan.

22                                      32.

23         Under certain conditions, the PMA allows OFI to delegate the performance of its

24   contractual duties to an affiliate. In the event of any delegation, OFI is "deemed to have full

25   control over its delegates," and remains responsible for the performance of its contractual duties

26   as if no delegation was made. PMA, Section 2.2. At some point prior to December 20, 2007,

Page 10 - COMPLAINT

EXHIBIT  A
PAGE  II  OF  49

1  OFI may have attempted to delegate or did delegate its Program Management duties under the

2  PMA to OFI Private, but Oregon did not receive a written notice of delegation as required under

3  Section 2.2 of the PMA.

4                                     33.

5        The PMA contained numerous provisions requiring Defendants, among other things, (1)

6  to recommend investment portfolios consistent with the Oregon Plan's Investment Policy, (2) to

7  ensure that once selected, those portfolios and the underlying funds remained consistent with the

8  Investment Policy, and (3) to regularly report to the Oregon Board on any significant issues,

9  events or changes in the portfolios or the underlying funds.

10                                    34.

11       Pursuant to the PMA, Defendants made a number of certifications, including the

12  following:

13            (A) [that] all portions of the Plan Description for the [Oregon Plan]
              ... are true and accurate in all material respects, (B) to the best of
14            [Defendants'] knowledge, based solely ... on [their] due diligence
              review and discussions concerning the Plan Description for the
15            [Oregon] Plan, the Plan Description for the [Oregon] Plan
              completely and accurately describes the [Oregon] Plan and does
16            not contain any untrue statement of a material fact or omit to state
              a material fact necessary to make the statements made therein not
17            misleading in light of the circumstances under which they were
              made, and (C) each of the representations and warranties of
18            [Defendants] set forth in [Section 13] shall be true and correct in
              all material respects as of the Start Date as if made on and as of the
19            Start Date. (PMA, Sections 3.2(b)(ii) and (iii)).

20                                    35.

21       Pursuant to Section 13 of the PMA, OFI made the following representations, warranties

22  and covenants:

23            (a) "[t]he Plan Marketing Materials ... shall not contain any untrue statement of
              material fact or omit to state a material fact necessary to make the statements not
24            misleading" (Section 13.1(h));

25            (b) that "[t]he operations of [Defendants] are and will at all times during the term of
              this Agreement be in material compliance with all laws, rules, regulations, orders
26            and restrictions of any federal, state, county, municipal, or local government or
              governmental body or agency applicable to their operations ..." (Section 13.1(i)).

Page 11 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 12 OF 49

1                                        36.

2          Pursuant to Section 13 of the PMA, OFDI made the following representations, warranties

3   and covenants:

4          (a) "[t]he Plan Marketing Materials provided or prepared by OFDI ... shall not
               contain any untrue statement of material fact or omit to state a material fact
5              necessary to make the statements not misleading" (Section 13.2(h));

6          (b) that "[t]he operations of OFDI are and will at all times during the term of this
               Agreement be in material compliance with all laws, rules, regulations, orders and
7              restrictions of any federal, state, county, municipal, or local government or
               governmental body or agency applicable to its operations ..." (Section 13.2(i)).

8

9                                        37.

10         The PMA imposes, among others, the following duties on Defendants:

11         (a) OFI and OFDI's duty to deliver to the Oregon Board certificates relating to
               various matters (including the accuracy of Oregon Plan documents and
12             compliance with applicable law) in the event they "know of any new or changed
               circumstances ..." (Section 3.6);

13

14         (b) OFI's duty to "invest and manage the assets of the [Oregon] Trust as investment
               agent of the [Oregon] Board" in accordance with the Investment Policy (Section
15             4.1);

16         (c) OFI's duty to provide to the Board "all information about [fund managers] and
               Underlying Funds ... as may be required for the [Oregon] Board to carry out its
17             duties as trustees of the [Oregon] Plan Trust," and to "review the Investment
               Portfolios and Underlying Funds utilized in the [Oregon] Plan and propose
18             changes thereto in accordance with Article V [of the PMA]" (Section 4.1);

19         (d) OFI's duty to recommend Investment Portfolios having "the characteristics ...
               described in the then-current Plan Description" (Section 4.4);

20         (e) OFI's duty to "invest the assets in each of the Investment Portfolios in the
               Underlying Funds so that such assets are allocated according to guidelines
21             established by OFI and approved by the Board ..." (Section 5.2(a));

22         (f) OF I's duty to determine that "the investment objectives, policies and practices of
               the Underlying Funds in which [Oregon] Trust assets are invested are consistent
23             with the [Oregon] Board's Investment Policy and applicable law" (Section
               5.2(b));

24

25         (g) OFI's duty to "at least annually, review the Investment Portfolios of the [Oregon]
               Plan" (Section 5.3);

26         (h) OFI's duty to "from time to time propose the addition of new Investment
               Portfolios, the removal of existing Investment Portfolios, or the modification of

Page 12 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT  A
PAGE  13  OF  49

1    the Underlying Funds in which certain existing Investment Portfolios invest . . ,
     all in accordance with the applicable Investment Policy and subject to Board
2    approval." (Section 5.3);

3    (i) OFI's duty to "deliver to the Board quarterly and annual reports on ... Investment
        Portfolio performance ..." (Section 8.2);

4
     (j) OFI's duty to prepare all Plan Marketing Materials (Section 9.1(a)); and
5
     (k) OFI's duty to (1) amend or supplement the Plan Description "in order to reflect
6        material developments arising subsequent to the preparing and delivery of the
         initial Plan Description," (2) to notify the Board "of any development of which
7        [they are] aware that would be material to the [Oregon] Plan that is not disclosed
         in, or is inconsistent with, the applicable Plan Description then in effect," and (3)
8        to "suggest modifications to the applicable Plan Description reflecting such
         material development" (Section 9.1(b)).
9

10                                         38.

11        As noted above, OFI had a duty to invest and manage the assets of the Oregon Trust in

12   accordance with the Investment Policy of the Oregon Board.  The Investment Policy of the

13.  Oregon Board is contained in a document titled Adopted Investment Objectives Policies and

14   Practices, dated June 4, 2004.  The Investment Policy imposes the following additional duties on

15   OFI:

16            [OFI] shall provide quarterly investment reports to the [Oregon]
              Board that include investment performance, applicable benchmark
17            performance, [Oregon] Plan assets, and the number of Accounts in
              each of the Plan's investment options.  The report shall include
18            significant issues and events or changes in [Oregon] Plan
              Portfolios and Underlying Funds that have occurred during the last
19            reporting period. A detailed report shall be presented to the
              [Oregon] Board annually, which analyzes the investments
20            supporting the [Oregon] Plan's investment options.

21                                         39.

22        The Investment Policy also describes the investment options available to plan

23   participants.  With respect to the Ultra Conservative/In College Portfolio, the Investment Policy

24   states that this portfolio is to:

25            Invest in bond and money market investments in order to seek the
              Portfolio's objectives of income and protection of principal.  This
26            Portfolio seeks preservation of capital with minimal growth by
              investing primarily in bond Underlying Funds and money market

Page 13 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067



EXHIBIT A
PAGE 14 OF 49

1    Underlying Funds to maintain stability. The target allocation is 60
     percent bond Underlying Funds, and 40 percent in money market
2    Underlying Funds. (Emphasis added.)

3                                    40.

4        With respect to Conservative/1-3 Years to College the Investment Policy states that this

5    portfolio is to:

6    Invest primarily in bond and money market investments in order to
     seek the Portfolio's objectives of <u>income and protection of</u>
7    <u>principal</u>. This Portfolio seeks <u>preservation of capital with</u>
     <u>minimal growth</u> by investing primarily in bond Underlying Funds
8    to maintain stability. The target allocation is 20 percent equity
     Underlying Funds and 80 percent in bond Underlying Funds.
9    (Emphasis added).

10                                   41.

11       With respect to the Balanced/4-6 Years to College Portfolio, the Investment Policy states

12   that this portfolio is to:

13   Invest in a combination of <u>conservative</u> and aggressive investments
     in order to seek the Portfolio's objectives of both capital
14   appreciation and income. This Portfolio seeks <u>moderate growth</u> by
     investing in a balanced asset allocation slightly weighted toward
15   bond Underlying Funds over equity Underlying Funds. This
     Portfolio has a target allocation of 40% equity Underlying Funds
16   and 60% bond Underlying Funds. (Emphasis added).

17                                   42.

18       With respect to the Moderate Portfolio/7-9 Years to College Portfolio the Investment

19   Policy states that this portfolio is to:

20   Invest in a combination of <u>conservative</u> and aggressive investments
     in order to seek the Portfolio's objectives of both capital
21   appreciation and income. This Portfolio seeks <u>moderate growth</u> by
     investing in a balanced asset allocation slightly weighted toward
22   equity Underlying Funds over bond Underlying Funds. This
     Portfolio has a target allocation of 60% equity Underlying Funds
23   and 40% bond Underlying Funds. (Emphasis added).

24                                   43.

25       With respect to the Aggressive Portfolio/10+ Years to College the Investment Policy

26   states that this portfolio is to:

Page 14 - COMPLAINT



EXHIBIT A
PAGE 15 OF 49

1    Invest primarily in equity investments in order to seek capital
     appreciation. This Portfolio seeks long-term growth by investing
2    primarily in equity Underlying Funds. A percentage of assets will
     be invested in <u>bond Underlying Funds to provide some protection</u>
3    <u>from equity volatility</u>. This Portfolio has an asset allocation target
     of 80% equity Underlying Funds and 20% bond Underlying Funds.
4    (Emphasis added).

5                                    44.

6          Pursuant to its responsibilities under the PMA and the Investment Policy, OFI

7    recommended portfolio allocations and underlying funds for those portfolios. Initially, OFI

8    proposed only two underlying funds, the OppenheimerFunds Bond Fund and the

9    OppenheimerFunds Main Street Opportunity Fund. The Oregon Board requested additional

10   choices and OFI eventually recommended portfolios that included allocations to 7 underlying

11   funds, as well as a money market fund. OFI also provided the Oregon Board with a number of

12   different allocation scenarios that it recommended, and represented that these scenarios were

13   consistent with the investment objectives of the various portfolios as stated in the Investment

14   Policy. The Oregon Board relied upon the advice and recommendations of its Program Manager,

15   OFI.

16                                   45.

17         The final portfolios contained allocations to the Bond Fund as follows:

18   | **Portfolio** | **% in OppenheimerFunds Bond Fund** |
     | --- | --- |
19   | Ultraconservative | 20 |
20   | Conservative | 35 |
21   | Balanced | 30 |
22   | Moderate | 20 |
23   | Aggressive | 10 |

24   These percentages adjusted slightly in April 2008 for those Portfolios sold in the "adviser-sold"

25   plan. They remained the same in the "direct-sold" plan.

26

Page 15 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067



EXHIBIT A
PAGE 16 OF 49

### C. The Oppenheimer Bond Fund, a seemingly conservative bond fund, changes its investment style and increases its risk over time, from 2004 to 2008.

#### 1. The Core Bond Fund takes undisclosed risks.

46.

As stated above, for each of the portfolios in the Oregon Plan that OFI managed, it recommended the Oppenheimer Bond Fund. Subsequently, this fund was renamed the OppenheimerFunds Core Bond Fund. In 2004, OFI represented to the Oregon Board that the Oppenheimer Bond Fund

> is designed to take advantage of opportunities presented by a wide range of high quality corporate bonds combined with an ancillary focus on government bonds, including mortgage agency paper. This broad diversification is designed to give us the flexibility to provide competitive yields from a portfolio with potentially less volatility.

47.

The Oregon Board paid OFI $250,000 to $350,000 in program management fees (based on a percentage of the total plan assets) to advise the board and select investment funds consistent with the adopted Investment Policy. OFI also acted as the investment manager for the Core Bond Fund in which the Oregon Plan was heavily invested. The Oregon Trust, as an investor in the Core Bond Fund, also paid OFI a separate investment management fee of approximately 50 basis points (varying over time) to manage the Core Bond Fund. (A basis point is 1/100 of a percent so that 50 basis points equal .50 percent). This was approximately $300,000 per year in additional Core Bond Fund management fees over the last two years. The Oregon Trust also paid other sales, marketing, and "other expense" charges charged directly by the Core Bond Fund. As the investment manager for the Core Bond Fund, OFI chose the underlying securities that were purchased in the Core Bond Fund and ultimately made the decision to turn the Core Bond Fund into a high-risk, hedge-fund like investment fund.

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

1                                    48.

2           Due to its position as the investment manager for the Core Bond Fund, OFI was in the

3    unique position of having complete access to information regarding the Core Bond Fund and its

4    investment activities. Despite the fact that it was managing the Core Bond Fund, and therefore

5    clearly was aware of Core Bond Fund's changing objectives and risks, until January 22, 2009,

6    OFI never indicated to the Oregon Board that the objectives or risk profile of the Core Bond

7    Fund had been changed or modified. In fact, OFI continued to recommend and represent that the

8    Core Bond Fund was appropriate for all of the Oregon Plan portfolios, including the

9    Conservative and Ultra Conservative Portfolios. However, for the first time, on January 22,

10   2009, OFI's Chief Investment Officer, Kurt Wolfgruber, informed the Oregon Board that the

11   ˜ Core Bond Fund was "a long-term vehicle, appropriate for investors who are willing to assume

12   the risk of investing in broadly defined, taxable, fixed income securities and can also handle the

13   risk of the impact of changing interest rates on those securities' prices. To be clear, the fund was

14   not a short-term bond fund."

15                                   49.

16          OFI never disclosed this information to the Oregon Board at any time before January 22,

17   2009. OFI also stated for the first time, on October 23, 2008, that the Core Bond Fund was

18   actually being managed by a "Core Plus" strategy. At no time before October 23, 2008, did OFI

19   even use the term Core Plus with respect to the Core Bond Fund.

20                                   50.

21          The difference between Core and Core Plus is significant to those who are

22   knowledgeable about mutual fund names and strategies because a Core Plus strategy allows the

23   managers to reach for greater returns, and grants them greater latitude to construct a portfolio

24   that deviates from the benchmark index. For example, the objective of OFI's Core strategy was

25   to achieve excess returns, relative to its benchmark, of 75 basis points. The Core Plus strategy

26   seeks to achieve even greater returns relative to the same benchmark, from 100 to 125 basis

Page 17 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT **A**
PAGE **18** OF **49**

1    points (or 1 to 1.25 percent). In other words, the Core Plus strategy seeks to achieve excess

2    returns of as much as 160 percent greater than the Core strategy. It is a well-known principle in

3    fixed income investing that significantly greater returns can only be achieved through the

4    assumption of greater risk, and that was precisely the outcome from this undisclosed switch to a

5    higher return objective.

6                                              51.

7           In the case of the Core Plus strategy, that greater risk was incurred through a relaxation of

8    restrictions on acceptable portfolio construction. This is evident in the large difference in the

9    allowable "tracking error" range between the Core and Core Plus strategies. Tracking error

10   measures how closely an investment fund follows the index to which the fund is benchmarked.

11   In this instance, the Core Bond Fund was benchmarked against the Lehman Brothers (now

12   Barclays Capital) Aggregate Bond Index. A higher tracking error indicates that the fund

13   manager has greater discretion and intends to take a higher risk in order to deviate from a pure

14   replication of the benchmark index. As alleged in detail below, the Core Bond Fund

15   substantially exceeded its assigned tracking error relative to its benchmark bond index.

16                                             52.

17          For the Core strategy, the acceptable tracking error range is between 75 to 125 basis

18   points. This means that the portfolio managers have license to construct a portfolio that differs

19   from the benchmark index, provided that the difference in expected return of the portfolio versus

20   the index falls between 75 to 125 basis points (or .75 to 1.25 percent). The Core Plus strategy,

21   on the other hand, operated within a tracking error range of 125 to 200 basis points. This 160

22   percent increase in the tracking error range provides a much wider tolerance for the construction

23   of a portfolio that could differ significantly, up or down, from its performance benchmark.

24                                             53.

25          Until October 23, 2008, well after significant losses had already occurred, OFI never

26   disclosed to the Oregon Board that the Core Bond Fund was operated with a Core Plus strategy.

Page 18 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067



EXHIBIT __A__
PAGE __19__ OF __49__

1    Even then, the disclosure occurred only in an offhanded manner, without any real reference to

2    the significant differences. From 2004 through 2006, the Core Bond Fund generated returns

3    consistent with what one would expect from a fund with a name like Core Bond Fund. Despite

4    the undisclosed additional risks with respect to its benchmark that it might have been taking

5    during this period, it seemed to provide low volatility, protection of principal, and income.

6    Accordingly, there were no performance issues that might have raised suspicion about the

7    management of the fund. In 2007, however, the Core Bond Fund altered its investment style and

8    risk profile and began to significantly increase its risk. Most significantly, the Core Bond Fund

9    began to seek alternative investments in the hopes of seeking much higher returns, including

10   dramatically increasing its use of derivative instruments and purchasing highly volatile

11   mortgage-related bonds.

12                                          54.

13       In addition, the Core Bond Fund began to take unnecessary risks by significantly

14   increasing its use of leverage. OFI failed to disclose or discuss this change in investment

15   strategy to the Oregon Board. While the use of leverage can increase the potential return of a

16   fund, it also greatly increases the potential loss. The reason that leverage has this two-edged

17   effect is that it allows a fund to participate in the gains and losses on a pool of assets that is

18   greater than the amount of dollars actually invested in the fund. Any gains on those extra assets

19   flow directly to the shareholders, but any losses come directly out of the investors' capital. In

20   effect, investors are in a first-loss position, much like a homeowner who buys a house with a

21   down payment and a mortgage.

22                                          55.

23       Unbeknownst to the Oregon Board, OFI either did not have or did not follow industry-

24   standard risk management policies for the Core Bond Fund, thus allowing its managers to take

25   unnecessary and reckless risks. Further, as discussed in more detail below, OFI intentionally

26   ignored internal risk management guidelines in order to position the Core Bond Fund to achieve

Page 19 - COMPLAINT

EXHIBIT A
PAGE 20 OF 49

1  returns well in excess of its benchmark, thereby also exposing the Fund to risks well in excess of

2  the tracking error.

3          **2.     The Core Bond Fund adds high-risk derivative "swap" instruments
                     throughout 2007-2008.**

4

5                                              56.

6          Throughout 2007 and 2008, without appropriate disclosure to or discussion with the

7  Oregon Board, the Core Bond Fund greatly increased its use of derivative instruments, most

8  notably by engaging in swap transactions. The Core Bond Fund engaged in both total return

9  swaps and credit default swaps. These derivative transactions were used by the managers as a

10 means to act in a highly-leveraged manner in order to make speculative bets on particular sectors

11 and names in the bond market. Both types had the effect of dramatically increasing the Fund's

12 overall leverage. The result was excessively leveraged and speculative bets that significantly

13 altered the risk profile of the Core Bond Fund.

14                                             57.

15         A total return swap is a financial contract between parties to exchange cash flows in the

16 future based on the performance of a particular index or set of securities. In 2007 and 2008, the

17 managers of the Core Bond Fund formed a view that Commercial Mortgage-Backed Securities

18 ("CMBS"), securities backed by commercial real estate loans, were trading at attractive levels.

19 To act upon this view, the managers acquired a few CMBS bonds for the fund. Simply

20 increasing the weighting of the CMBS position, and perhaps slightly overweighting it with

21 respect to the benchmark, might have been within the acceptable level of risk. The Core Bond

22 Fund managers, however, increased the risk to a much higher level by entering into total return

23 swaps on commercial real estate indices, essentially a highly leveraged and speculative bet that

24 the CMBS market, which had suffered a widening of spreads (the difference in yields between

25 CMBS and similar term government bonds), would rally in 2008, causing spreads to narrow and

26 generating large returns for the fund. Unfortunately for fund shareholders, the CMBS market

Page 20 - COMPLAINT

EXHIBIT **A**
PAGE **21** OF **49**

1    continued to decline precipitously in the latter half of 2008, and the Core Bond Fund realized

2    substantial declines in its portfolio value as a result of the leverage in these speculative swap

3    positions.

4                                              58.

5           The Core Bond Fund also purchased and sold credit default swaps. Credit default swaps

6    are essentially insurance contracts that insure against the default on debt securities such as

7    corporate bonds. In a credit default swap, two parties enter into a private contract whereby the

8    buyer of the protection agrees to pay the seller premiums over a set period of time, which is

9    typically four or five years. In exchange, the seller agrees to pay the buyer in the event a

10   particular pre-defined credit event occurs, such as a default on the underlying security. In this

11   manner, a credit default swap functions as an insurance policy. The buyer of credit protection

12   can use the swap to hedge an existing position in a particular security. The writer of credit

13   protection receives a regular insurance premium, in the hope of not having to pay an insurance

14   "claim."

15                                             59.

16          In 2008, the Core Bond Fund entered into a significant number of credit default swaps,

17   but not as a buyer of credit protection to hedge existing fund holdings. Instead, it became a

18   significant seller of credit protection, essentially writing insurance on corporate bonds. This had

19   the effect of adding leverage, because the Fund was in a position to realize the full impact of

20   price declines in the bonds it was insuring, even though it did not have actual ownership of those

21   bonds and received a small amount of income relative to the risk to the Fund.

22                                             60.

23          The Core Bond Fund not only engaged in risky selling of protection on corporate bonds,

24   it sometimes actually sold protection on the issuers of bonds that it also owned in the Fund,

25   thereby doubling or tripling its bet with respect to the credit-worthiness of those issuers. For

26   example, as of June 30, 2008, the Core Bond Fund held bonds issued by AIG, Lehman Brothers,

Page 21 - COMPLAINT

EXHIBIT **A**
PAGE **22** OF **49**

1   Merrill Lynch, Citigroup, General Motors, and Ford Motors. At the same time, the Core Bond

2   Fund was selling protection, credit default swaps, on bonds by these very issuers. In other

3   words, if one of the issuers, like Lehman Brothers, went into default on its bonds, not only would

4   the Core Bond Fund lose value in the bonds of Lehman Brothers that it currently held, it would

5   also be responsible for making payments to other holders of Lehman Brothers' bonds who had

6   purchased the credit protection sold by the fund. By selling credit protection on these issuers, the

7   managers were gambling that no credit events requiring a payment would occur in these issuers

8   prior to the expiration dates of the swaps, and that the fund would pocket the fixed premium

9   being paid by the protection buyer. By selling protection in names that the portfolio was long,

10  the managers risked a loss both of bond value and of a payout on the credit default swap. In this

11  manner, these credit default swaps constituted highly speculative bets on these issuers, and

12  multiplied the Core Bond Fund's risk of loss in these corporate issuers.

13                                          61.

14        This practice of writing credit protection was not a minor activity for the Core Bond

15  Fund. By August 2008, it has been estimated that the fund's net notional exposure to credit

16  default swaps was over $850 million. In other words, the $2 billion fund had additional exposure

17  to the credit performance of an additional $850 million in corporate credits. In this manner, the

18  credit default swap activity added significant leverage, and greatly increased fund holders'

19  exposure to loss.

20                                          62.

21        OFI has indicated that in 2008 the managers of the Core Bond Fund stopped adding to the

22  Fund's position or exposure to Residential Mortgage-Backed Securities ("RMBS"), and instead

23  began to increase its exposure to corporate bonds. However, the managers failed to disclose that

24  it was heavily weighting this corporate bond allocation to the financial sector. Many of these

25  same financial companies themselves were heavily exposed to the RMBS market, so by

26  overweighting its position in financial sector bonds, the Core Bond Fund actually increased its

Page 22 - COMPLAINT

EXHIBIT __A__
PAGE _23_ OF _49_

1   overall exposure to problems in the housing sector, as well as to all the other problems plaguing

2   the financial sector, which were well-known at the time. This over-concentration in RMBS and

3   financial sector bonds ultimately resulted in huge losses to the Core Bond Fund

4          **3.    The Core Bond Fund increases its risk, makes hedge fund-like bets,
               and exceeds its own ever-changing internal risk controls.**
5

6                                            63.

7          In the first half of 2008, the Core Bond Fund began to add significantly to its exposure to

8   the CMBS sector. As previously explained, it did this by an ever-escalating position in total

9   return and credit default swaps on various CMBS indices. As the "spread" between CMBS and

10  Treasury bonds widened steadily in the first half of 2008, the managers quickly and dramatically

11  ramped up the fund's exposure to this sector through the use of total return and credit default

12  swaps, increasing the already excessive risk. As spreads continued to widen throughout the year,

13  the managers made a large bet on the "opportunity of a lifetime" without regard to the risk to

14  investors or their own internal risk factors. They continually escalated the size of the bet that

15  spreads would narrow by continually adding to the Fund's already excessively risky position in

16  CMBS total return swaps.

17                                           64.

18         Between April 30, 2007, and July 31, 2008, the Core Bond Fund increased it notional

19  exposure to CMBS total return swaps from approximately $15 million to $900 million, an

20  increase of 6,000 percent. In other words, as of the end of July 2008, the approximately $2

21  billion Core Bond Fund was exposed to the performance of an additional $900 million in assets

22  that it did not actually own. In this manner, the one-sided and speculative bet on the direction of

23  CMBS spreads added leverage and grossly increased the fund holders' exposure to the risk of

24  loss.

25

26

Page 23 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 24 OF 49

1                                 65.

2          On October 23, 2008, OFI made a presentation to the Oregon Board which included a

3    discussion of the Core Bond Fund.  At the presentation were Kevin Dachille and Dan Herrmann

4    of OFI.  Kevin Dachille is an investment director of OFI who works with the fixed income teams

5    articulating their investment policy, strategy and performance to existing and prospective

6    institutional clients.  During his presentation to the Board, Kevin Dachille explained the situation

7    in 2008 as follows:

8                  MR. DACHILLE: ...  Now, this is a trying time, because every
                   time we bought something, it went down in price.  And we'd buy it
9                  again, and it would go down in price.  And we'd buy it again, and it
                   would go down in price.  To the point where right at the eve of the
10                 Bear Stearns episode in mid-March, we were, for all intents and
                   purposes, all in.  Ninety-five percent of our risk budget was -- we
11                 still have 95 percent of our risk budget, so the last six months we
                   have not added to aggregate risk, but rather just held our position
12                 or stayed the course.

13                 MR. EDWARDS: So why would you keep buying?  I mean,
                   hindsight is always 20/20.  But what was it forcing you to --
14
                   MR. DACHILLE: Valuations got more attractive.
15
                   MR. DACHILLE: And so we were getting greedy.  That's how we
16                 -- when the value increases --

17                 -- we back up the truck.

18                 MR. EDWARDS: Well, let me ask you, is this abnormal?  Has the
                   fund done this before where you've kept the steady buying spree --
19
                   MR. DACHILLE: Never like this.
20
                   MR. EDWARDS: -- and took a risk budget --
21
                   MR. DACHILLE: Never like this.
22
                   MR. EDWARDS: -- up like that?
23
                   MR. DACHILLE: No.  We've never gotten close to our
24                 maximum.

25   (Emphasis added).

26

Page 24 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067



EXHIBIT A
PAGE 25 OF 49

1                                        66.

2           In other words, by April 2008, the Core Bond Fund had placed such a large bet that for

3    the purposes of assessing its risk, it was in OFI's own words "all in."

4                                        67.

5           In addition to fully expending its risk budget, in April 2008, the Core Bond Fund's

6    internal risk profile indicated that it was positioned to achieve inordinately high excess returns

7    compared to its benchmark.  These potentially inordinate returns created correspondingly

8    inordinate risks.  The so-called Core Plus strategy that was used to manage the Core Bond Fund,

9    set an *ex ante* target for excess return over the benchmark of between 100 to 125 basis points, or

10   1 percent to 1.25 percent.  However, internal documents indicate that as early as April 1, 2008,

11   the composition of the Core Bond Fund was such that prospective excess return over the

12   benchmark was already forecast to be 1,058 basis points or 10.58 percent, well in excess of

13   OFI's own internal guideline, and an extraordinary level of risk and deviation from the

14   benchmark index.  An excess return of this size, and the risk required to achieve it, was totally

15   inappropriate for a fund labeled as a "core" bond fund and was particularly inappropriate for the

16   college savings plan portfolios.  Moreover, OFI never disclosed to the Oregon Board that the

17   Core Bond Fund was taking enormous risks in an effort to generate additional returns of almost

18   10 times the excess returns it represented to the investors.

19                                       68.

20          Navin Sharma is OFI's Director of Risk Management.  His role is to prevent OFI

21   portfolio managers from taking too much risk or exceeding internal risk management guidelines.

22   On April 1, 2008, Sharma informed Ben Gord, a portfolio manager who helped manage the Core

23   Bond Fund, that the team had been exceeding the "pre-set limits" set forth in the firm's risk

24   models.  In response to Mr. Sharma's warning, Gord told his team that it "was obvious from the

25   start" that Sharma did not "understand[] why he's been asked to do what he does."  Rather than

26   heed the warning to control risk and change practices, Gord informed Sharma that "maybe the

Page 25 - COMPLAINT

EXHIBIT  A
PAGE 26 OF 49

1   guidelines have actually done their job, that we're taking big bets and now he knows about it[.]"
2   (Emphasis added). Despite the stated warnings of its risk managers, OFI continued to make bets
3   throughout 2008 that were even bigger than the "big bets" it made in April that caused it to
4   exceed its risk controls.

5                                           69.

6          The following week, April 8, 2008, the Core Bond Fund's internal risk profile documents
7   again confirm that the managers had exceeded the Fund's risk budget. According to the
8   documents, it had expended over 121 percent of its risk budget based upon the metric used the
9   previous week. Indeed, in his October 23, 2008, presentation to the Oregon Board, Mr. Dachille
10  stated that for the Core Bond Fund a tracking error of 200 basis points, which would be a fully
11  expended risk budget of 100 percent, was a "hard maximum." Nonetheless, on April 8, 2008,
12  the tracking error was 242 basis points, a 21 percent overage in the risk budget.

13                                          70.

14         Apparently unwilling to lower the risk profile to the required parameters, and likely
15  hoping to achieve outsized returns, OFI changed the metric used to calculate the amount of risk
16  budget remaining. Accordingly, while the old metric showed the Fund exceeding its risk budget
17  by 21 percent, using the new metric starting on April 2008, OFI's internal documents showed a
18  risk budget remaining of 31 percent. This more favorable metric would be used by OFI for the
19  rest of 2008 in calculating the risk budget remaining. The previous metric was disregarded even
20  though it reached as high as 145 percent by the end of 2008. OFI failed to disclose to the Oregon
21  Board that it had abandoned the old metric used to assess risk.

22                                          71.

23         As evidenced by the above, OFI repeatedly exceeded the Core Bond Fund's risk budget
24  in an effort to generate outsized returns. OFI failed to disclose that the Core Bond Fund was
25  engaging in risky hedge fund-type activities and was regularly exceeding its internal controls. In
26

Page 26 - COMPLAINT

EXHIBIT A
PAGE 27 OF 49

1    addition, OFI failed to disclose that throughout 2008, the Core Bond Fund regularly exceeded its

2    stated tracking error range and excess return guidelines.

3         **D.    OFI breaches its duties as an investment adviser to the Oregon Plan by**
              **failing to disclose the risk and continuing to recommend the now high-risk**
4             **Core Bond Fund in the Oregon Plan portfolios.**

5                                                    72.

6        From June 2004 through October 2008, OFI made quarterly reports to the Oregon Board.

7    At no time during this period did OFI indicate any significant issues, events or changes in the

8    Core Bond Fund.

9                                                    73.

10       Further, with one exception, OFI never recommended changes in portfolio allocations.

11   The one exception occurred in April 2008 when the adviser-sold option within the Oregon Plan

12   underwent a number of changes in portfolio allocations in underlying funds purportedly for the

13   purpose of seeking higher returns.

14        **E.    OFI reveals that it was aware of the risks being taken by Core Bond, tries to**
              **convince Oregon that it should stay in Core Bond but also admits, for the**
15            **first time, that Core Bond was too aggressive for some portfolios and that it**
              **had never fulfilled its duties under the PMA to evaluate portfolios and**
16            **underlying funds.**

17                                                   74.

18       As of the October 23, 2008, Board meeting, the Core Bond Fund was down over

19   11 percent for the third quarter alone and over 12 percent for the year-to-date. When asked by

20   Treasurer Randall Edwards to put the loss in layman's terms, Kevin Dachille replied, "mind-

21   numbing."

22                                                   75.

23       In the face of these dismal performance numbers, Mr. Dachille nonetheless offered the

24   following hope:

25            Our story isn't one of despair, however. As I mentioned, the bond
              market has been dealing with this for about a year and a half, and
26            some of the more recent -- and we'll talk about this in a little bit,
              but some of the more recent policy initiatives, not just in the

Page 27 - COMPLAINT

EXHIBIT A
PAGE 28 OF 49

1    United States, but worldwide, give us a great deal of hope. And so
     it is one of those messages that yes, things are pretty bad now.
2    We're under tremendous stress. The cavalry isn't just coming, it's
     on its way.
3
                   * * *
4    And what I want to talk about specifically with regard to this
     underperformance is what bond guys like me refer to as permanent
5    impairment versus recoverable losses, because far and away, the
     underperformance that you're seeing right here is in recoverable --
6    highly recoverable losses.

7                                    76.

8        In his presentation, Mr. Dachille presented a chart, attached as Exhibit 2, that shows the

9    portfolio performance attribution of the various sectors in which the Core Bond Fund invests. In

10   other words, it shows the sectors that contributed the most to the Core Bond Fund's gains or

11   losses. This chart reveals that the greatest contributor to the Fund's losses thus far in 2008 were

12   its CMBS holdings, which contributed 451 basis points to the losses. Nonetheless, Mr. Dachille

13   stated that the Core Bond Fund was well positioned for a significant recovery in the CMBS

14   sector:

15   But more importantly, were spreads to come back to where they
     rallied to at the end of May -- and by no means would this be a
16   normal environment, just to come back into some form of
     reasonableness -- these have well double digit return potentials that
17   we're looking at here.

18       So to us, this is why we fell in love with this asset.

19                                   77.

20       The second largest contributor to the Core Bond Fund's poor performance was the

21   RMBS sector, contributing 412 basis points to the Fund's losses for the first three quarters of

22   2008. With regard to that sector, Mr. Dachille stated:

23   They're well into the double digits for just the carry trade if you
     will, of moving into non-agencies. And the potential total rate of
24   return on yields coming back to some sort of normal range -- and
     by that, I mean just where they were at the end of May, not back to
25   where their historical averages are. -- believe it or not, puts the
     total return potential on these close to 30 percent.
26

Page 28 - COMPLAINT

EXHIBIT A
PAGE 29 OF 49

1                                               78.

2         In an acknowledgment of OFI's failure to fulfill its responsibilities to the Oregon Plan

3 with respect to portfolio allocations and risks of underlying funds, Mr. Dachille revealed that

4 OFI, for the first time since it had been hired as the Oregon Plan's investment adviser was going

5 to undertake a review of the portfolios, the underlying funds, and their respective risks, stating:

6                 And one -- and <u>one thing that we've directed the consultant to do</u>
                <u>with this is we're going to look at the risk.</u>  We're going to look at
7                 where we need to be on how much risk we want to take in all the
                portfolios.

8
                The point about what fund is proper for what age band, that's going
9                 to be looked at very closely.  I mean, core bond may be perfectly
                fine for the first two portfolios, and not for the last two.

10
                You know, that's clearly been the one fund that's been the most
11                 egregious.  But, again, we're going to look at every single fund that
                Oppenheimer has and say, okay, where do we want be on the risk
12                 spectrum, in what portfolio.  So we're going to look at them
                portfolio by portfolio, not just where we're going to pick three
13                 equity funds and say 20 percent here, 10 percent here.  <u>We're going</u>
                <u>to look at each portfolio separately and then build the portfolio</u>
14                 <u>from there.  That's our new strategy.</u>  (Emphasis added).

15                                        79.

16         In other words, OFI stated that it had a "new strategy" for building portfolios with

17 investments that were matched to the portfolios' risk profiles despite the fact that it had this legal

18 duty from the outset of its contractual and fiduciary adviser relationship to the Oregon Trust.

19                                        80.

20         As of the October 23, 2008 Oregon Board meeting and before, OFI knew the following:

21            (a) The Core Bond Fund had exceeded its risk budget since April 2008;

22            (b) The Core Bond Fund had incurred significant losses as result of taking excessive
                risks such as in CMBS, Corporate Financial Bonds, and RMBS.

23
           (c) The Core Bond Fund was positioned such that it might achieve significant excess
24                 returns over its benchmark or be exposed to significant losses;

25            (d) That the losses year-to-date in the Core Bond Fund of 12 percent were "mind-
                numbing;"
26

Page 29 - COMPLAINT


EXHIBIT ___
PAGE **30** OF **49**

1        (e) That the Core Bond Fund was being operated more as a hedge fund than a Core
Bond Fund;

2

        (f) That the Core Bond Fund was using leverage that amplified the risks;

3

        (g) That the Oregon Plan and the Oregon Board were concerned about preventing any
4        further losses; and,

5        (h) That the Oregon Board was relying upon OFI's knowledge of the Core Bond
Fund and its expertise as an investment adviser.

6

7                                        81.

8        Nonetheless, OFI never recommended to the Oregon Board that the Oregon Plan pull its

9   assets from the Core Bond Fund despite the fact that the Oregon Plan was exposed to significant

10  additional risk by remaining in the Core Bond Fund going forward. OFI failed to recommend an

11  appropriate change in the bond fund because it was motivated, not in the best interests of the

12  Oregon Plan, but rather to maximize the management fees of OFI as well as to prevent a mass

13  exodus of investments by the Oregon College Savings Plan and other college savings plans from

14  the Core Bond Fund and other OppenheimerFunds investments.  OFI also did not have an

15  appropriate core bond fund to offer to the Oregon Plan.

16      **F.**     **OFI's statement at the Oregon Board January 22, 2009 board meeting**
**further highlights the hedge fund-type risks taken by OFI with the Core**
17            **Bond Fund and the failure of OFI to make recommendations in the best**
**interest of the Oregon Plan.**

18

19                                     82.

20        In his presentation to the Oregon Board on January 22, 2009, OFI's Chief Investment

21  Officer, Kurt Wolfgruber, stated that a large part of the Core Bond Funds' poor performance was

22  due to the fact that "interest rates spreads widened to levels never seen before." He went on to

23  explain the issue as follows:

24             First, the spreads.  Spreads between the yields on CMBS, or
Commercial Mortgage Backed Securities and Treasury Bonds,
25             widen to unforeseeable levels.  Between 1988 and 2007, historical
spreads for these types of securities averaged less than 1 percent[or
26             100 basis points].  Indeed, actually a move of five basis points . . .
was deemed to be a lot.  At the start of 2008, it [CMBS spread]

Page 30 - COMPLAINT

EXHIBIT A
PAGE 31 OF 49

1    stood at 1.75 percent and climbed to 4.75 percent during the Bear
     Stearns crisis. On November 21st, that spread peaked at 15.6
2    percent, so nearly 16 times than what we would view as the normal
     spread level for those instruments.
3

4                                    83.

5         Mr. Wolfgruber was claiming that what occurred in November 2008 was unforeseeable,

6    i.e., that the possibility that spreads could widen so dramatically was unprecedented.

7    Mr. Wolfgruber wanted the Oregon Board to believe that OFI could never have anticipated the

8    widening of CMBS spreads. In fact, the result was predictable and known to OFI in light of its

9    own risk tracking data.

10                                   84.

11        Mr. Wolfgruber's statements failed to describe the unprecedented widening that had

12   already occurred in CMBS spreads. Instead, the statements highlighted the "all in" mentality

13   that caused the Core Bond Fund to be run more as a hedge fund than a core bond fund.

14   Mr. Wolfgruber was correct that historically spreads for CMBS securities averaged less than

15   1 percent or 100 basis points. In fact, between January 2004 and June 2007, CMBS spreads were

16   consistently between 25 to 30 basis points. However, by November 2007, CMBS spreads had

17   more than doubled to 70 basis points. As Mr. Wolfgruber noted, a move of even 5 basis points

18   was "deemed to be a lot." This was a move of 40 basis points, or eight times more than a

19   movement that he deemed to be significant.

20                                   85.

21        The unprecedented widening of CMBS spreads was only beginning. By January 2008,

22   CMBS spreads more than doubled once again to 152 basis points, or in excess of 500 percent of

23   CMBS spreads just six months earlier. Within the next five or six weeks, by February 15, 2008,

24   spreads had once again doubled to 308 basis points. Thus, in just eight months, spreads had

25   increased over 1,000 percent. Given this prior and already unprecedented widening of CMBS

26   spreads, the Core Bond Fund managers could not reasonably rely upon historical patterns or the

Page 31 - COMPLAINT

EXHIBIT **A**
PAGE **32** OF **49**

1    theoretical premise of reversion. The decision of OFI to continue to use leverage to increase the

2    Core Bond Fund's exposure to CMBS until it was "all in," was unreasonable and reckless for a

3    bond fund that OFI used in connection with college savings plans. It also was done in total

4    disregard of OFI's own risk metrics and controls.

5                                                    86.

6            Unfortunately, OFI's investment managers for the Core Bond Fund continued their hedge

7    fund bets. After losing a "mind numbing" 11 percent in the third quarter of 2008, by the time

8    Mr. Dachille appeared before the Oregon Board on October 23, 2008, CMBS spreads had once

9    again doubled from February 2008, and were then at 676 basis points, 10 times the spread just

10   one year earlier and 20 times the spread average from 2004 to 2007. In other words, as of the

11   October 23, 2008, Board meeting, OFI knew that it had repeatedly been wrong in its bets on

12   CMBS spreads, had already lost 11 percent in just the third quarter alone, was facing CMBS

13   spreads that defied any historical precedent, and was acting without regard to its own risk metrics

14   or risk controls.

15                                                   87.

16           Nonetheless, at the October 2008 board meeting, OFI never advised the Oregon Board of

17   the huge risks being taken by the Core Bond Fund or of the fact that the Core Bond Fund

18   managers were continuing to place hedge fund-type bets. Instead, OFI reassured the Oregon

19   Board that "the cavalry is on its way." OFI spoke only about the potential upside of the CMBS

20   position held by the Core Bond Fund, never advising the Oregon Board that it had placed a bet

21   that could and did result in a 26 percent loss in the fourth quarter alone. As the Oregon Plan's

22   Program Manager, OFI owed the Oregon Plan a duty to disclose the highly risky position in

23   which the Core Bond Fund found itself in October 2008.

24

25

26

Page 32 - COMPLAINT

EXHIBIT A
PAGE 33 OF 49

1                                        88.

2            While the Core Bond Fund lost a total of nearly 36% for the year 2008, its benchmark

3    index was actually up 5% for the year. Through March 2009, the Core Bond Fund lost another

4    10% while the index remained virtually even.

5                                        89.

6            Prior to the plan's investment in the Core Bond Fund, OFI employed a management team

7    in Boston headed by Angelo Manioudakis to oversee the Core Bond Funds' investments. In the

8    wake of the devastating losses in the Core Bond Fund, OFI pulled the Core Bond Fund

9    management team from Boston back to its New York office. Manioudakis and all of his top

10   level managers have since left OFI and, for the first time, OFI has hired a Chief Risk Officer.

11                                       90.

12           Since leaving OFI, Manioudakis has stated that he never had any knowledge that the

13   Core Bond Fund was being used by OFI to invest money from the Oregon College Savings Plan.

14       G.      The Oregon Board terminates the Core Bond Fund (and the Limited Term
                 Government Bond Fund).
15

16                                       91.

17           Despite OFI's assurances at the October 2008 Board Meeting, the Oregon Board engaged

18   an independent firm to review the Oregon Plan portfolios after that meeting. As the result of this

19   review, the Oregon Board decided at the January 22, 2009 meeting to terminate the Oregon

20   Plan's participation in the Core Bond Fund and the Limited Term Government Bond Fund as

21   soon as possible. It finalized that plan at a follow-up meeting of the Oregon Board on February

22   26, 2009. The Core Bond Fund and Limited Term Government Funds were fully liquidated and

23   exchanged into index funds on or by March 27, 2009.

24

25

26

Page 33 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT A
PAGE 34 OF 49

1    **H.    Defendants' Continued Recommendation and Sale of the Core Bond Fund to the Trust Portfolios Violated the PMA and The Adopted Investment Policy.**

2

3      **1.    OFI breached its duties under the PMA.**

4                92.

5    As alleged at length above, OFI had a number of contractual duties including but not

6 limited to "determining that the investment objectives, policies, and practices of the Underlying

7 Funds in which the Trusts assets are invested [e.g., the Core Bond Fund] are consistent with the

8 Board's Investment Policy and applicable law." PMA Section 5.2(b). It also had the continuing

9 duty to "at least annually, review the Investment Portfolios of the OCS Plan" and "shall from

10 time to time propose . . . the modification of the Underlying Funds [e.g., the Core Bond Fund] in

11 which certain existing Investment Portfolios invest . . . all in accordance with the applicable

12 Investment Policy and subject to Board approval." PMA Section 5.3. It had the further duty to

13 inform the Oregon Board of material changes that impacted the Underlying Fund and the Oregon

14 Plan. PMA Sections 4.1; 9.1(b).

15

               93.

16

17 At least as of early 2008, OFI violated the PMA by, among other things:

18    (a)    failing to report to the Board that the investment objectives, policies, and practices of the Core Bond Fund were no longer consistent with the Board's Investment Policy;

19

20    (b)    continuing to recommend and selling the Core Bond Fund to each of the Portfolios in violation of the Board's Investment Policy; and,

21    (c)    failing to recommend that the Core Bond Fund be removed from each of the Portfolios because that Fund was in violation of the Board's Investment Policy.

22

These violations occurred across each of the Portfolios in the Plan as alleged below.

23

24

25

26

Page 34 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT A
PAGE 35 OF 49

1          **2.      OFI breached the PMA by recommending the Core Bond Fund for
                   the Ultra Conservative/In College or the Conservative/1-3 Years to
2                  College Portfolios.**

3                                              94.

4          The Investment Policy provided that the Ultra Conservative/In College and

5    Conservative/1-3 Years to College Portfolios had the primary investment objectives of

6    "protection of principal" and "income." OFI was supposed to manage these portfolios by

7    "preserv[ing] capital" and seeking "minimal income growth by investing primarily in bond

8    Underlying Funds to maintain stability."

9                                              95.

10         OFI, however, continued to recommend, use and sell the high risk Core Bond Fund in the

11   Ultra Conservative/In College and Conservative/1-3 Years to College Portfolios. OFI generally

12   recommended that Oregon have and, as a result, Oregon generally had 20 percent of the Ultra

13   Conservative/In College Portfolio and 35 percent of the Conservative/1-3 Years to College

14   Portfolio invested in the Core Bond Fund. At least as of early 2008, the Core Bond Fund did not

15   meet the Investment Policy as to any portfolio that had "principal protection" and "minimal

16   income growth" as its objectives. Indeed, Mr. Manioudakis, the former manager of the Core

17   Bond Fund, has admitted that the Core Bond Fund was not designed to protect principal.

18                                             96.

19         At least as of early 2008 and continuing throughout the year, the Core Bond Fund did not

20   meet the Investment Policy as to the Ultra Conservative/In College and Conservative/1-3 Years

21   to College Portfolios for many of the reasons alleged above, including but not limited to the

22   following:

23         (a)    The Core Bond Fund took hedge fund-like risks that exposed it to substantial
                  swings in the market;
24
           (b)    Those who invest for children in college or just a couple of years from college
25                cannot afford to take hedge fund-like risks because they will have an immediate
                  or imminent need to use their money;
26

Page 35 - COMPLAINT



EXHIBIT __A__
PAGE __36__ OF __49__

1     (c)    The Core Bond Fund sought much higher returns and took much higher risk through perceived "once-in-a-lifetime" opportunities in which OFI recommended

2              that those investing for college "back up the truck" and make "all in" bets that were not appropriate for a portfolio designed to protect principal and obtain

3              minimal income;

4     (d)    The Core Bond Fund had substantial investments in derivatives, swaps, sub-prime mortgage-backed securities and other similar investments that, particularly taken

5              together, were not designed to preserve principal or seek minimal income growth;

6     (e)    The Core Bond Fund used leverage, exposing investors to the risk of suffering losses greater than just the money invested in the portfolio; such leverage was

7              inappropriate for those who wanted to preserve principal for the immediate costs of education;

8

9     (f)    At least as of early 2008, the Core Bond Fund, by OFI's own admission, was only appropriate for those investors with a long term investment horizon. By

               definition, the Ultra Conservative/In College and Conservative/1-3 Years to

10            College Portfolios were intended for people who needed money for college immediately or in the next 1-3 years.

11

12     **3.**     **The Core Bond Fund was not consistent with the investment objectives of the remaining portfolios.**

13                                97.

14     The Core Bond Fund also was not appropriate for the Balanced/4-6 Years to College,

15  Moderate/7-9 Years to College or even the Aggressive/10+ Years to College Portfolios.

16                                98.

17     The Balanced/4-6 Years to College and Moderate/7-9 Years to College Portfolios had

18  investment objectives of "capital appreciation and income" through "moderate growth" with the

19  Balanced/4-6 Years to College Portfolio slightly weighted towards bond funds and the

20  Moderate/7-9 Years to College Portfolio slightly weighted towards equity funds. The funds were

21  supposed to have a "combination of conservative and aggressive investments." The Balanced/4-

22  6 Years to College Portfolio, however, generally had 30 percent of its portfolio in the Core Bond

23  Fund and the Moderate/7-9 Years to College Portfolio generally had 20 percent of its portfolio in

24  the Core Bond Fund. At least as of early 2008, there were two significant problems with these

25  investments in the Core Bond Fund. First, the Core Bond Fund itself did not seek moderate

26  growth but took hedge fund-like risks and sought hedge fund-like returns. Second, OFI used the

Page 36 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT A
PAGE 37 OF 49

1    Core Bond Fund in the Balanced/4-6 Years to College and Moderate/7-9 Years to College

2    Portfolios as one of the purportedly "conservative investments" to balance out the greater risks,

3    and associated volatility, taken in the more aggressive equity investments. However, the effect

4    of the Core Bond Fund was not to make the portfolio risks more moderate through the addition

5    of a conservative investment, but to make the portfolios much more aggressive through the

6    addition of a higher-risk investment.

7                                                        99.

8            At least as of early 2008, the Core Bond Fund was also an improper investment for even

9    the Aggressive/10+ Years to College Portfolio. The Aggressive Portfolio was designed to seek

10   capital appreciation. However, the Investment Policy provided that it also would invest "[a]

11   percentage of assets" in bond funds "to provide some protection from equity volatility." The

12   Aggressive/10+ Years to College Portfolio generally had 10 percent of its portfolio in the Core

13   Bond Fund. The effect of this investment was not to provide protection from "equity volatility."

14   Indeed, the investment in the Core Bond Fund in 2008 substantially increased the volatility of the

15   Aggressive/10+ Years to College Portfolio and subjected that portfolio to much higher risks.

16            **4.    Defendants breached the "Representations, Warranties and
                      Covenants" in the PMA.**

17

18                                                     100.

19           OFI and OFDI also made a number of representations, warranties and covenants, alleged

20   in greater detail above, that provided, among other things, that the "Plan Marketing Materials

21   (excluding information provided by the Board) shall not contain any untrue statement of material

22   fact or omit to state a material fact necessary to make the statements not misleading." PMA

23   Sections 13.1(h); 13.2(h). OFI and OFDI further certified that the Plan Description, which was

24   also included within the Plan Marketing Materials, was complete, accurate, and did not include

25   any material misrepresentations or omissions. PMA Sections 3.2(b)(ii), (iii). OFI also had a

26

Page 37 - COMPLAINT

EXHIBIT A
PAGE 38 OF 49

1   duty to update the Plan description if there were material developments arising after the Plan

2   Description was initially prepared.  PMA Section 9.1(b)

3                                   101.

4           As of early 2008, the Plan Description and Plan Participation Agreement prepared by OFI

5   and OFDI, which was part of the Plan Marketing Materials sent to all participants for the direct

6   and the advisor-sold plans, provided the following:

7       (a)     For the Years to College Portfolio, "[i]nvestments are automatically moved to
                more conservative Portfolios that seek to preserve capital as the expected time for
8               disbursement approaches."

9       (b)     The Ultra-Conservative/In-College Portfolio invests in fixed income and money
                market investments "in order seek the Portfolio's objectives of income and
10              protection of principal" and seeks "preservation of capital with minimal growth
                by investing primarily in fixed income mutual funds and a money market fund to
11              maintain stability."

12      (c)     The Conservative/1-3 Years College Portfolio invests "primarily in fixed income
                and money market investments in order to seek the Portfolio's objectives of
13              income and protection of principal" and "seeks preservation of capital with
                minimal growth[.]"
14
        (d)     The Balanced/4-6 Years to College Portfolio "seeks moderate growth" by slightly
15              weighting investments towards fixed income funds, such as the Core Bond Fund.

16      (e)     The Moderate/7-9 Years to College Portfolio also "seeks moderate growth" by
                including fixed income funds, such as the Core Bond Fund.
17
        (f)     Even the Aggressive/10-plus Years to College Portfolio used "fixed income
18              mutual funds," like the Core Bond Fund "to provide some protection against
                equity volatility."
19

20  Each of the statements contained above was either a misrepresentation or contained an untrue or

21  material omission of fact because those getting closer to college did not move into a more

22  conservative policy and the Core Bond Fund did not provide and was not designed to provide

23  protection of principal.  It also did not seek preservation of capital, minimal growth, moderate

24  growth or provide some protection against equity volatility because Core Bond Fund, instead,

25  was operated as a high-risk fund that sought speculative returns by taking very aggressive risks.

26

Page 38 - COMPLAINT


EXHIBIT A
PAGE 39 OF 49

1    I.    **Defendants Acted in Concert and Knowingly Aided and Assisted Each
            Other's Tortious Conduct.**

2

3                                         102.

4           Defendants acted in concert and knowingly aided and assisted each other's breach of duty

5    to the Oregon Trust in connection with the sale of the securities at issue and the provision of

6    services to the Oregon Trust. Each Defendant is therefore responsible for all actions, statements,

7    and omissions of the other Defendants.   Defendants are jointly liable for Plaintiff's damages.

8    J.    **OFDI Is Independently and Jointly and Severally Liable With the Other
            Defendants.**

9

10                                        103.

11          OFI and OFI Private recommended and sold the Core Bond Fund securities to the Oregon

12   Board. OFI and OFI Private marketed the sale of the Core Bond Fund through their preparation

13   of the Trust marketing materials.  Those Defendants breached the PMA and violated the law with

14   the participation and assistance of defendant OFDI, which distributed the securities to the

15   Oregon Trust.  OFDI was a party to the PMA and facilitated the others in the sale of and sold

16   Plaintiff securities in violation of the PMA and Oregon law.

17   K.    **The Oregon Trust's Damages**

18                                        104.

19          Subject to additional proof at trial, the Oregon Trust suffered at least the following

20   damages to each of the Portfolios:

21                    **Oregon Trust Portfolio Damages**

22                    Ultra Conservative/In-College:        $1.73 million

23                    Conservative/1-3 Years to College:    $9.21 million

24                    Balanced/4-6 Years to College:        $8.97 million

25                    Moderate/7-9 Years to College:        $8.15 million

26                    Aggressive/10+ Years to College:      $8.21 million

Page 39 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067


EXHIBIT **A**
PAGE **40** OF **49**

1    The total Portfolio damages are in excess of $36.2 million.

2    VI.    **CLAIMS FOR RELIEF**

3                    **FIRST CLAIM FOR RELIEF**
             **VIOLATION OF OREGON SECURITIES LAW, ORS 59.137**
4

5                                    105.

6        Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

7    as if fully alleged herein.

8                                    106.

9        Defendants sold the Oregon Trust securities and shares in the Core Bond Fund in

10   violation of ORS 59.137 by:

11           (a) employing a device, scheme and/or artifice to defraud;

12           (b) by engaging in acts, practices and a course of business that operated as a fraud or
                 deceit upon Plaintiff; and/or
13
             (c) by making untrue statements of material fact and omitting to state material facts
14               necessary in order to make the statements made, in light of the circumstances
                 under which they were made, not misleading, as alleged herein.
15

16                                   107.

17       Defendants violated and/or materially aided in violations of ORS 59.135(1), (2), and/or

18   (3) in connection with the sale of the Core Bond Fund shares to the Oregon Trust.

19                                   108.

20       In addition, in advising Plaintiff regarding the securities and portfolios of securities at

21   issue, Defendants made material misrepresentations and omissions by virtue of their failure to

22   exercise reasonable care or competence in communicating information to Plaintiff.

23                                   109.

24       Defendants' conduct created a foreseeable risk that Plaintiff would invest in securities

25   and portfolios of securities and would sustain losses as a result thereof.

26

Page 40 - COMPLAINT

EXHIBIT A
PAGE 41 OF 49

1                                   110.

2       As a direct result, Plaintiff invested in the securities and portfolios of securities at issue.

3                                   111.

4       OFI directly or indirectly controlled OFI Private and OFDI. OFI is therefore jointly and

5 severally liable to the same extent as OFI Private as OFDI pursuant to ORS 59.137(2).

6                                   112.

7       Defendants' violations of ORS 59.135 caused the Oregon Trust actual damages in excess

8 of $36.2 million.

9                                   113.

10      Pursuant to ORS 59.137(1) Plaintiff is entitled to recover from Defendants, jointly and

11 severally, (1) damages in an amount to be proven at trial, which is in excess of $36.2 million, (2)

12 the amount of fees or other remuneration paid to Defendants, and (3) interest as provided in ORS

13 59.137(1).

14                                   114.

15      Pursuant to ORS 59.137(4), Plaintiff is entitled to an award of its costs and reasonable

16 attorney fees.

17                 **SECOND CLAIM FOR RELIEF**
     **VIOLATION OF OREGON SECURITIES LAW, ORS 59.115(1)(b) AND 59.135**

18

19                                   115.

20      Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

21 as if fully alleged herein.

22                                   116.

23      Defendants sold and/or successfully solicited the sale of the Core Bond Fund shares to

24 the Oregon Trust.

25

26

Page 41 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT __A__
PAGE __42__ OF __49__

1                                           117.

2          Defendants sold and/or successfully solicited the sale of these securities in violation of

3    ORS 59.115(1)(b) and 59.135 by:

4                (a) employing a device, scheme and/or artifice to defraud;

5                (b) by engaging in acts, practices and a course of business that operated as a fraud or
                     deceit upon Plaintiff; and/or
6
                (c) by making untrue statements of material fact and omitting to state material facts
7                    necessary in order to make the statements made, in light of the circumstances
                     under which they were made, not misleading, as alleged herein.
8

9                                           118.

10         Plaintiff did not know of the untruth of Defendants' representations and was unaware of

11   Defendants' omissions.

12                                          119.

13         Defendants each participated and materially aided in the sale of securities at issue, and

14   are therefore jointly and severally liable for the violations of ORS 59.115 pursuant to

15   ORS 59.115(3).

16                                          120.

17         OFI directly or indirectly controlled OFI Private and OFDI. OFI is therefore jointly and

18   severally liable to the same extent as OFI Private and OFDI pursuant to ORS 59.115(3).

19                                          121.

20         Pursuant to ORS 59.115(2)(a), Plaintiff is entitled to recover from Defendants, jointly

21   and severally, rescissionary damages of the consideration paid for the securities, plus interest

22   from the date of the purchase of the securities. Alternatively, pursuant to ORS 59.115(2)(b),

23   Plaintiff is entitled to recover from Defendants, jointly and severally, rescissionary damages less

24   any amounts received for the securities plus interest in an amount to be proven at trial, which

25   amount is in excess of $36.2 million.

26

Page 42 - COMPLAINT

EXHIBIT A
PAGE 43 OF 49

1                                          122.

2         Pursuant to ORS 59.115(10), Plaintiff is entitled to an award of its costs and reasonable

3    attorney fees.

4                           **THIRD CLAIM FOR RELIEF**
                            **BREACH OF CONTRACT**

5
                            **(Program Management Agreement)**
6

7                                          123.

8         Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

9    as if fully alleged herein.

10                                         124.

11        The Oregon Board, on behalf of the Oregon Trust, entered into the PMA with Defendants

12   OFI and OFDI.  OFI Private may also be a party to that contract.

13                                         125.

14        Pursuant to the PMA, Defendants made a number of certifications, representations and

15   warranties, and assumed numerous contractual duties as detailed in paragraphs 33-38, among

16   others, above.

17                                         126.

18        Further, Defendants owed Plaintiff the duty of good faith and fair dealing implied in

19   every contract.  Plaintiff had a reasonable expectation that any materials prepared by Defendants

20   pursuant to the PMA would not contain any untrue statement of a material fact or omit to state a

21   material fact necessary to make the statements made therein not misleading in light of the

22   circumstances under which they were made.  Plaintiff also had a reasonable expectation that any

23   information provided by Defendants pursuant to the PMA would not contain any untrue

24   statement of a material fact or omit to state a material fact necessary to make the statements

25   made not misleading in light of the circumstances under which they were made.

26

Page 43 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 44 OF 49

1                                127.

2          Defendants breached the above-described contractual duties, representations, warranties

3    and covenants as alleged herein.

4                                128.

5          As a direct result of Defendants' breach of contract, Plaintiff has been injured in an actual

6    amount to be proven at trial, which is in excess of $36.2 million.  Plaintiff is entitled to an award

7    of prejudgment interest on this claim.

8                                129.

9          Plaintiff is entitled to its attorney fees and costs under section 12.1 of the PMA.

10                    **FOURTH CLAIM FOR RELIEF**
                      **BREACH OF FIDUCIARY DUTY**
11

12                                130.

13         Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

14   as if fully alleged herein.

15                                131.

16         As Plaintiff's investment advisers and broker-dealer, Defendants owed fiduciary duties to

17   Plaintiff.  Defendants owed Plaintiff the fiduciary duties of care, loyalty, honesty, and full and

18   fair disclosure.  Defendants also owed Plaintiff the duty to comply with all applicable standards

19   of care, including applicable codes of professional conduct.

20                                132.

21         Defendants breached the fiduciary duties they owed to Plaintiff in the course of advising

22   Plaintiff regarding the Core Bond Fund.  In advising Plaintiff regarding the Core Bond Fund,

23   Defendants made material misrepresentations and omissions by virtue of their failure to exercise

24   reasonable care or competence in communicating information to Plaintiff.

25

26

Page 44 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 45 OF 49

1          133.

2          Defendants' conduct created a foreseeable risk that Plaintiff would invest in the Core

3    Bond Fund and would sustain losses as a result thereof.

4          134.

5          As a direct result of Defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff

6    invested, continued to invest, and did not terminate its participation in the Core Bond Fund.

7          135.

8          As a direct result of Defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff

9    has been injured in an actual amount to be proven at trial, which is in excess of $36.2 million.

10   Plaintiff is entitled to an award of prejudgment interest on this claim.

11                          **FIFTH CLAIM FOR RELIEF**
                                  **NEGLIGENCE**
12

13         136.

14         Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

15   as if fully alleged herein.

16         137.

17         As Plaintiff's investment advisers and broker-dealer, Defendants had a duty to exercise

18   reasonable care and competence in obtaining and communicating information to Plaintiff and in

19   advising Plaintiff regarding the Core Bond Fund.

20         138.

21         Defendants breached the duties they owed to Plaintiff in the course of advising Plaintiff

22   regarding the Core Bond Fund.  In advising Plaintiff regarding the Core Bond Fund, Defendants

23   made material misrepresentations and omissions by virtue of their failure to exercise reasonable

24   care or competence in communicating information to Plaintiff.

25

26

Page 45 - COMPLAINT



EXHIBIT A
PAGE 46 OF 49

1      139.

2          Defendants' conduct unreasonably created a foreseeable risk that Plaintiff would invest in

3      the Core Bond Fund and would sustain losses as a result thereof.

4      140.

5          As a direct and foreseeable result of Defendants' conduct, Plaintiff has been injured in an

6      actual amount to be proven at trial, which is in excess of $36.2 million.  Plaintiff is entitled to an

7      award of prejudgment interest on this claim.

8      **SIXTH CLAIM FOR RELIEF**
**NEGLIGENT MISREPRESENTATION**
9

10      141.

11          Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

12      as if fully alleged herein.

13      142.

14          As Plaintiff's investment advisers and broker-dealer, Defendants had a special

15      relationship with Plaintiff.  Defendants had a duty to exercise reasonable care and competence in

16      obtaining and communicating information to Plaintiff.

17      143.

18          In the course of their business relationship with Plaintiff, Defendants supplied false

19      information to Plaintiff regarding the Core Bond Fund and omitted to state material facts

20      necessary in order to make the statements made, in light of the circumstances under which they

21      were made, not misleading, as alleged herein.  Defendants failed to exercise reasonable care in

22      obtaining information regarding the Core Bond Fund and/or in providing the information to

23      Plaintiff regarding the Core Bond Fund.

24      144.

25          Plaintiff justifiably relied on Defendants' misrepresentations and omissions in investing

26      in the Core Bond Fund.

Page 46 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT A
PAGE 47 OF 49

1                                          145.

2        Plaintiff sustained damages as a result of their reliance on Defendants' misrepresentations

3   and omissions.

4                                          146.

5        As a direct and foreseeable result of Defendants' negligent misrepresentations and

6   omissions, Plaintiff has been injured in an actual amount to be proven at trial, which is in excess

7   of $36.2 million.  Plaintiff is entitled to an award of prejudgment interest on this claim.

8                                  **PRAYER FOR RELIEF**

9        WHEREFORE, Plaintiff prays for judgment as follows:

10       A.      Awarding Plaintiff compensatory damages in an amount in excess of $36.2

11  million and in an exact amount to be proven at trial;

12       B.      Awarding Plaintiff its costs and expenses for this litigation, including reasonable

13  attorneys' fees and expert witness fees pursuant to ORS 59.137(4) and ORS 59.115(10) and

14  Section 12.1 of the PMA;

15       C.      Awarding Plaintiff prejudgment interest at the statutory rate of 9%; and

16       D.      Awarding Plaintiff such other and further relief as may be deemed just and proper

17  under the circumstances.

18

19

20

21

22

23

24

25

26

Page 47 - COMPLAINT

EXHIBIT _A_
PAGE 48 OF 49

1    VII.    **JURY DEMAND**

2    Plaintiff hereby demands a trial by jury as to all issues.

3    DATED this 13th day of April, 2009.

4                                    JOHN R. KROGER
                                     Attorney General
5

6                                    By:

7                                        **Keith S. Dubanevich,** OSB No. 975200
                                         Special Counsel, Office of the Attorney General
8                                        **Frederick M. Boss,** OSB No. 911424
                                         Division Administrator, Civil Enforcement
9                                        **Simon Whang,** OSB No. 035282
                                         Assistant Attorney General
10
                                     Oregon Department of Justice
11                                   1162 Court Street NE
                                     Salem, OR 97301-4096
12                                   Telephone:    (503) 934-4400
                                     Facsimile:    (503) 373-7067
13                                   Email:        keith.dubanevich@doj.state.or.us
                                                   fred.boss@doj.state.or.us
14                                                 simon.c.whang@doj.state.or.us

15                                   and

16                                   **Keith A. Ketterling,** OSB No. 913368
                                     **Scott A. Shorr,** OSB No. 961873
17                                   **Jennifer A. Wagner,** OSB No. 024470
                                     STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
18                                   209 SW Oak Street, 5th Floor
                                     Portland, OR 97204
19                                   Telephone:    (503) 227-1600
                                     Facsimile:    (503) 227-6840
20                                   Email:        kketterling@stollberne.com
                                                   sshorr@stollberne.com
21                                                 jwagner@stollberne.com

22                                   Attorneys for Plaintiff

23                                   Trial Attorneys:    Keith S. Dubanevich, OSB No. 975200
                                                         Keith A. Ketterling, OSB No. 913368
24

25

26

Page 48 - COMPLAINT



EXHIBIT _A_
PAGE _49_ OF _49_

IN THE CIRCUIT COURT OF THE STATE OF OREGON

S. V
4-20-09
3-20 pm

FOR THE COUNTY OF MARION

THE STATE OF OREGON, by and through the        )
OREGON 529 COLLEGE SAVINGS BOARD               )        Case No. 09C14018
AND THE OREGON STATE TREASURER on              )
behalf of the OREGON COLLEGE SAVINGS           )        **SUMMONS**
PLAN TRUST,                                    )
                                               )
              Plaintiffs,                      )
                                               )
    v.                                         )
                                               )
OPPENHEIMERFUNDS, INC., a Colorado             )
corporation; et al.,                           )
                                               )
              Defendants.

## To:    OPPENHEIMERFUNDS, INC., %The Corporation Company;
1675 Broadway, Suite 1200;      Denver, CO 80202

        You are hereby required to appear and defend the complaint filed against you in the above entitled action within thirty (30) days from the date of service of this summons upon you, and in case of your failure to do so, for want thereof, plaintiff(s) will apply to the court for the relief demanded in the complaint.

NOTICE TO THE DEFENDANT:  READ THESE PAPERS CAREFULLY!

You must "appear" in this case or the other side will win automatically.  To "appear" you must file with the court a legal paper called a "motion" or "answer."  The "motion" or "answer" mustbe given to the court clerk or administrator within 30 days along with the required filing fee.  It must be in proper form and have proof of service on the plaintiffs' attorney or, of the plaintiffs do not have an attorney, proof of service uponthe plaintiffs.

    If you have any questions, you should see an attorney immediately.  If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

| | | | |
|---|---|---|---|
| Signature of Attorney/Author for Plaintiffs | | | |
| Keith A. Ketterling | | | 913368 |
| Attorney/Author's Name (typed or Printed) | | | Bar No. (if any) |
| Stoll Stoll Berne Lokting & Shlachter P.C. | | | |
| 209 SW Oak Street, 5th Floor | | | |
| Address | | | |
| Portland | Oregon | 97301-4096 | (503) 227-1600 |
| City | State | Zip | Phone |
| Keith S. Dubanevich | | | 975200 |
| Keith A. Ketterling | | | 913368 |
| Trial Attorney if other than above (typed or Printed) | | | Bar No. |

STATE OF OREGON, County of Multnomah    ) ss.

    I the undersigned attorney of record for the plaintiff, certify that the foregoing is an exact and complete copy of the original summons in the above entitled action.

                                                        Attorney(s) for Plaintiff(s)

TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS:  You are hereby directed to serve a true copy of this summons, together with a true copy of the complaint mentioned therein, upon the individual(s) or other legal entity(ies) to whom or which this summons is directed, and to make your proof of service on the reverse hereof or upon a separate similar document which you shall attach hereto.

                                                        Attorneys for Plaintiff(s)

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
Keith A. Ketterling, OSB No. 913368
Attorneys for Plaintiff
209 SW Oak Street, 5th Floor
Portland, Oregon  97204
Telephone:  (503) 227-1600

EXHIBIT   B
PAGE   1   OF   3

**PROOF OF SERVICE**

STATE OF _____    )
County of _____    ) ss.

      I hereby certify that I made service of the foregoing summons upon the individuals and other legal entities to be served, named below, by delivering or leaving true copies of said summons and the complaint mentioned therein, certified to be such by the attorney for the plaintiff, as follows:

**PERSONAL SERVICE UPON INDIVIDUAL(S)**

      Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____ , 20___, at _____ o'clock ___.M.

      Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____ , 20___, at _____ o'clock .M.

**Substituted Service upon Individual(s)\*\***

      Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____ , 20___, at _____ o'clock ___.M.

      Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____ , 20___, at _____ o'clock ___.M.

**Office Service upon Individual(s)**

      Upon _____ , at the office which he/she maintains for the conduct of business at _____
_____ , by leaving such true copy with _____ , the person who is
apparently in charge, on _____ , 20___, during normal working hours, at to-wit: _____ o'clock, _____.M.

**Service on Corporations, limited Partnerships or Unincorporated Associations Subject to Suit Under a Common Name**

      Upon _____ , by
        (Name of Corporation, Limited Partnership, Etc.)

      (a) delivering such true copy, personally and in person, to _____ , who is a/the \* _____
thereof; OR

      (b) leaving such true copy with _____ , the person who is apparently in charge of the office of
_____ , who is a/the \* _____ thereof.
       \*Specify registered agent, officer (by title), director, general partner, managing agent.
at _____ , on _____ , 20___, at _____ o'clock ___.M.

DATED: _____ 20___,

_____
                          Sheriff

BY_____
                          Deputy

I further certify that I am a competent person 18 years of age or older and a resident of the state of service or the State of Oregon, and that I am not a party to nor an officer, director or employee of, nor attorney for any party, corporate or otherwise; that the person, firm or corporation served by me is the identical person, firm or corporation named in the action.

DATED: _____ 20____,

_____
                                         Signature

_____
                               Type or Print Name

_____
                                           Address

_____
                                           Phone

The signature lines on the left should be used only by an Oregon county sheriff or deputy; all other servers complete certificate on the right. The Proof of Service above contains most, but not all, of the methods of service. For example, this form does not include proof of service on a minor or incompetent person. See ORCP 7D(2) and 7D(3) for complete service methods on particular parties. \*\*Where substituted or office service is used, the plaintiff, as soon as reasonably possible, shall cause to be mailed a true copy of the summons and complaint to the defendant at the defendant's dwelling house or usual place of abode, together with a statement of the time, date and place at which such service was made. Use 5-N Form No. 1149 or equivalent.

EXHIBIT **B**
PAGE **2** OF **3**

## THIRD JUDICIAL DISTRICT
## MARION COUNTY CIRCUIT COURT

***Important Notice***

Read Carefully. If you do not comply with the following, your case will be dismissed.

_Oregon_ v. _Oppenheimer_

Case Number: _09C14018_          This case has been assigned to :

☐  **Judge Pamela L Abernethy**          ☐  **Judge Mary M. James**
    **(503) 566-2974**                       **(503) 373-4303**

☑  **Judge L. E. Ashcroft**              ☐  **Judge Albin W. Norblad**
    **(503) 588-5492**                       **(503) 588-5028**

☐  **Judge Claudia M. Burton**           ☐  **Judge Tracy A. Prall**
    **(503) 584-7713**                       **(503) 588-5026**

☐  **Judge Don A. Dickey**               ☐  **Judge Jamese L. Rhoades**
    **(503) 373-4445**                       **(503) 588-7950**

☐  **Judge Dennis J. Graves**            ☐  **Judge Susan M. Tripp**
    **(503) 585-4939**                       **(503) 373-4361**

☐  **Judge Joseph C. Guimond**           ☐  **Judge John B. Wilson**
    **(503) 588-5160**                       **(503) 588-5030**

☐  **Judge Thomas M. Hart**
    **(503) 584-7749**

**If a party served with a summons intends to contest this matter, that party
must file a response, or other appearance, as instructed in the summons.**

A status conference will be set after the party served has file and appearance. All attorneys must appear at the status conference with their calendars. If parties do not have legal representation, they are to appear at the status conference.

If the Plaintiff has not filed a Return or Acceptance of Service by the 63rd day after the filing of the complaint, the case may be dismissed for want of prosecution 28 days later. If proof of service is filed by the 91st day from the filing of the complaint, and no default is later filed, the case will be dismissed 119 days from the date of filing of the complaint.

Follow these instructions carefully and refer to the Uniform Trial Court Rules for further information or clarification.

All correspondence or other communication shall be directed to the assigned Judge at the following address:

Third Judicial District, PO Box 12869, Salem, Oregon 97309-0869.

CIVIL CASE ASSIGNMENT NOTICE-PAGE 1 OF 1                    FC(07/18/08)

EXHIBIT **B**
PAGE **3** OF **3**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

THE STATE OF OREGON, by and through the ) 
OREGON 529 COLLEGE SAVINGS BOARD )   Case No. 09C14018
AND THE OREGON STATE TREASURER on )
behalf of the OREGON COLLEGE SAVINGS )   **SUMMONS**
PLAN TRUST, )
                           )
       Plaintiffs, )
                           )
     v. )
                           )
OPPENHEIMERFUNDS, INC., a Colorado )
corporation; et al., )
                           )
      Defendants.

**To:**   **OPPENHEIMERFUNDS DISTRIBUTOR, INC.,** %The Corporation Company;
     111 Eighth Avenue, New York, NY 10011

    You are hereby required to appear and defend the complaint filed against you in the above entitled action within thirty (30) days from the date of service of this summons upon you, and in case of your failure to do so, for want thereof, plaintiff(s) will apply to the court for the relief demanded in the complaint.

NOTICE TO THE DEFENDANT: READ THESE PAPERS CAREFULLY!

You must "appear" in this case or the other side will win automatically. To "appear" you must file with the court a legal paper called a "motion" or "answer." The "motion" or "answer" must be given to the court clerk or administrator within 30 days along with the required filing fee. It must be in proper form and have proof of service on the plaintiffs' attorney or, of the plaintiffs do not have an attorney, proof of service upon the plaintiffs.

  If you have any questions, you should see an attorney immediately. If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

Signature of Attorney/Author for Plaintiffs

| | |
|---|---|
| Keith A. Ketterling | 913368 |
| Attorney/Author's Name (typed or Printed) | Bar No. (if any) |
| Stoll Stoll Berne Lokting & Shlachter P.C. | |
| 209 SW Oak Street, 5th Floor | |
| Address | | |
| Portland    Oregon    97301-4096    (503) 227-1600 | |
| City      State      Zip      Phone | |
| | |
| Keith S. Dubanevich | 975200 |
| Keith A. Ketterling | 913368 |
| Trial Attorney if other than above (typed or Printed) | Bar No. |

STATE OF OREGON, County of Multnomah    ) ss.

  I the undersigned attorney of record for the plaintiff, certify that the foregoing is an exact and complete copy of the original summons in the above entitled action.

                                         Attorney(s) for Plaintiff(s)

**TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS:** You are hereby directed to serve a true copy of this summons, together with a true copy of the complaint mentioned therein, upon the individual(s) or other legal entity(ies) to whom or which this summons is directed, and to make your proof of service on the reverse hereof or upon a separate similar document which you shall attach hereto.

                                         Attorneys for Plaintiff(s)

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
Keith A. Ketterling, OSB No. 913368
Attorneys for Plaintiff
209 SW Oak Street, 5th Floor
Portland, Oregon 97204
Telephone: (503) 227-1600

EXHIBIT  O

PAGE  1  OF  3

**PROOF OF SERVICE**

STATE OF _____ )
County of _____ ) ss.

    I hereby certify that I made service of the foregoing summons upon the individuals and other legal entities to be served, named below, by delivering or leaving true copies of said summons and the complaint mentioned therein, certified to be such by the attorney for the plaintiff, as follows:

**PERSONAL SERVICE UPON INDIVIDUAL(S)**

    Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____ , 20___ , at _____ o'clock ___.M.
    Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____ , 20___ , at _____ o'clock ___.M.

**Substituted Service upon Individual(s)****

    Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____ , 20___ , at ____ o'clock ___.M.
    Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____ , 20___ , at ____ o'clock ___.M.

**Office Service upon Individual(s)**

    Upon _____ , at the office which he/she maintains for the conduct of business at
_____ , by leaving such true copy with _____ , the person who is
apparently in charge, on _____ , 20___ , during normal working hours, at to-wit: ___ o'clock, ___M.

**Service on Corporations, limited Partnerships or Unincorporated Associations Subject to Suit Under a Common Name**

    Upon _____ , by
        (Name of Corporation, Limited Partnership, Etc.)
    (a) delivering such true copy, personally and in person, to _____ , who is a/the *_____
thereof; OR
    (b) leaving such true copy with _____ , the person who is apparently in charge of the office of
_____ , who is a/the *_____ thereof.
    *Specify registered agent, officer (by title), director, general partner, managing agent.
at _____ , on _____ , 20___ , at ____ o'clock ___M.

DATED: _____ 20___ ,
_____
                   Sheriff

BY_____
                   Deputy

I further certify that I am a competent person 18 years of age or older and a resident of the state of service or the State of Oregon, and that I am not a party to nor an officer, director or employee of, nor attorney for any party, corporate or otherwise; that the person, firm or corporation served by me is the identical person, firm or corporation named in the action.

DATED: _____ 20___ ,

_____
                   Signature

_____
           Type or Print Name

_____
                 Address

_____
                 Phone

The signature lines on the left should be used only by an Oregon county sheriff or deputy; all other servers complete certificate on the right. The Proof of Service above contains most, but not all, of the methods of service. For example, this form does not include proof of service on a minor or incompetent person. See ORCP 7D(2) and 7D(3) for complete service methods on particular parties. **Where substituted or office service is used, the plaintiff, as soon as reasonably possible, shall cause to be mailed a true copy of the summons and complaint to the defendant at the defendant's dwelling house or usual place of abode, together with a statement of the time, date and place at which such service was made. Use 5-N Form No. 1149 or equivalent.

EXHIBIT _C_
PAGE _2_ OF _3_

## THIRD JUDICIAL DISTRICT
## MARION COUNTY CIRCUIT COURT

***\*\*\*Important Notice\*\*\****

Read Carefully. If you do not comply with the following, your case will be dismissed.

Oregon _____ v. Oppenheimer _____

Case Number: 09C14018

This case has been assigned to :

☐ **Judge Pamela L Abernethy**
   **(503) 566-2974**

☐ **Judge Mary M. James**
   **(503) 373-4303**

☑ **Judge L. E. Ashcroft**
   **(503) 588-5492**

☐ **Judge Albin W. Norblad**
   **(503) 588-5028**

☐ **Judge Claudia M. Burton**
   **(503) 584-7713**

☐ **Judge Tracy A. Prall**
   **(503) 588-5026**

☐ **Judge Don A. Dickey**
   **(503) 373-4445**

☐ **Judge Jamese L. Rhoades**
   **(503) 588-7950**

☐ **Judge Dennis J. Graves**
   **(503) 585-4939**

☐ **Judge Susan M. Tripp**
   **(503) 373-4361**

☐ **Judge Joseph C. Guimond**
   **(503) 588-5160**

☐ **Judge John B. Wilson**
   **(503) 588-5030**

☐ **Judge Thomas M. Hart**
   **(503) 584-7749**

**If a party served with a summons intends to contest this matter, that party
must file a response, or other appearance, as instructed in the summons.**

A status conference will be set after the party served has file and appearance. All attorneys must appear at the status conference with their calendars. If parties do not have legal representation, they are to appear at the status conference.

If the Plaintiff has not filed a Return or Acceptance of Service by the 63rd day after the filing of the complaint, the case may be dismissed for want of prosecution 28 days later. If proof of service is filed by the 91st day from the filing of the complaint, and no default is later filed, the case will be dismissed 119 days from the date of filing of the complaint.

Follow these instructions carefully and refer to the Uniform Trial Court Rules for further information or clarification.

All correspondence or other communication shall be directed to the assigned Judge at the following address:

Third Judicial District, PO Box 12869, Salem, Oregon 97309-0869.

CIVIL CASE ASSIGNMENT NOTICE-PAGE 1 OF 1

FC(07/18/08)
EXHIBIT C
PAGE 3 OF 3

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

S. V
4-20-09
3:20pm

THE STATE OF OREGON, by and through the )
OREGON 529 COLLEGE SAVINGS BOARD )    Case No. 09C14018
AND THE OREGON STATE TREASURER on )
behalf of the OREGON COLLEGE SAVINGS )    **SUMMONS**
PLAN TRUST, )
 )
        Plaintiffs, )
 )
v. )
 )
OPPENHEIMERFUNDS, INC., a Colorado )
corporation; et al., )
 )

        Defendants.

**To:    OFI PRIVATE INVESTMENTS, INC.,** %The Corporation Company;
1675 Broadway, Suite 1200; Denver, CO 80202

        You are hereby required to appear and defend the complaint filed against you in the above entitled action within thirty (30) days from the date of service of this summons upon you, and in case of your failure to do so, for want thereof, plaintiff(s) will apply to the court for the relief demanded in the complaint.

NOTICE TO THE DEFENDANT:  READ THESE PAPERS CAREFULLY!

You must "appear" in this case or the other side will win automatically.  To "appear" you must file with the court a legal paper called a "motion" or "answer."  The "motion" or "answer" must be given to the court clerk or administrator within 30 days along with the required filing fee.  It must be in proper form and have proof of service on the plaintiffs' attorney or, of the plaintiffs do not have an attorney, proof of service upon the plaintiffs.

        If you have any questions, you should see an attorney immediately.  If you need help in finding an attorney, you may call the Oregon State Bar's Lawyer Referral Service at (503) 684-3763 or toll-free in Oregon at (800) 452-7636.

| | | | |
|---|---|---|---|
| Signature of Attorney/Author for Plaintiffs | | | |
| Keith A. Ketterling | | | 913368 |
| Attorney/Author's Name (typed or Printed) | | | Bar No. (if any) |
| Stoll Stoll Berne Lokting & Shlachter P.C. | | | |
| 209 SW Oak Street, 5th Floor | | | |
| Address | | | |
| Portland | Oregon | 97301-4096 | (503) 227-1600 |
| City | State | Zip | Phone |
| | | | |
| Keith S. Dubanevich | | | 975200 |
| Keith A. Ketterling | | | 913368 |
| Trial Attorney if other than above (typed or Printed) | | | Bar No |

STATE OF OREGON, County of Multnomah    ) ss.

        I the undersigned attorney of record for the plaintiff, certify that the foregoing is an exact and complete copy of the original summons in the above entitled action.

Attorney(s) for Plaintiff(s)

**TO THE OFFICER OR OTHER PERSON SERVING THIS SUMMONS:**  You are hereby directed to serve a true copy of this summons, together with a true copy of the complaint mentioned therein, upon the individual(s) or other legal entity(ies) to whom or which this summons is directed, and to make your proof of service on the reverse hereof or upon a separate similar document which you shall attach hereto.

Attorneys for Plaintiff(s)

STOLL STOLL BERNE LOKTING & SHLACHTER P.C.
Keith A. Ketterling, OSB No. 913368
Attorneys for Plaintiff
209 SW Oak Street, 5th Floor
Portland, Oregon  97204
Telephone:  (503) 227-1600

EXHIBIT **D**
PAGE **1** OF **3**

**PROOF OF SERVICE**

STATE OF _____ )
County of _____ ) ss.

I hereby certify that I made service of the foregoing summons upon the individuals and other legal entities to be served, named below, by delivering or leaving true copies of said summons and the complaint mentioned therein, certified to be such by the attorney for the plaintiff, as follows:

**PERSONAL SERVICE UPON INDIVIDUAL(S)**
Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____, 20___, at _____ o'clock ___.M.
Upon _____ , by delivering such true copy to him/her, personally and in person, at _____
on _____, 20___, at _____ o'clock ___.M.

**Substituted Service upon Individual(s)\*\***
Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____, 20___, at _____ o'clock ___.M.
Upon _____ , by delivering such true copy at his/her dwelling house or usual place of abode, to-wit:
_____ , to _____ , who is a
person over the age of 14 years and member of the household of the person served on _____, 20___, at _____ o'clock ___.M.

**Office Service upon Individual(s)**
Upon _____ , at the office which he/she maintains for the conduct of business at
_____ , by leaving such true copy with _____ , the person who is
apparently in charge, on _____, 20___, during normal working hours, at to-wit: ___ o'clock, ___M.

**Service on Corporations, limited Partnerships or Unincorporated Associations Subject to Suit Under a Common Name**
Upon _____ , by
(Name of Corporation, Limited Partnership, Etc.)
(a) delivering such true copy, personally and in person, to _____ , who is a/the \*_____
thereof; OR
(b) leaving such true copy with _____ , the person who is apparently in charge of the office of
_____ , who is a/the \*_____ thereof.
\*Specify registered agent, officer (by title), director, general partner, managing agent.
at _____ , on _____, 20___, at _____ o'clock ___M.

DATED: _____ 20___,

_____
                                    Sheriff

BY_____
                                    Deputy

I further certify that I am a competent person 18 years of age or older and a resident of the state of service or the State of Oregon, and that I am not a party to nor an officer, director or employee of, nor attorney for any party, corporate or otherwise; that the person, firm or corporation served by me is the identical person, firm or corporation named in the action.

DATED: _____ 20___,

_____
                                    Signature

_____
                                    Type or Print Name

_____
                                    Address

_____
                                    Phone

The signature lines on the left should be used only by an Oregon county sheriff or deputy; all other servers complete certificate on the right. The Proof of Service above contains most, but not all, of the methods of service. For example, this form does not include proof of service on a minor or incompetent person. See ORCP 7D(2) and 7D(3) for complete service methods on particular parties. \*\*Where substituted or office service is used, the plaintiff, as soon as reasonably possible, shall cause to be mailed a true copy of the summons and complaint to the defendant at the defendant's dwelling house or usual place of abode, together with a statement of the time, date and place at which such service was made. Use S-N Form No. 1149 or equivalent.

EXHIBIT **D**
PAGE **2** OF **3**

## THIRD JUDICIAL DISTRICT
## MARION COUNTY CIRCUIT COURT

### ***Important Notice***

<u>Read Carefully. If you do not comply with the following, your case will be dismissed.</u>

_Oregon_ v. _Oppenheimer_

Case Number: _09C14018_                         <u>This case has been assigned to :</u>

| | | | |
|---|---|---|---|
| ☐ | **Judge Pamela L Abernethy**<br>**(503) 566-2974** | ☐ | **Judge Mary M. James**<br>**(503) 373-4303** |
| ☒ | **Judge L. E. Ashcroft**<br>**(503) 588-5492** | ☐ | **Judge Albin W. Norblad**<br>**(503) 588-5028** |
| ☐ | **Judge Claudia M. Burton**<br>**(503) 584-7713** | ☐ | **Judge Tracy A. Prall**<br>**(503) 588-5026** |
| ☐ | **Judge Don A. Dickey**<br>**(503) 373-4445** | ☐ | **Judge Jamese L. Rhoades**<br>**(503) 588-7950** |
| ☐ | **Judge Dennis J. Graves**<br>**(503) 585-4939** | ☐ | **Judge Susan M. Tripp**<br>**(503) 373-4361** |
| ☐ | **Judge Joseph C. Guimond**<br>**(503) 588-5160** | ☐ | **Judge John B. Wilson**<br>**(503) 588-5030** |
| ☐ | **Judge Thomas M. Hart**<br>**(503) 584-7749** | | |

<u>**If a party served with a summons intends to contest this matter, that party**</u>
<u>**must file a response, or other appearance, as instructed in the summons.**</u>

A status conference will be set after the party served has file and appearance. All attorneys must appear at the status conference with their calendars. If parties do not have legal representation, they are to appear at the status conference.

If the Plaintiff has not filed a <u>Return</u> or <u>Acceptance of Service</u> by the 63rd day after the filing of the complaint, the case may be dismissed for want of prosecution 28 days later. If proof of service is filed by the 91st day from the filing of the complaint, and no default is later filed, the case will be dismissed 119 days from the date of filing of the complaint.

Follow these instructions carefully and refer to the <u>Uniform Trial Court Rules</u> for further information or clarification.

All correspondence or other communication shall be directed to the assigned Judge at the following address:

Third Judicial District, PO Box 12869, Salem, Oregon 97309-0869.

CIVIL CASE ASSIGNMENT NOTICE-PAGE 1 OF 1                         FC(07/18/08)

EXHIBIT___D___
PAGE___3___OF_3_

## Certification

Case number: _09C14018_

Case title: _Oppenheimerfunds_

STATE OF OREGON       )

                           )   SS.

County of Marion       )

The foregoing copy has been compared and is certified by me as a full, true

and correct copy of _entire file_ , which is on

file in my office an in my custody.

In testimony Whereof, I have hereunto set my hand and affixed the seal of the Court on:

_5-13-09_

Trial Court _____

by: _____

EXHIBIT __E__

PAGE __1__ OF __50__



STATE OF OREGON
Marion County Circuit Courts

APR 1 3 2009

**ENTERED**

STATE OF OREGON
MARION COUNTY COURTS

APR 1 3 2009

FILED

**ORIGINAL**

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF MARION

| | |
|---|---|
| THE STATE OF OREGON, by and through the OREGON 529 COLLEGE SAVINGS BOARD AND THE OREGON STATE TREASURER on behalf of the OREGON COLLEGE SAVINGS PLAN TRUST,<br><br>        Plaintiff,<br><br>        v.<br><br>OPPENHEIMERFUNDS, INC., a Colorado corporation; OPPENHEIMERFUNDS DISTRIBUTOR, INC., a New York corporation; and OFI PRIVATE INVESTMENTS, INC., a New York corporation;<br><br>        Defendants. | Case No. 09C14018<br><br>COMPLAINT FOR VIOLATION OF THE OREGON SECURITIES LAW, BREACH OF CONTRACT, BREACH OF FIDUCIARY DUTY, NEGLIGENCE, AND NEGLIGENT MISREPRESENTATION<br><br>CLAIMS NOT SUBJECT TO MANDATORY ARBITRATION<br><br>JURY TRIAL DEMANDED |

EXHIBIT E
PAGE 2 OF 50

 

1    Plaintiff State of Oregon, by and through the Oregon 529 College Savings Board

2    ("Plaintiff" or the "Oregon Board") and the Oregon State Treasurer on behalf of the Oregon

3    College Savings Plan Trust (the "Oregon Trust") alleges as follows:

4    **I.    INTRODUCTION AND NATURE OF THE ACTION**

5                                                1.

6    The Oregon Board initially hired Defendants OppenheimerFunds, Inc. ("OFI") and

7    OppenheimerFunds Distributor, Inc ("OFDI") pursuant to a Program Management Agreement

8    ("PMA") in June 2004. Pursuant to that agreement, Defendants agreed to provide the Oregon

9    529 College Savings Plan (the "Oregon Plan") with investment and program management

10   services that would benefit families saving for their children's higher education. At some point

11   after that date, OFI may have attempted to delegate or delegated some of its management duties

12   to Defendant OFI Private Investments, Inc. ("OFI Private"). OFI, however, continued to be

13   bound to all of its management duties under the contract and at law.

14                                                2.

15   Pursuant to the PMA, OFI agreed that the investments it recommended for children's

16   college funds would be consistent with the Oregon Board's approved investment policy

17   ("Investment Policy"). It also agreed to update the Oregon Board if there were any material

18   changes to the investments in the Oregon Plan and make necessary changes to the Plan as a

19   result. The Investment Policy made perfectly clear to Defendants that college savings plan

20   beneficiaries who wished to be in an Ultraconservative or Conservative portfolio would be

21   provided conservative investments whose objectives were "income" and "protection of

22   principal" with "minimal growth." Even for those who wished to invest in moderate, balanced

23   and more aggressive portfolios, OFI agreed to provide bond funds that would be conservative

24   investments to protect against the volatility of equity securities in those portfolios.

25

26

Page 1 -   COMPLAINT

EXHIBIT E
PAGE 3 OF 50



3.

2    In addition to duties owed to the Trust by contract, OFI owed fiduciary duties to the Trust

3 as an investment adviser that provided investment advice intended to benefit the Trust and,

4 ultimately, families and children saving for college. Those duties included the duties of care,

5 loyalty, honesty, and full and fair disclosure of all material facts. As discussed at length below,

6 defendants violated their duties to the Trust by, among other things, continuing to recommend

7 and sell the OppenheimerFunds Core Bond Fund ("Core Bond Fund") to all of the Trust

8 portfolios and failing to inform the Board of the substantial changes in risks that the managers of

9 the Core Bond Fund had undertaken by late 2007 or early 2008.

4.

11    From the outset in 2004, OFI recommended, solicited, and sold the OppenheimerFunds

12 Core Bond Fund (originally presented as the Oppenheimer Bond Fund) to the Oregon Plan's

13 various portfolios. OFI recommended and sold the Core Bond Fund as a straightforward bond

14 fund that invested mainly in high quality corporate bonds with an ancillary focus on government

15 bonds. In 2004 and for the first few years, the Core Bond Fund appeared to be what OFI

16 represented it to be.

5.

18    Over time, however, and without discussion with the Board, the Core Bond Fund

19 underwent a radical transformation. By late 2007 or early 2008, the Core Bond Fund was no

20 longer a plain bond fund that sought to protect principal, obtain income and minimal growth

21 through corporate and government debt securities. It had become a hedge-fund like investment

22 fund that took extreme risks in a search for speculative large returns. It began, among other

23 things, to sell credit default swaps and other high-risk derivative instruments to Wall Street

24 firms, promising to pay and insure those Wall Street firms if they lost money as a result of

25 defaults in mortgage-backed securities investments. These were high-risk bets that were plainly

26 inappropriate for those saving for college or in college.

Page 2 -  COMPLAINT


Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT E
PAGE 4 OF 50

1                                            6.

2       Defendants knowingly failed to disclose the following material facts in violation of their

3    contractual duties and Oregon law:

4           (a) The Core Bond Fund was no longer an appropriate investment for anyone seeking
                conservative investments or protection of principal because by late 2007 or early
5               2008 it had become a hedge-fund like investment fund that took excessive risks
                through speculative investment strategies;
6
            (b) The Core Bond Fund was particularly inappropriate for anyone who was in-
7               college or within a few years to college because the risks the fund had undertaken
                exposed it to substantial losses at a time when families and individuals needed
8               immediate or imminent access to their money;

9           (c) As of late 2007 or early 2008, the Core Bond Fund had engaged in a new strategy
                of investing in high-risk derivatives (credit default swaps and total return swaps)
10              and mortgage-backed securities that were not designed to protect principal or
                obtain minimal growth but to achieve outsized returns through extraordinary risks
11              that had the potential for (and ultimately resulted in) staggering losses;

12          (d) The Core Bond Fund was actually managed according to a more aggressive
                strategy by which it took far greater risks than initially disclosed to the Oregon
13              Board; and,

14          (e) The Core Bond Fund investment managers ignored the warnings of its own risk
                managers when the Fund exceeded its risk controls and risk budget in April 2008.
15              Rather than adjust its risk downward, the Core Bond Fund changed its risk
                controls and risk metrics in order to allow it to take even greater risks. In fact,
16              after receiving these warnings from its own risk managers, the OFI portfolio
                managers decided that they would, in their own words, place "big bets" with the
17              college savings plan's and other investors' money, speculative bets that they knew
                to be in excess of OFI's risk controls.
18

19                                           7.

20      As the result of its speculation, the Core Bond Fund suffered losses in 2008 and 2009 that

21   OFI itself characterized as "mind-numbing." The Core Bond Fund lost over 35 percent of its

22   value in 2008 and continued to fall precipitously another 10% in the first three months of 2009.

23                                           8.

24      Not until late October of 2008, after the Oregon Trust (and thereby families' college

25   savings accounts) had already lost millions as a result of its investment in the Core Bond Fund,

26   did OFI even begin to suggest to the Oregon Board just a few of the changes in the

Page 3 - COMPLAINT

EXHIBIT  E
PAGE  5  OF 50

 

1    characteristics of the Fund. Even at that time, however, OFI continued to reassure the Oregon

2    Board and advised it to remain invested in the Core Bond Fund. Despite OFI's assurances, in

3    late 2008 and early 2009, the Oregon Board began an investigation into the Fund. At a meeting

4    in late January 2009, the Oregon Board voted to begin to terminate the Oregon Plan's

5    participation in the Core Bond Fund (and the OppenheimerFunds Limited Term Government

6    Bond) and finalized that plan at a follow-up meeting in February 2009.

7                                     9.

8         The Oregon Trust's losses are the direct result of Defendants' breach of contractual

9    duties, breach of fiduciary duties owed to the Oregon Trust, negligence, and violations of the

10   Oregon Securities Law.

11                                   10.

12         The State of Oregon created the Oregon Board and Oregon Trust. The Oregon Treasurer

13   chairs the Oregon Trust. Through this action, the Oregon Board, on behalf of the Oregon Trust,

14   seeks to recover the damages suffered by the Oregon Trust and the many Oregon families who

15   lost substantial amounts of their college savings as the result of Defendants' wrongdoing.

16   **II.**    **PARTIES**

17                                  11.

18         The Oregon Board was created to establish, implement and maintain the Oregon 529

19   College Savings Network (the "Oregon 529 Network"). The Oregon Board members are the

20   trustees of the Oregon Trust, which holds the funds invested in the Oregon Plan.

21                                   12.

22         Defendant OFI is a Colorado corporation with its principal place of business in New

23   York. OFI is a registered investment adviser with the Securities and Exchange Commission

24   ("SEC").

25

26

Page 4 - COMPLAINT

EXHIBIT $E$
PAGE $6$ OF $50$

 

1                                        13.

2          Defendant OFDI is a New York corporation with its principal place of business in New

3    York. OFDI is a registered broker-dealer with the Financial Industry Regulatory Authority

4    ("FINRA").

5                                        14.

6          Defendant OFI Private is a New York corporation with its principal place of business in

7    New York. OFI Private is a wholly owned subsidiary of OFI and a registered investment adviser

8    with the SEC. Where Plaintiff alleges a violation of OFI's duties arising out of its role as a

9    program manager, such duties are also the duties of defendant OFI Private and, therefore, such

10   references to OFI include OFI Private.

11   **III.    JURISDICTION AND VENUE**

12                                       15.

13         This Court has subject matter jurisdiction over the Oregon Securities Law claims under

14   Article VII, section 9 of the Oregon Constitution.

15                                       16.

16         This Court has personal jurisdiction over Defendants under ORCP 4(J)(2), which

17   provides for personal jurisdiction over any person who engages in conduct in violation of the

18   Oregon Securities Law.

19                                       17.

20         Violations of law occurred in Marion County, Oregon, including the dissemination of

21   materially false and misleading statements complained of herein. Defendants have regular

22   sustained business activity in Marion County.

23                                       18.

24         This Court has jurisdiction over Defendants pursuant to a contractual forum selection

25   clause found at Section 18.9 of the PMA by and between the State of Oregon, acting by and

26   through the Oregon 529 College Savings Board, on the one hand, and Defendants OFI and

Page 5 -   COMPLAINT


**Department of Justice**
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT _E_
PAGE _7_ OF _50_

 

1  OFDI, on the other hand, dated as of June 4, 2004. Defendant OFI Private may have been or was

2  delegated some duties under that contract and may also be a party thereto. The forum selection

3  clause is binding on each Defendant and provides that any action arising from or relating to the

4  PMA "shall be brought and conducted solely and exclusively within the Circuit Court of Marion

5  County for the State of Oregon ...."

6  **IV.    CLAIMS NOT SUBJECT TO REMOVAL FROM STATE COURT**

7                                              19.

8        The claims alleged in this Complaint are not subject to removal from state court under the

9  Securities Litigation Uniform Standards Act, 15 USC §77p(d)(2)(A). That statute specifically

10  preserves state-court claims brought, as here, by states and political subdivisions thereof.

11  Further, the claims are not subject to removal under diversity jurisdiction principles because

12  "[t]here is no question that a State is not a 'citizen' for purposes of the diversity jurisdiction."

13  *Moor v. County of Alameda*, 411 US 693, 717, 93 S Ct 1785, 36 L Ed 2d 596 (1973). The

14  United States District Court for the District of Oregon recently held on two separate occasions

15  that the State of Oregon and its entities are not citizens for diversity jurisdiction and, thus,

16  remanded similar state securities law complaints by State entities to State court. *State of Oregon*

17  *by and through the Oregon Public Employee Retirement Board and the Oregon State Treasurer*

18  *on behalf of the Oregon Public Employee Retirement Fund v. Marsh & McLennan Co's, Inc.*,

19  USDC Oregon CV-05-1434PK, Opinion and Order (Jan. 27, 2006); *State of Oregon by and*

20  *through the Oregon Public Employee Retirement Board and the Oregon State Treasurer on*

21  *behalf of the Oregon Public Employee Retirement Fund v. American Int'l; Group, Inc.*, USDC

22  Oregon CV-08-6110-HO, Opinion and Order, (Aug. 20, 2008). As a result, this case will

23  proceed in the Circuit Court of the State of Oregon.

24                                              20.

25        The claims alleged in this Complaint are also not subject to removal from state court

26  pursuant to the forum selection clause found at Section 18.9 of the PMA. The forum selection

Page 6 -  COMPLAINT

EXHIBIT **E**
PAGE **8** OF **50**

 

1    clause is binding on each Defendant and provides that any action arising from or relating to the

2    PMA "shall be brought and conducted solely and exclusively within the Circuit Court of Marion

3    County for the State of Oregon ...." This action arises from and relates to the PMA.

4    **V.    FACTUAL ALLEGATIONS**

5         **A.    Background of the Oregon 529 College Savings Network**

6                                              21.

7         The Oregon 529 Network was created by the Oregon legislature in 1999 and commenced

8    in January 2001 in order to provide families and others a tax-advantaged opportunity to save for

9    the cost of higher education expenses. A 529 plan (named after Section 529 of the Internal

10   Revenue Code) is an education savings plan designed to encourage families to save in advance

11   for college expenses through the use of tax incentives. Funds invested in the Oregon Plan by

12   plan participants are placed in the Oregon Trust. The Oregon Trust, in turn, relies on the

13   investment information and services provided by Defendants to invest those funds for the

14   Oregon Trust beneficiaries.

15                                             22.

16        Plan participants make contributions to individual accounts for the benefit of designated

17   beneficiaries whose education expenses may be paid using money from the account. The monies

18   invested in the individual accounts are part of the Oregon Trust. Title to the assets held in the

19   Oregon Trust is vested in the Oregon Board as trustees of the Oregon Trust. The Oregon Board

20   operates the Oregon Trust for the benefit of the designated beneficiaries.

21                                             23.

22        The Oregon 529 Network provides different methods for the investment of funds in the

23   Oregon Plan. There is a "direct-sold" option available directly from the Oregon 529 Network. It

24   includes portfolios of funds that have been assembled and recommended by the Oregon 529

25   Network's investment adviser, Defendant OFI. OFI also manages the underlying funds in each

26   portfolio. The funds in these portfolios are distributed by Defendant OFDI. There is also an

Page 7 -  COMPLAINT



EXHIBIT **E**
PAGE **9** OF **50**

 

1  "adviser-sold" option that includes nearly identical portfolios but is provided only through

2  financial advisers. The term "Oregon Plan" as used herein refers to both the "direct-sold" and

3  "adviser-sold" investment options.[1]

4                                              24.

5        The Oregon Plan offers plan participants three ways to select the investment approach

6  and type of risk that they as investors want to incur in saving for their children's college: (1) the

7  Lifestyle Option, (2) the Years to College Option, and (3) the Single Fund Portfolio Option. The

8  Single Fund Portfolio Option is not involved in this action because it did not hold investments in

9  the Core Bond Fund.

10                                             25.

11       The Lifestyle Option offers investment portfolios with various levels of risk. The

12  portfolio options are: (1) OppenheimerFunds 100% Equity Portfolio, (2) OppenheimerFunds

13  Aggressive Portfolio, (3) OppenheimerFunds Moderate Portfolio, (4) OppenheimerFunds

14  Balanced Portfolio, (5) OppenheimerFunds Conservative Portfolio, and (6) OppenheimerFunds

15  Ultra Conservative Portfolio. The plan participants choose among the portfolios and their funds

16  remain in the selected portfolio(s) until the participant requests they be moved.

17                                             26.

18       The Years to College Option automatically moves the participant's account to lower risk

19  portfolios as the designated beneficiary nears college. The Years to College Option utilizes five

20  of the portfolios also available in the Lifestyle Option. For accounts whose designated

21  beneficiary is 10-plus years to college, the account is invested in the OppenheimerFunds

22  Aggressive Portfolio (the "Aggressive /10+ Years to College Portfolio"). For accounts whose

23  designated beneficiary is seven to nine years to college, the account is invested in the

24

25  [1] The "direct-sold" option also includes portfolios assembled by Vanguard and the "adviser-
26  sold" option includes portfolios assembled by MFS. None of those portfolios or their underlying
    funds is involved in this action.

Page 8 -  COMPLAINT

EXHIBIT E
PAGE 10 OF 50



1    OppenheimerFunds Moderate Portfolio (the "Moderate /7-9 Years to College Portfolio").[2]  For

2    accounts whose designated beneficiary is four to six years to college, the account is invested in

3    the OppenheimerFunds Balanced Portfolio (the "Balanced /4-6 Years to College Portfolio").  For

4    accounts whose designated beneficiary is one to three years to college, the account is invested in

5    the OppenheimerFunds Conservative Portfolio (the "Conservative /1-3 Years to College

6    Portfolio"), and for accounts whose designated beneficiary is in college, the account is invested

7    in the OppenheimerFunds Ultra Conservative Portfolio (the "Ultra Conservative/In College

8    Portfolio").  In the appropriate years, the funds are moved between the portfolios on the first

9    business day of August.

10                                               27.

11        The more conservative portfolios have always been represented by Defendants as having

12    objectives of "income and protection of principal" and "preservation of capital."  As discussed

13    further below, these portfolios were never intended to take hedge-fund like risks or strive to

14    obtain high-risk returns that might expose someone in college or nearly in college to substantial

15    losses at exactly the time that they intend to use their money.  As was abundantly clear to

16    Defendants, those in college or nearly in college cannot afford to take huge risks with money that

17    will be used either immediately or imminently.  Further, all of the portfolios were to have

18    conservative investments, including the Core Bond Fund, within them.

19    **B.    The Oregon Board hires OFI as a fiduciary to provide investment advice to
             the Oregon Trust according to the Oregon Trust investment policy and**
20    **       applicable law.**

21                                               28.

22        The Oregon Board engages a professional investment adviser and program manager to

23    advise the Board and invest Oregon Trust assets.  The Oregon Board relies on the investment

24    adviser to provide it with recommendations that are consistent with the Board approved

25    _____

26    [2]  The length of some of the Years to College Portfolios in the adviser-sold plan was extended in
         April 2008.

Page 9 -  COMPLAINT

EXHIBIT **E**
PAGE **11** OF **50**

1  Investment Policy and to invest the college savings plan money accordingly. On November 13,

2  2003, the Oregon Board voted to replace Strong Capital Management, Inc. as a program manager

3  for the Oregon 529 Network. The Oregon Board interviewed numerous potential program

4  managers before choosing OFI. On February 17, 2004, the Oregon Board voted to select OFI as

5  program manager for the Oregon Plan.

6                                    29.

7       In making the decision to select OFI as the program manager, the Oregon Board relied

8  upon information provided to it by Defendants including, among other things, representations by

9  OFI that it would recommend investment funds for the various plan portfolios that were

10  consistent with the investment objectives of each portfolio.

11                                    30.

12      In addition, OFI presented the Oregon Board with a proposal in which it said that it was a

13  client-focused firm offering excellent investment management and award winning customer

14  service. OFI described itself as well respected and represented that it operated with integrity.

15  The Oregon Board relied upon these representations in voting to select OFI as the program

16  manager.

17                                    31.

18      Subsequently, the Oregon Board, on behalf of the Oregon Trust, entered into the PMA

19  dated June 4, 2004, with Defendants OFI and OFDI. Pursuant to the PMA, OFI became the

20  Program Manager for the Oregon Plan and OFDI (a registered broker-dealer) became the

21  distributor for the Oregon Plan.

22                                    32.

23      Under certain conditions, the PMA allows OFI to delegate the performance of its

24  contractual duties to an affiliate. In the event of any delegation, OFI is "deemed to have full

25  control over its delegates," and remains responsible for the performance of its contractual duties

26  as if no delegation was made. PMA, Section 2.2. At some point prior to December 20, 2007,

Page 10 - COMPLAINT

EXHIBIT E
PAGE 12 OF 50


 

1    OFI may have attempted to delegate or did delegate its Program Management duties under the

2    PMA to OFI Private, but Oregon did not receive a written notice of delegation as required under

3    Section 2.2 of the PMA.

4                                                  33.

5 ·      The PMA contained numerous provisions requiring Defendants, among other things, (1)

6    to recommend investment portfolios consistent with the Oregon Plan's Investment Policy, (2) to

7    ensure that once selected, those portfolios and the underlying funds remained consistent with the

8    Investment Policy, and (3) to regularly report to the Oregon Board on any significant issues,

9    events or changes in the portfolios or the underlying funds.

10                                                 34.

11       Pursuant to the PMA, Defendants made a number of certifications, including the

12   following:

13            (A) [that] all portions of the Plan Description for the [Oregon Plan]
              ... are true and accurate in all material respects, (B) to the best of
14            [Defendants'] knowledge, based solely ... on [their] due diligence
              review and discussions concerning the Plan Description for the
15            [Oregon] Plan, the Plan Description for the [Oregon] Plan
              completely and accurately describes the [Oregon] Plan and does
16            not contain any untrue statement of a material fact or omit to state
              a material fact necessary to make the statements made therein not
17            misleading in light of the circumstances under which they were
              made, and (C) each of the representations and warranties of
18            [Defendants] set forth in [Section 13] shall be true and correct in
              all material respects as of the Start Date as if made on and as of the
19            Start Date. (PMA, Sections 3.2(b)(ii) and (iii)).

20                                                 35.

21       Pursuant to Section 13 of the PMA, OFI made the following representations, warranties

22   and covenants:

23            (a) "[t]he Plan Marketing Materials ... shall not contain any untrue statement of
              material fact or omit to state a material fact necessary to make the statements not
24            misleading" (Section 13.1(h));

25            (b) that "[t]he operations of [Defendants] are and will at all times during the term of
              this Agreement be in material compliance with all laws, rules, regulations, orders
26            and restrictions of any federal, state, county, municipal, or local government or
              governmental body or agency applicable to their operations ..." (Section 13.1(i)).

Page 11 - COMPLAINT

EXHIBIT **E**
PAGE **13** OF **50**

    

1                                                    36.

2          Pursuant to Section 13 of the PMA, OFDI made the following representations, warranties

3     and covenants:

4              (a) "[t]he Plan Marketing Materials provided or prepared by OFDI ... shall not
                    contain any untrue statement of material fact or omit to state a material fact
5                   necessary to make the statements not misleading" (Section 13.2(h));

6              (b) that "[t]he operations of OFDI are and will at all times during the term of this
                    Agreement be in material compliance with all laws, rules, regulations, orders and
7                   restrictions of any federal, state, county, municipal, or local government or
                    governmental body or agency applicable to its operations ..." (Section 13.2(i)).
8

9                                                    37.

10         The PMA imposes, among others, the following duties on Defendants:

11             (a) OFI and OFDI's duty to deliver to the Oregon Board certificates relating to
                    various matters (including the accuracy of Oregon Plan documents and
12                  compliance with applicable law) in the event they "know of any new or changed
                    circumstances ..." (Section 3.6);
13
               (b) OFI's duty to "invest and manage the assets of the [Oregon] Trust as investment
14                  agent of the [Oregon] Board" in accordance with the Investment Policy (Section
                    4.1);
15
               (c) OFI's duty to provide to the Board "all information about [fund managers] and
16                  Underlying Funds ... as may be required for the [Oregon] Board to carry out its
                    duties as trustees of the [Oregon] Plan Trust," and to "review the Investment
17                  Portfolios and Underlying Funds utilized in the [Oregon] Plan and propose
                    changes thereto in accordance with Article V [of the PMA]" (Section 4.1);
18
               (d) OFI's duty to recommend Investment Portfolios having "the characteristics ...
19                  described in the then-current Plan Description" (Section 4.4);

20             (e) OFI's duty to "invest the assets in each of the Investment Portfolios in the
                    Underlying Funds so that such assets are allocated according to guidelines
21                  established by OFI and approved by the Board ..." (Section 5.2(a));

22             (f) OF I's duty to determine that "the investment objectives, policies and practices of
                    the Underlying Funds in which [Oregon] Trust assets are invested are consistent
23                  with the [Oregon] Board's Investment Policy and applicable law" (Section
                    5.2(b));
24
               (g) OFI's duty to "at least annually, review the Investment Portfolios of the [Oregon]
25                  Plan" (Section 5.3);

26             (h) OFI's duty to "from time to time propose the addition of new Investment
                    Portfolios, the removal of existing Investment Portfolios, or the modification of

Page 12 - COMPLAINT

EXHIBIT **E**
PAGE **14** OF **50**



1    the Underlying Funds in which certain existing Investment Portfolios invest . . ,
     all in accordance with the applicable Investment Policy and subject to Board
2    approval." (Section 5.3);

3    (i) OFI's duty to "deliver to the Board quarterly and annual reports on … Investment
        Portfolio performance …" (Section 8.2);

4
     (j) OFI's duty to prepare all Plan Marketing Materials (Section 9.1(a)); and
5
     (k) OFI's duty to (1) amend or supplement the Plan Description "in order to reflect
6       material developments arising subsequent to the preparing and delivery of the
        initial Plan Description," (2) to notify the Board "of any development of which
7       [they are] aware that would be material to the [Oregon] Plan that is not disclosed
        in, or is inconsistent with, the applicable Plan Description then in effect," and (3)
8       to "suggest modifications to the applicable Plan Description reflecting such
        material development" (Section 9.1(b)).
9

10                                        38.

11        As noted above, OFI had a duty to invest and manage the assets of the Oregon Trust in

12   accordance with the Investment Policy of the Oregon Board.  The Investment Policy of the

13   Oregon Board is contained in a document titled Adopted Investment Objectives Policies and

14   Practices, dated June 4, 2004. The Investment Policy imposes the following additional duties on

15   OFI:

16        [OFI] shall provide quarterly investment reports to the [Oregon]
          Board that include investment performance, applicable benchmark
17        performance, [Oregon] Plan assets, and the number of Accounts in
          each of the Plan's investment options. The report shall include
18        significant issues and events or changes in [Oregon] Plan
          Portfolios and Underlying Funds that have occurred during the last
19        reporting period. A detailed report shall be presented to the
          [Oregon] Board annually, which analyzes the investments
20        supporting the [Oregon] Plan's investment options.

21                                        39.

22        The Investment Policy also describes the investment options available to plan

23   participants.  With respect to the Ultra Conservative/In College Portfolio, the Investment Policy

24   states that this portfolio is to:

25        Invest in bond and money market investments in order to seek the
          Portfolio's objectives of income and protection of principal.  This
26        Portfolio seeks preservation of capital with minimal growth by
          investing primarily in bond Underlying Funds and money market

Page 13 - COMPLAINT

EXHIBIT _E_
PAGE _15_ OF _50_


1    Underlying Funds to maintain stability. The target allocation is 60
     percent bond Underlying Funds, and 40 percent in money market
2    Underlying Funds. (Emphasis added.)

3                                   40.

4         With respect to Conservative/1-3 Years to College the Investment Policy states that this

5    portfolio is to:

6         Invest primarily in bond and money market investments in order to
          seek the Portfolio's objectives of income and protection of
7         principal. This Portfolio seeks preservation of capital with
          minimal growth by investing primarily in bond Underlying Funds
8         to maintain stability. The target allocation is 20 percent equity
          Underlying Funds and 80 percent in bond Underlying Funds.
9         (Emphasis added).

10                                  41.

11        With respect to the Balanced/4-6 Years to College Portfolio, the Investment Policy states

12   that this portfolio is to:

13        Invest in a combination of conservative and aggressive investments
          in order to seek the Portfolio's objectives of both capital
14        appreciation and income. This Portfolio seeks moderate growth by
          investing in a balanced asset allocation slightly weighted toward
15        bond Underlying Funds over equity Underlying Funds. This
          Portfolio has a target allocation of 40% equity Underlying Funds
16        and 60% bond Underlying Funds. (Emphasis added).

17                                  42.

18        With respect to the Moderate Portfolio/7-9 Years to College Portfolio the Investment

19   Policy states that this portfolio is to:

20        Invest in a combination of conservative and aggressive investments
          in order to seek the Portfolio's objectives of both capital
21        appreciation and income. This Portfolio seeks moderate growth by
          investing in a balanced asset allocation slightly weighted toward
22        equity Underlying Funds over bond Underlying Funds. This
          Portfolio has a target allocation of 60% equity Underlying Funds
23        and 40% bond Underlying Funds. (Emphasis added).

24                                  43.

25        With respect to the Aggressive Portfolio/10+ Years to College the Investment Policy

26   states that this portfolio is to:

Page 14 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT E
PAGE 16 OF 50



1    Invest primarily in equity investments in order to seek capital
     appreciation. This Portfolio seeks long-term growth by investing
2    primarily in equity Underlying Funds. A percentage of assets will
     be invested in <u>bond Underlying Funds to provide some protection</u>
3    <u>from equity volatility</u>. This Portfolio has an asset allocation target
     of 80% equity Underlying Funds and 20% bond Underlying Funds.
4    (Emphasis added).

5                                   44.

6          Pursuant to its responsibilities under the PMA and the Investment Policy, OFI

7    recommended portfolio allocations and underlying funds for those portfolios. Initially, OFI

8    proposed only two underlying funds, the OppenheimerFunds Bond Fund and the

9    OppenheimerFunds Main Street Opportunity Fund. The Oregon Board requested additional

10   choices and OFI eventually recommended portfolios that included allocations to 7 underlying

11   funds, as well as a money market fund. OFI also provided the Oregon Board with a number of

12   different allocation scenarios that it recommended, and represented that these scenarios were

13   consistent with the investment objectives of the various portfolios as stated in the Investment

14   Policy. The Oregon Board relied upon the advice and recommendations of its Program Manager,

15   OFI.

16                                  45.

17         The final portfolios contained allocations to the Bond Fund as follows:

18   **Portfolio**              **% in OppenheimerFunds Bond Fund**

19   Ultraconservative              20

20   Conservative                   35

21   Balanced                       30

22   Moderate                       20

23   Aggressive                     10

24   These percentages adjusted slightly in April 2008 for those Portfolios sold in the "adviser-sold"

25   plan. They remained the same in the "direct-sold" plan.

26

Page 15 - COMPLAINT

EXHIBIT E
PAGE 17 OF 50

 

C.    **The Oppenheimer Bond Fund, a seemingly conservative bond fund, changes its investment style and increases its risk over time, from 2004 to 2008.**

1.    **The Core Bond Fund takes undisclosed risks.**

46.

As stated above, for each of the portfolios in the Oregon Plan that OFI managed, it recommended the Oppenheimer Bond Fund.  Subsequently, this fund was renamed the OppenheimerFunds Core Bond Fund.  In 2004, OFI represented to the Oregon Board that the Oppenheimer Bond Fund

> is designed to take advantage of opportunities presented by a wide range of high quality corporate bonds combined with an ancillary focus on government bonds, including mortgage agency paper. This broad diversification is designed to give us the flexibility to provide competitive yields from a portfolio with potentially less volatility.

47.

The Oregon Board paid OFI $250,000 to $350,000 in program management fees (based on a percentage of the total plan assets) to advise the board and select investment funds consistent with the adopted Investment Policy.  OFI also acted as the investment manager for the Core Bond Fund in which the Oregon Plan was heavily invested.  The Oregon Trust, as an investor in the Core Bond Fund, also paid OFI a separate investment management fee of approximately 50 basis points (varying over time) to manage the Core Bond Fund.  (A basis point is 1/100 of a percent so that 50 basis points equal .50 percent).  This was approximately $300,000 per year in additional Core Bond Fund management fees over the last two years.  The Oregon Trust also paid other sales, marketing, and "other expense" charges charged directly by the Core Bond Fund.  As the investment manager for the Core Bond Fund, OFI chose the underlying securities that were purchased in the Core Bond Fund and ultimately made the decision to turn the Core Bond Fund into a high-risk, hedge-fund like investment fund.

Page 16 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400 FAX (503) 373-7067

EXHIBIT **E**
PAGE **18** OF **50**



1                                                           48.

2          Due to its position as the investment manager for the Core Bond Fund, OFI was in the

3   unique position of having complete access to information regarding the Core Bond Fund and its

4   investment activities. Despite the fact that it was managing the Core Bond Fund, and therefore

5   clearly was aware of Core Bond Fund's changing objectives and risks, until January 22, 2009,

6   OFI never indicated to the Oregon Board that the objectives or risk profile of the Core Bond

7   Fund had been changed or modified. In fact, OFI continued to recommend and represent that the

8   Core Bond Fund was appropriate for all of the Oregon Plan portfolios, including the

9   Conservative and Ultra Conservative Portfolios. However, for the first time, on January 22,

10  2009, OFI's Chief Investment Officer, Kurt Wolfgruber, informed the Oregon Board that the

11  Core Bond Fund was "a long-term vehicle, appropriate for investors who are willing to assume

12  the risk of investing in broadly defined, taxable, fixed income securities and can also handle the

13  risk of the impact of changing interest rates on those securities' prices. To be clear, the fund was

14  not a short-term bond fund."

15                                                          49.

16         OFI never disclosed this information to the Oregon Board at any time before January 22,

17  2009. OFI also stated for the first time, on October 23, 2008, that the Core Bond Fund was

18  actually being managed by a "Core Plus" strategy. At no time before October 23, 2008, did OFI

19  even use the term Core Plus with respect to the Core Bond Fund.

20                                                          50.

21         The difference between Core and Core Plus is significant to those who are

22  knowledgeable about mutual fund names and strategies because a Core Plus strategy allows the

23  managers to reach for greater returns, and grants them greater latitude to construct a portfolio

24  that deviates from the benchmark index. For example, the objective of OFI's Core strategy was

25  to achieve excess returns, relative to its benchmark, of 75 basis points. The Core Plus strategy

26  seeks to achieve even greater returns relative to the same benchmark, from 100 to 125 basis

Page 17 - COMPLAINT



EXHIBIT $E$
PAGE 19 OF 50

1  points (or 1 to 1.25 percent).  In other words, the Core Plus strategy seeks to achieve excess

2  returns of as much as 160 percent greater than the Core strategy.  It is a well-known principle in

3  fixed income investing that significantly greater returns can only be achieved through the

4  assumption of greater risk, and that was precisely the outcome from this undisclosed switch to a

5  higher return objective.

6                                              51.

7         In the case of the Core Plus strategy, that greater risk was incurred through a relaxation of

8  restrictions on acceptable portfolio construction.  This is evident in the large difference in the

9  allowable "tracking error" range between the Core and Core Plus strategies.  Tracking error

10  measures how closely an investment fund follows the index to which the fund is benchmarked.

11  In this instance, the Core Bond Fund was benchmarked against the Lehman Brothers (now

12  Barclays Capital) Aggregate Bond Index.  A higher tracking error indicates that the fund

13  manager has greater discretion and intends to take a higher risk in order to deviate from a pure

14  replication of the benchmark index.  As alleged in detail below, the Core Bond Fund

15  substantially exceeded its assigned tracking error relative to its benchmark bond index.

16                                              52.

17         For the Core strategy, the acceptable tracking error range is between 75 to 125 basis

18  points.  This means that the portfolio managers have license to construct a portfolio that differs

19  from the benchmark index, provided that the difference in expected return of the portfolio versus

20  the index falls between 75 to 125 basis points (or .75 to 1.25 percent).  The Core Plus strategy,

21  on the other hand, operated within a tracking error range of 125 to 200 basis points.  This 160

22  percent increase in the tracking error range provides a much wider tolerance for the construction

23  of a portfolio that could differ significantly, up or down, from its performance benchmark.

24                                              53.

25         Until October 23, 2008, well after significant losses had already occurred, OFI never

26  disclosed to the Oregon Board that the Core Bond Fund was operated with a Core Plus strategy.

Page 18 - COMPLAINT



EXHIBIT **E**
PAGE **20** OF **50**

 

1    Even then, the disclosure occurred only in an offhanded manner, without any real reference to

2    the significant differences. From 2004 through 2006, the Core Bond Fund generated returns

3    consistent with what one would expect from a fund with a name like Core Bond Fund. Despite

4    the undisclosed additional risks with respect to its benchmark that it might have been taking

5    during this period, it seemed to provide low volatility, protection of principal, and income.

6    Accordingly, there were no performance issues that might have raised suspicion about the

7    management of the fund. In 2007, however, the Core Bond Fund altered its investment style and

8    risk profile and began to significantly increase its risk. Most significantly, the Core Bond Fund

9    began to seek alternative investments in the hopes of seeking much higher returns, including

10    dramatically increasing its use of derivative instruments and purchasing highly volatile

11    mortgage-related bonds.

12                                          54.

13        In addition, the Core Bond Fund began to take unnecessary risks by significantly

14    increasing its use of leverage. OFI failed to disclose or discuss this change in investment

15    strategy to the Oregon Board. While the use of leverage can increase the potential return of a

16    fund, it also greatly increases the potential loss. The reason that leverage has this two-edged

17    effect is that it allows a fund to participate in the gains and losses on a pool of assets that is

18    greater than the amount of dollars actually invested in the fund. Any gains on those extra assets

19    flow directly to the shareholders, but any losses come directly out of the investors' capital. In

20    effect, investors are in a first-loss position, much like a homeowner who buys a house with a

21    down payment and a mortgage.

22                                          55.

23        Unbeknownst to the Oregon Board, OFI either did not have or did not follow industry-

24    standard risk management policies for the Core Bond Fund, thus allowing its managers to take

25    unnecessary and reckless risks. Further, as discussed in more detail below, OFI intentionally

26    ignored internal risk management guidelines in order to position the Core Bond Fund to achieve

Page 19 - COMPLAINT

EXHIBIT E
PAGE 21 OF 50

 

1    returns well in excess of its benchmark, thereby also exposing the Fund to risks well in excess of

2    the tracking error.

3              **2.      The Core Bond Fund adds high-risk derivative "swap" instruments
                          throughout 2007-2008.**

4

5                                                56.

6              Throughout 2007 and 2008, without appropriate disclosure to or discussion with the

7    Oregon Board, the Core Bond Fund greatly increased its use of derivative instruments, most

8    notably by engaging in swap transactions.  The Core Bond Fund engaged in both total return

9    swaps and credit default swaps.  These derivative transactions were used by the managers as a

10   means to act in a highly-leveraged manner in order to make speculative bets on particular sectors

11   and names in the bond market.  Both types had the effect of dramatically increasing the Fund's

12   overall leverage.   The result was excessively leveraged and speculative bets that significantly

13   altered the risk profile of the Core Bond Fund.

14                                               57.

15             A total return swap is a financial contract between parties to exchange cash flows in the

16   future based on the performance of a particular index or set of securities.  In 2007 and 2008, the

17   managers of the Core Bond Fund formed a view that Commercial Mortgage-Backed Securities

18   ("CMBS"), securities backed by commercial real estate loans, were trading at attractive levels.

19   To act upon this view, the managers acquired a few CMBS bonds for the fund.  Simply

20   increasing the weighting of the CMBS position, and perhaps slightly overweighting it with

21   respect to the benchmark, might have been within the acceptable level of risk.  The Core Bond

22   Fund managers, however, increased the risk to a much higher level by entering into total return

23   swaps on commercial real estate indices, essentially a highly leveraged and speculative bet that

24   the CMBS market, which had suffered a widening of spreads (the difference in yields between

25   CMBS and similar term government bonds), would rally in 2008, causing spreads to narrow and

26   generating large returns for the fund.  Unfortunately for fund shareholders, the CMBS market

Page 20 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT **E**
PAGE **22** OF **50**

 

1  continued to decline precipitously in the latter half of 2008, and the Core Bond Fund realized

2  substantial declines in its portfolio value as a result of the leverage in these speculative swap

3  positions.

4                                        58.

5       The Core Bond Fund also purchased and sold credit default swaps.  Credit default swaps

6  are essentially insurance contracts that insure against the default on debt securities such as

7  corporate bonds.  In a credit default swap, two parties enter into a private contract whereby the

8  buyer of the protection agrees to pay the seller premiums over a set period of time, which is

9  typically four or five years.  In exchange, the seller agrees to pay the buyer in the event a

10  particular pre-defined credit event occurs, such as a default on the underlying security.  In this

11  manner, a credit default swap functions as an insurance policy.  The buyer of credit protection

12  can use the swap to hedge an existing position in a particular security.  The writer of credit

13  protection receives a regular insurance premium, in the hope of not having to pay an insurance

14  "claim."

15                                       59.

16      In 2008, the Core Bond Fund entered into a significant number of credit default swaps,

17  but not as a buyer of credit protection to hedge existing fund holdings.  Instead, it became a

18  significant seller of credit protection, essentially writing insurance on corporate bonds.  This had

19  the effect of adding leverage, because the Fund was in a position to realize the full impact of

20  price declines in the bonds it was insuring, even though it did not have actual ownership of those

21  bonds and received a small amount of income relative to the risk to the Fund.

22                                       60.

23      The Core Bond Fund not only engaged in risky selling of protection on corporate bonds,

24  it sometimes actually sold protection on the issuers of bonds that it also owned in the Fund,

25  thereby doubling or tripling its bet with respect to the credit-worthiness of those issuers.  For

26  example, as of June 30, 2008, the Core Bond Fund held bonds issued by AIG, Lehman Brothers,

Page 21 - COMPLAINT

EXHIBIT E
PAGE 23 OF 50

 

1   Merrill Lynch, Citigroup, General Motors, and Ford Motors.  At the same time, the Core Bond

2   Fund was selling protection, credit default swaps, on bonds by these very issuers.  In other

3   words, if one of the issuers, like Lehman Brothers, went into default on its bonds, not only would

4   the Core Bond Fund lose value in the bonds of Lehman Brothers that it currently held, it would

5   also be responsible for making payments to other holders of Lehman Brothers' bonds who had

6   purchased the credit protection sold by the fund.  By selling credit protection on these issuers, the

7   managers were gambling that no credit events requiring a payment would occur in these issuers

8   prior to the expiration dates of the swaps, and that the fund would pocket the fixed premium

9   being paid by the protection buyer.  By selling protection in names that the portfolio was long,

10  the managers risked a loss both of bond value and of a payout on the credit default swap.  In this

11  manner, these credit default swaps constituted highly speculative bets on these issuers, and

12  multiplied the Core Bond Fund's risk of loss in these corporate issuers.

13                                            61.

14          This practice of writing credit protection was not a minor activity for the Core Bond

15  Fund.  By August 2008, it has been estimated that the fund's net notional exposure to credit

16  default swaps was over $850 million.  In other words, the $2 billion fund had additional exposure

17  to the credit performance of an additional $850 million in corporate credits.  In this manner, the

18  credit default swap activity added significant leverage, and greatly increased fund holders'

19  exposure to loss.

20                                            62.

21          OFI has indicated that in 2008 the managers of the Core Bond Fund stopped adding to the

22  Fund's position or exposure to Residential Mortgage-Backed Securities ("RMBS"), and instead

23  began to increase its exposure to corporate bonds.  However, the managers failed to disclose that

24  it was heavily weighting this corporate bond allocation to the financial sector.  Many of these

25  same financial companies themselves were heavily exposed to the RMBS market, so by

26  overweighting its position in financial sector bonds, the Core Bond Fund actually increased its

Page 22 - COMPLAINT

EXHIBIT **E**
PAGE **24** OF **50**



1    overall exposure to problems in the housing sector, as well as to all the other problems plaguing

2    the financial sector, which were well-known at the time.  This over-concentration in RMBS and

3    financial sector bonds ultimately resulted in huge losses to the Core Bond Fund

4          **3.    The Core Bond Fund increases its risk, makes hedge fund-like bets,**
                   **and exceeds its own ever-changing internal risk controls.**

5

6                                          63.

7          In the first half of 2008, the Core Bond Fund began to add significantly to its exposure to

8    the CMBS sector.  As previously explained, it did this by an ever-escalating position in total

9    return and credit default swaps on various CMBS indices.  As the "spread" between CMBS and

10   Treasury bonds widened steadily in the first half of 2008, the managers quickly and dramatically

11   ramped up the fund's exposure to this sector through the use of total return and credit default

12   swaps, increasing the already excessive risk.  As spreads continued to widen throughout the year,

13   the managers made a large bet on the "opportunity of a lifetime" without regard to the risk to

14   investors or their own internal risk factors.  They continually escalated the size of the bet that

15   spreads would narrow by continually adding to the Fund's already excessively risky position in

16   CMBS total return swaps.

17                                         64.

18         Between April 30, 2007, and July 31, 2008, the Core Bond Fund increased it notional

19   exposure to CMBS total return swaps from approximately $15 million to $900 million, an

20   increase of 6,000 percent.  In other words, as of the end of July 2008, the approximately $2

21   billion Core Bond Fund was exposed to the performance of an additional $900 million in assets

22   that it did not actually own.  In this manner, the one-sided and speculative bet on the direction of

23   CMBS spreads added leverage and grossly increased the fund holders' exposure to the risk of

24   loss.

25

26

Page 23 - COMPLAINT

EXHIBIT **E**
PAGE **25** OF **50**

 

1                                            65.

2          On October 23, 2008, OFI made a presentation to the Oregon Board which included a

3    discussion of the Core Bond Fund.  At the presentation were Kevin Dachille and Dan Herrmann

4    of OFI.  Kevin Dachille is an investment director of OFI who works with the fixed income teams

5    articulating their investment policy, strategy and performance to existing and prospective

6    institutional clients.  During his presentation to the Board, Kevin Dachille explained the situation

7    in 2008 as follows:

8              MR. DACHILLE: ...  Now, this is a trying time, because every
               time we bought something, it went down in price.  And we'd buy it
9              again, and it would go down in price.  And we'd buy it again, and it
               would go down in price.  To the point where right at the eve of the
10             Bear Stearns episode in mid-March, we were, for all intents and
               purposes, all in.  Ninety-five percent of our risk budget was -- we
11             still have 95 percent of our risk budget, so the last six months we
               have not added to aggregate risk, but rather just held our position
12             or stayed the course.

13             MR. EDWARDS:  So why would you keep buying?  I mean,
               hindsight is always 20/20.  But what was it forcing you to --
14
               MR. DACHILLE:  Valuations got more attractive.
15
               MR. DACHILLE:  And so we were getting greedy.  That's how we
16             -- when the value increases –

17             -- we back up the truck.

18             MR. EDWARDS:  Well, let me ask you, is this abnormal?  Has the
               fund done this before where you've kept the steady buying spree --
19
               MR. DACHILLE:  Never like this.
20
               MR. EDWARDS:  -- and took a risk budget --
21
               MR. DACHILLE:  Never like this.
22
               MR. EDWARDS:  -- up like that?
23
               MR. DACHILLE:  No.  We've never gotten close to our
24             maximum.

25    (Emphasis added).

26

Page 24 - COMPLAINT

EXHIBIT E
PAGE 26 OF 50

 

1                                            66.

2          In other words, by April 2008, the Core Bond Fund had placed such a large bet that for

3   the purposes of assessing its risk, it was in OFI's own words "all in."

4                                            67.

5          In addition to fully expending its risk budget, in April 2008, the Core Bond Fund's

6   internal risk profile indicated that it was positioned to achieve inordinately high excess returns

7   compared to its benchmark. These potentially inordinate returns created correspondingly

8   inordinate risks. The so-called Core Plus strategy that was used to manage the Core Bond Fund,

9   set an *ex ante* target for excess return over the benchmark of between 100 to 125 basis points, or

10  1 percent to 1.25 percent. However, internal documents indicate that as early as April 1, 2008,

11  the composition of the Core Bond Fund was such that prospective excess return over the

12  benchmark was already forecast to be 1,058 basis points or 10.58 percent, well in excess of

13  OFI's own internal guideline, and an extraordinary level of risk and deviation from the

14  benchmark index. An excess return of this size, and the risk required to achieve it, was totally

15  inappropriate for a fund labeled as a "core" bond fund and was particularly inappropriate for the

16  college savings plan portfolios. Moreover, OFI never disclosed to the Oregon Board that the

17  Core Bond Fund was taking enormous risks in an effort to generate additional returns of almost

18  10 times the excess returns it represented to the investors.

19                                           68.

20         Navin Sharma is OFI's Director of Risk Management. His role is to prevent OFI

21  portfolio managers from taking too much risk or exceeding internal risk management guidelines.

22  On April 1, 2008, Sharma informed Ben Gord, a portfolio manager who helped manage the Core

23  Bond Fund, that the team had been exceeding the "pre-set limits" set forth in the firm's risk

24  models. In response to Mr. Sharma's warning, Gord told his team that it "was obvious from the

25  start" that Sharma did not "understand[] why he's been asked to do what he does." Rather than

26  heed the warning to control risk and change practices, Gord informed Sharma that "maybe the

Page 25 - COMPLAINT

EXHIBIT **E**
PAGE **27** OF **50**

 

1  guidelines have actually done their job, that we're taking big bets and now he knows about it[.]"

2  (Emphasis added). Despite the stated warnings of its risk managers, OFI continued to make bets

3  throughout 2008 that were even bigger than the "big bets" it made in April that caused it to

4  exceed its risk controls.

5                                          69.

6       The following week, April 8, 2008, the Core Bond Fund's internal risk profile documents

7  again confirm that the managers had exceeded the Fund's risk budget. According to the

8  documents, it had expended over 121 percent of its risk budget based upon the metric used the

9  previous week. Indeed, in his October 23, 2008, presentation to the Oregon Board, Mr. Dachille

10 stated that for the Core Bond Fund a tracking error of 200 basis points, which would be a fully

11 expended risk budget of 100 percent, was a "hard maximum." Nonetheless, on April 8, 2008,

12 the tracking error was 242 basis points, a 21 percent overage in the risk budget.

13                                         70.

14      Apparently unwilling to lower the risk profile to the required parameters, and likely

15 hoping to achieve outsized returns, OFI changed the metric used to calculate the amount of risk

16 budget remaining. Accordingly, while the old metric showed the Fund exceeding its risk budget

17 by 21 percent, using the new metric starting on April 2008, OFI's internal documents showed a

18 risk budget remaining of 31 percent. This more favorable metric would be used by OFI for the

19 rest of 2008 in calculating the risk budget remaining. The previous metric was disregarded even

20 though it reached as high as 145 percent by the end of 2008. OFI failed to disclose to the Oregon

21 Board that it had abandoned the old metric used to assess risk.

22                                         71.

23      As evidenced by the above, OFI repeatedly exceeded the Core Bond Fund's risk budget

24 in an effort to generate outsized returns. OFI failed to disclose that the Core Bond Fund was

25 engaging in risky hedge fund-type activities and was regularly exceeding its internal controls. In

26

Page 26 - COMPLAINT

EXHIBIT E
PAGE 28 OF 50

1    addition, OFI failed to disclose that throughout 2008, the Core Bond Fund regularly exceeded its

2    stated tracking error range and excess return guidelines.

3          **D.**      **OFI breaches its duties as an investment adviser to the Oregon Plan by**
                   **failing to disclose the risk and continuing to recommend the now high-risk**

4                       **Core Bond Fund in the Oregon Plan portfolios.**

5                  72.

6          From June 2004 through October 2008, OFI made quarterly reports to the Oregon Board.

7    At no time during this period did OFI indicate any significant issues, events or changes in the

8    Core Bond Fund.

9                  73.

10          Further, with one exception, OFI never recommended changes in portfolio allocations.

11    The one exception occurred in April 2008 when the adviser-sold option within the Oregon Plan

12    underwent a number of changes in portfolio allocations in underlying funds purportedly for the

13    purpose of seeking higher returns.

14          **E.**      **OFI reveals that it was aware of the risks being taken by Core Bond, tries to**
                   **convince Oregon that it should stay in Core Bond but also admits, for the**

15                       **first time, that Core Bond was too aggressive for some portfolios and that it**
                   **had never  fulfilled its duties under the PMA to evaluate portfolios and**

16                       **underlying funds.**

17                  74.

18          As of the October 23, 2008, Board meeting, the Core Bond Fund was down over

19    11 percent for the third quarter alone and over 12 percent for the year-to-date.  When asked by

20    Treasurer Randall Edwards to put the loss in layman's terms, Kevin Dachille replied, "mind-

21    numbing."

22                  75.

23          In the face of these dismal performance numbers, Mr. Dachille nonetheless offered the

24    following hope:

25              Our story isn't one of despair, however.  As I mentioned, the bond
           market has been dealing with this for about a year and a half, and

26              some of the more recent -- and we'll talk about this in a little bit,
           but some of the more recent policy initiatives, not just in the

Page 27 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT **E**
PAGE **29** OF **50**



1     United States, but worldwide, give us a great deal of hope. And so
      it is one of those messages that yes, things are pretty bad now.
2     We're under tremendous stress. The cavalry isn't just coming, it's
      on its way.
3
                              * * *
4     And what I want to talk about specifically with regard to this
      underperformance is what bond guys like me refer to as permanent
5     impairment versus recoverable losses, because far and away, the
      underperformance that you're seeing right here is in recoverable --
6     highly recoverable losses.

7                                    76.

8     In his presentation, Mr. Dachille presented a chart, attached as Exhibit 2, that shows the

9     portfolio performance attribution of the various sectors in which the Core Bond Fund invests. In

10    other words, it shows the sectors that contributed the most to the Core Bond Fund's gains or

11    losses. This chart reveals that the greatest contributor to the Fund's losses thus far in 2008 were

12    its CMBS holdings, which contributed 451 basis points to the losses. Nonetheless, Mr. Dachille

13    stated that the Core Bond Fund was well positioned for a significant recovery in the CMBS

14    sector:

15          But more importantly, were spreads to come back to where they
            rallied to at the end of May -- and by no means would this be a
16          normal environment, just to come back into some form of
            reasonableness -- these have well double digit return potentials that
17          we're looking at here.

18          So to us, this is why we fell in love with this asset.

19                                   77.

20    The second largest contributor to the Core Bond Fund's poor performance was the

21    RMBS sector, contributing 412 basis points to the Fund's losses for the first three quarters of

22    2008. With regard to that sector, Mr. Dachille stated:

23          They're well into the double digits for just the carry trade if you
            will, of moving into non-agencies. And the potential total rate of
24          return on yields coming back to some sort of normal range -- and
            by that, I mean just where they were at the end of May, not back to
25          where their historical averages are. -- believe it or not, puts the
            total return potential on these close to 30 percent.
26

Page 28 - COMPLAINT

EXHIBIT E
PAGE 30 OF 50

1                                                  78.

2        In an acknowledgment of OFI's failure to fulfill its responsibilities to the Oregon Plan

3   with respect to portfolio allocations and risks of underlying funds, Mr. Dachille revealed that

4   OFI, for the first time since it had been hired as the Oregon Plan's investment adviser was going

5   to undertake a review of the portfolios, the underlying funds, and their respective risks, stating:

6                  And one -- and one thing that we've directed the consultant to do
                   with this is we're going to look at the risk.  We're going to look at
7                  where we need to be on how much risk we want to take in all the
                   portfolios.
8
                   The point about what fund is proper for what age band, that's going
9                  to be looked at very closely.  I mean, core bond may be perfectly
                   fine for the first two portfolios, and not for the last two.
10
                   You know, that's clearly been the one fund that's been the most
11                 egregious.  But, again, we're going to look at every single fund that
                   Oppenheimer has and say, okay, where do we want be on the risk
12                 spectrum, in what portfolio.  So we're going to look at them
                   portfolio by portfolio, not just where we're going to pick three
13                 equity funds and say 20 percent here, 10 percent here.  We're going
                   to look at each portfolio separately and then build the portfolio
14                 from there.  That's our new strategy.  (Emphasis added).

15                                                 79.

16       In other words, OFI stated that it had a "new strategy" for building portfolios with

17  investments that were matched to the portfolios' risk profiles despite the fact that it had this legal

18  duty from the outset of its contractual and fiduciary adviser relationship to the Oregon Trust.

19                                                 80.

20       As of the October 23, 2008 Oregon Board meeting and before, OFI knew the following:

21           (a) The Core Bond Fund had exceeded its risk budget since April 2008;

22           (b) The Core Bond Fund had incurred significant losses as result of taking excessive
                 risks such as in CMBS, Corporate Financial Bonds, and RMBS.
23
             (c) The Core Bond Fund was positioned such that it might achieve significant excess
24               returns over its benchmark or be exposed to significant losses;

25           (d) That the losses year-to-date in the Core Bond Fund of 12 percent were "mind-
                 numbing;"
26

Page 29 - COMPLAINT

EXHIBIT E
PAGE 31 OF 50



1         (e) That the Core Bond Fund was being operated more as a hedge fund than a Core
              Bond Fund;

2         (f) That the Core Bond Fund was using leverage that amplified the risks;

3

4         (g) That the Oregon Plan and the Oregon Board were concerned about preventing any
              further losses; and,

5         (h) That the Oregon Board was relying upon OFI's knowledge of the Core Bond
              Fund and its expertise as an investment adviser.

6

7                               81.

8         Nonetheless, OFI never recommended to the Oregon Board that the Oregon Plan pull its

9   assets from the Core Bond Fund despite the fact that the Oregon Plan was exposed to significant

10  additional risk by remaining in the Core Bond Fund going forward. OFI failed to recommend an

11  appropriate change in the bond fund because it was motivated, not in the best interests of the

12  Oregon Plan, but rather to maximize the management fees of OFI as well as to prevent a mass

13  exodus of investments by the Oregon College Savings Plan and other college savings plans from

14  the Core Bond Fund and other OppenheimerFunds investments. OFI also did not have an

15  appropriate core bond fund to offer to the Oregon Plan.

16      F.     **OFI's statement at the Oregon Board January 22, 2009 board meeting
                   further highlights the hedge fund-type risks taken by OFI with the Core
17                   Bond Fund and the failure of OFI to make recommendations in the best
                   interest of the Oregon Plan.**

18

19                               82.

20         In his presentation to the Oregon Board on January 22, 2009, OFI's Chief Investment

21  Officer, Kurt Wolfgruber, stated that a large part of the Core Bond Funds' poor performance was

22  due to the fact that "interest rates spreads widened to levels never seen before." He went on to

23  explain the issue as follows:

24             First, the spreads. Spreads between the yields on CMBS, or
                Commercial Mortgage Backed Securities and Treasury Bonds,
25             widen to unforeseeable levels. Between 1988 and 2007, historical
                spreads for these types of securities averaged less than 1 percent[or
26             100 basis points]. Indeed, actually a move of five basis points . . .
                was deemed to be a lot. At the start of 2008, it [CMBS spread]

Page 30 - COMPLAINT

EXHIBIT **E**
PAGE **32** OF **50**

 

1    stood at 1.75 percent and climbed to 4.75 percent during the Bear
     Stearns crisis. On November 21st, that spread peaked at 15.6
2    percent, so nearly 16 times than what we would view as the normal
     spread level for those instruments.
3

4                                    83.

5        Mr. Wolfgruber was claiming that what occurred in November 2008 was unforeseeable,

6    i.e., that the possibility that spreads could widen so dramatically was unprecedented.

7    Mr. Wolfgruber wanted the Oregon Board to believe that OFI could never have anticipated the

8    widening of CMBS spreads. In fact, the result was predictable and known to OFI in light of its

9    own risk tracking data.

10                                   84.

11       Mr. Wolfgruber's statements failed to describe the unprecedented widening that had

12   already occurred in CMBS spreads. Instead, the statements highlighted the "all in" mentality

13   that caused the Core Bond Fund to be run more as a hedge fund than a core bond fund.

14   Mr. Wolfgruber was correct that historically spreads for CMBS securities averaged less than

15   1 percent or 100 basis points. In fact, between January 2004 and June 2007, CMBS spreads were

16   consistently between 25 to 30 basis points. However, by November 2007, CMBS spreads had

17   more than doubled to 70 basis points. As Mr. Wolfgruber noted, a move of even 5 basis points

18   was "deemed to be a lot." This was a move of 40 basis points, or eight times more than a

19   movement that he deemed to be significant.

20                                   85.

21       The unprecedented widening of CMBS spreads was only beginning. By January 2008,

22   CMBS spreads more than doubled once again to 152 basis points, or in excess of 500 percent of

23   CMBS spreads just six months earlier. Within the next five or six weeks, by February 15, 2008,

24   spreads had once again doubled to 308 basis points. Thus, in just eight months, spreads had

25   increased over 1,000 percent. Given this prior and already unprecedented widening of CMBS

26   spreads, the Core Bond Fund managers could not reasonably rely upon historical patterns or the

Page 31 - COMPLAINT

EXHIBIT **E**
PAGE **33** OF **50**



1    theoretical premise of reversion. The decision of OFI to continue to use leverage to increase the

2    Core Bond Fund's exposure to CMBS until it was "all in," was unreasonable and reckless for a

3    bond fund that OFI used in connection with college savings plans. It also was done in total

4    disregard of OFI's own risk metrics and controls.

5                                              86.

6              Unfortunately, OFI's investment managers for the Core Bond Fund continued their hedge

7    fund bets. After losing a "mind numbing" 11 percent in the third quarter of 2008, by the time

8    Mr. Dachille appeared before the Oregon Board on October 23, 2008, CMBS spreads had once

9    again doubled from February 2008, and were then at 676 basis points, 10 times the spread just

10   one year earlier and 20 times the spread average from 2004 to 2007. In other words, as of the

11   October 23, 2008, Board meeting, OFI knew that it had repeatedly been wrong in its bets on

12   CMBS spreads, had already lost 11 percent in just the third quarter alone, was facing CMBS

13   spreads that defied any historical precedent, and was acting without regard to its own risk metrics

14   or risk controls.

15                                             87.

16             Nonetheless, at the October 2008 board meeting, OFI never advised the Oregon Board of

17   the huge risks being taken by the Core Bond Fund or of the fact that the Core Bond Fund

18   managers were continuing to place hedge fund-type bets. Instead, OFI reassured the Oregon

19   Board that "the cavalry is on its way." OFI spoke only about the potential upside of the CMBS

20   position held by the Core Bond Fund, never advising the Oregon Board that it had placed a bet

21   that could and did result in a 26 percent loss in the fourth quarter alone. As the Oregon Plan's

22   Program Manager, OFI owed the Oregon Plan a duty to disclose the highly risky position in

23   which the Core Bond Fund found itself in October 2008.

24

25

26

Page 32 - COMPLAINT

EXHIBIT **E**
PAGE **34** OF **50**

1                                                88.

2          While the Core Bond Fund lost a total of nearly 36% for the year 2008, its benchmark

3    index was actually up 5% for the year.  Through March 2009, the Core Bond Fund lost another

4    10% while the index remained virtually even.

5                                                89.

6          Prior to the plan's investment in the Core Bond Fund, OFI employed a management team

7    in Boston headed by Angelo Manioudakis to oversee the Core Bond Funds' investments.  In the

8    wake of the devastating losses in the Core Bond Fund, OFI pulled the Core Bond Fund

9    management team from Boston back to its New York office.  Manioudakis and all of his top

10   level managers have since left OFI and, for the first time, OFI has hired a Chief Risk Officer.

11                                               90.

12         Since leaving OFI, Manioudakis has stated that he never had any knowledge that the

13   Core Bond Fund was being used by OFI to invest money from the Oregon College Savings Plan.

14   **G.     The Oregon Board terminates the Core Bond Fund (and the Limited Term
             Government Bond Fund).**
15

16                                               91.

17         Despite OFI's assurances at the October 2008 Board Meeting, the Oregon Board engaged

18   an independent firm to review the Oregon Plan portfolios after that meeting.  As the result of this

19   review, the Oregon Board decided at the January 22, 2009 meeting to terminate the Oregon

20   Plan's participation in the Core Bond Fund and the Limited Term Government Bond Fund as

21   soon as possible. It finalized that plan at a follow-up meeting of the Oregon Board on February

22   26, 2009.  The Core Bond Fund and Limited Term Government Funds were fully liquidated and

23   exchanged into index funds on or by March 27, 2009.

24

25

26

Page 33 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067

EXHIBIT E
PAGE 35 OF 50

1    **H.    Defendants' Continued Recommendation and Sale of the Core Bond Fund to the Trust Portfolios Violated the PMA and The Adopted Investment Policy.**

2

3    **1.    OFI breached its duties under the PMA.**

4    92.

5    As alleged at length above, OFI had a number of contractual duties including but not

6    limited to "determining that the investment objectives, policies, and practices of the Underlying

7    Funds in which the Trusts assets are invested [e.g., the Core Bond Fund] are consistent with the

8    Board's Investment Policy and applicable law." PMA Section 5.2(b). It also had the continuing

9    duty to "at least annually, review the Investment Portfolios of the OCS Plan" and "shall from

10    time to time propose . . . the modification of the Underlying Funds [e.g., the Core Bond Fund] in

11    which certain existing Investment Portfolios invest . . . all in accordance with the applicable

12    Investment Policy and subject to Board approval." PMA Section 5.3. It had the further duty to

13    inform the Oregon Board of material changes that impacted the Underlying Fund and the Oregon

14    Plan. PMA Sections 4.1; 9.1(b).

15

16    93.

17    At least as of early 2008, OFI violated the PMA by, among other things:

18    (a)    failing to report to the Board that the investment objectives, policies, and practices
           of the Core Bond Fund were no longer consistent with the Board's Investment
           Policy;

19

20    (b)    continuing to recommend and selling the Core Bond Fund to each of the
           Portfolios in violation of the Board's Investment Policy; and,

21    (c)    failing to recommend that the Core Bond Fund be removed from each of the
           Portfolios because that Fund was in violation of the Board's Investment Policy.

22

       These violations occurred across each of the Portfolios in the Plan as alleged below.

23

24

25

26

Page 34 - COMPLAINT

EXHIBIT **E**
PAGE **36** OF **50**

1    **2.    OFI breached the PMA by recommending the Core Bond Fund for
         the Ultra Conservative/In College or the Conservative/1-3 Years to**
2    **     College Portfolios.**

3                                        94.

4         The Investment Policy provided that the Ultra Conservative/In College and

5    Conservative/1-3 Years to College Portfolios had the primary investment objectives of

6    "protection of principal" and "income." OFI was supposed to manage these portfolios by

7    "preserv[ing] capital" and seeking "minimal income growth by investing primarily in bond

8    Underlying Funds to maintain stability."

9                                        95.

10        OFI, however, continued to recommend, use and sell the high risk Core Bond Fund in the

11   Ultra Conservative/In College and Conservative/1-3 Years to College Portfolios. OFI generally

12   recommended that Oregon have and, as a result, Oregon generally had 20 percent of the Ultra

13   Conservative/In College Portfolio and 35 percent of the Conservative/1-3 Years to College

14   Portfolio invested in the Core Bond Fund. At least as of early 2008, the Core Bond Fund did not

15   meet the Investment Policy as to any portfolio that had "principal protection" and "minimal

16   income growth" as its objectives. Indeed, Mr. Manioudakis, the former manager of the Core

17   Bond Fund, has admitted that the Core Bond Fund was not designed to protect principal.

18                                       96.

19        At least as of early 2008 and continuing throughout the year, the Core Bond Fund did not

20   meet the Investment Policy as to the Ultra Conservative/In College and Conservative/1-3 Years

21   to College Portfolios for many of the reasons alleged above, including but not limited to the

22   following:

23        (a)    The Core Bond Fund took hedge fund-like risks that exposed it to substantial
                 swings in the market;
24
          (b)    Those who invest for children in college or just a couple of years from college
25               cannot afford to take hedge fund-like risks because they will have an immediate
                 or imminent need to use their money;
26

Page 35 - COMPLAINT

EXHIBIT __E__
PAGE __37__ OF __50__

 

1   (c)   The Core Bond Fund sought much higher returns and took much higher risk through perceived "once-in-a-lifetime" opportunities in which OFI recommended that those investing for college "back up the truck" and make "all in" bets that were not appropriate for a portfolio designed to protect principal and obtain minimal income;

2

3

4   (d)   The Core Bond Fund had substantial investments in derivatives, swaps, sub-prime mortgage-backed securities and other similar investments that, particularly taken together, were not designed to preserve principal or seek minimal income growth;

5

6   (e)   The Core Bond Fund used leverage, exposing investors to the risk of suffering losses greater than just the money invested in the portfolio; such leverage was inappropriate for those who wanted to preserve principal for the immediate costs of education;

7

8

9   (f)   At least as of early 2008, the Core Bond Fund, by OFI's own admission, was only appropriate for those investors with a long term investment horizon. By definition, the Ultra Conservative/In College and Conservative/1-3 Years to College Portfolios were intended for people who needed money for college immediately or in the next 1-3 years.

10

11

12   **3.    The Core Bond Fund was not consistent with the investment objectives of the remaining portfolios.**

13                                        97.

14       The Core Bond Fund also was not appropriate for the Balanced/4-6 Years to College,

15   Moderate/7-9 Years to College or even the Aggressive/10+ Years to College Portfolios.

16                                        98.

17       The Balanced/4-6 Years to College and Moderate/7-9 Years to College Portfolios had

18   investment objectives of "capital appreciation and income" through "moderate growth" with the

19   Balanced/4-6 Years to College Portfolio slightly weighted towards bond funds and the

20   Moderate/7-9 Years to College Portfolio slightly weighted towards equity funds. The funds were

21   supposed to have a "combination of conservative and aggressive investments." The Balanced/4-

22   6 Years to College Portfolio, however, generally had 30 percent of its portfolio in the Core Bond

23   Fund and the Moderate/7-9 Years to College Portfolio generally had 20 percent of its portfolio in

24   the Core Bond Fund. At least as of early 2008, there were two significant problems with these

25   investments in the Core Bond Fund. First, the Core Bond Fund itself did not seek moderate

26   growth but took hedge fund-like risks and sought hedge fund-like returns. Second, OFI used the

Page 36 - COMPLAINT

EXHIBIT E
PAGE 38 OF 50

 

1    Core Bond Fund in the Balanced/4-6 Years to College and Moderate/7-9 Years to College

2    Portfolios as one of the purportedly "conservative investments" to balance out the greater risks,

3    and associated volatility, taken in the more aggressive equity investments. However, the effect

4    of the Core Bond Fund was not to make the portfolio risks more moderate through the addition

5    of a conservative investment, but to make the portfolios much more aggressive through the

6    addition of a higher-risk investment.

7                                    99.

8         At least as of early 2008, the Core Bond Fund was also an improper investment for even

9    the Aggressive/10+ Years to College Portfolio. The Aggressive Portfolio was designed to seek

10   capital appreciation. However, the Investment Policy provided that it also would invest "[a]

11   percentage of assets" in bond funds "to provide some protection from equity volatility." The

12   Aggressive/10+ Years to College Portfolio generally had 10 percent of its portfolio in the Core

13   Bond Fund. The effect of this investment was not to provide protection from "equity volatility."

14   Indeed, the investment in the Core Bond Fund in 2008 substantially increased the volatility of the

15   Aggressive/10+ Years to College Portfolio and subjected that portfolio to much higher risks.

16        **4.    Defendants breached the "Representations, Warranties and**
            **Covenants" in the PMA.**

17

18                                   100.

19        OFI and OFDI also made a number of representations, warranties and covenants, alleged

20   in greater detail above, that provided, among other things, that the "Plan Marketing Materials

21   (excluding information provided by the Board) shall not contain any untrue statement of material

22   fact or omit to state a material fact necessary to make the statements not misleading." PMA

23   Sections 13.1(h); 13.2(h). OFI and OFDI further certified that the Plan Description, which was

24   also included within the Plan Marketing Materials, was complete, accurate, and did not include

25   any material misrepresentations or omissions. PMA Sections 3.2(b)(ii), (iii). OFI also had a

26

Page 37 - COMPLAINT

EXHIBIT E
PAGE 39 OF 50



1   duty to update the Plan description if there were material developments arising after the Plan

2   Description was initially prepared.  PMA Section 9.1(b)

3                                                                          101.

4          As of early 2008, the Plan Description and Plan Participation Agreement prepared by OFI

5   and OFDI, which was part of the Plan Marketing Materials sent to all participants for the direct

6   and the advisor-sold plans, provided the following:

7          (a)     For the Years to College Portfolio, "[i]nvestments are automatically moved to
                   more conservative Portfolios that seek to preserve capital as the expected time for
8                  disbursement approaches."

9          (b)     The Ultra-Conservative/In-College Portfolio invests in fixed income and money
                   market investments "in order seek the Portfolio's objectives of income and
10                 protection of principal" and seeks "preservation of capital with minimal growth
                   by investing primarily in fixed income mutual funds and a money market fund to
11                 maintain stability."

12         (c)     The Conservative/1-3 Years College Portfolio invests "primarily in fixed income
                   and money market investments in order to seek the Portfolio's objectives of
13                 income and protection of principal" and "seeks preservation of capital with
                   minimal growth[.]"
14
           (d)     The Balanced/4-6 Years to College Portfolio "seeks moderate growth" by slightly
15                 weighting investments towards fixed income funds, such as the Core Bond Fund.

16         (e)     The Moderate/7-9 Years to College Portfolio also "seeks moderate growth" by
                   including fixed income funds, such as the Core Bond Fund.
17
           (f)     Even the Aggressive/10-plus Years to College Portfolio used "fixed income
18                 mutual funds," like the Core Bond Fund "to provide some protection against
                   equity volatility."
19

20  Each of the statements contained above was either a misrepresentation or contained an untrue or

21  material omission of fact because those getting closer to college did not move into a more

22  conservative policy and the Core Bond Fund did not provide and was not designed to provide

23  protection of principal.  It also did not seek preservation of capital, minimal growth, moderate

24  growth or provide some protection against equity volatility because Core Bond Fund, instead,

25  was operated as a high-risk fund that sought speculative returns by taking very aggressive risks.

26

Page 38 - COMPLAINT

EXHIBIT E
PAGE 40 OF 50

1  **I.    Defendants Acted in Concert and Knowingly Aided and Assisted Each**
   **Other's Tortious Conduct.**

2

3                                          102.

4        Defendants acted in concert and knowingly aided and assisted each other's breach of duty

5  to the Oregon Trust in connection with the sale of the securities at issue and the provision of

6  services to the Oregon Trust.  Each Defendant is therefore responsible for all actions, statements,

7  and omissions of the other Defendants.   Defendants are jointly liable for Plaintiff's damages.

8  **J.    OFDI Is Independently and Jointly and Severally Liable With the Other**
   **Defendants.**

9

10                                         103.

11       OFI and OFI Private recommended and sold the Core Bond Fund securities to the Oregon

12  Board. OFI and OFI Private marketed the sale of the Core Bond Fund through their preparation

13  of the Trust marketing materials.  Those Defendants breached the PMA and violated the law with

14  the participation and assistance of defendant OFDI, which distributed the securities to the

15  Oregon Trust.  OFDI was a party to the PMA and facilitated the others in the sale of and sold

16  Plaintiff securities in violation of the PMA and Oregon law.

17  **K.    The Oregon Trust's Damages**

18                                         104.

19       Subject to additional proof at trial, the Oregon Trust suffered at least the following

20  damages to each of the Portfolios:

21                      **Oregon Trust Portfolio Damages**

22            Ultra Conservative/In-College:        $1.73 million

23            Conservative/1-3 Years to College:    $9.21 million

24            Balanced/4-6 Years to College:        $8.97 million

25            Moderate/7-9 Years to College:        $8.15 million

26            Aggressive/10+ Years to College:      $8.21 million

Page 39 - COMPLAINT


EXHIBIT **E**
PAGE **41** OF **50**

1  The total Portfolio damages are in excess of $36.2 million.

2  **VI.**  **CLAIMS FOR RELIEF**

3  **FIRST CLAIM FOR RELIEF**
   **VIOLATION OF OREGON SECURITIES LAW, ORS 59.137**
4

5                                    105.

6      Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

7  as if fully alleged herein.

8                                    106.

9      Defendants sold the Oregon Trust securities and shares in the Core Bond Fund in

10  violation of ORS 59.137 by:

11          (a) employing a device, scheme and/or artifice to defraud;

12          (b) by engaging in acts, practices and a course of business that operated as a fraud or
               deceit upon Plaintiff; and/or
13
            (c) by making untrue statements of material fact and omitting to state material facts
14              necessary in order to make the statements made, in light of the circumstances
               under which they were made, not misleading, as alleged herein.
15

16                                   107.

17     Defendants violated and/or materially aided in violations of ORS 59.135(1), (2), and/or

18  (3) in connection with the sale of the Core Bond Fund shares to the Oregon Trust.

19                                   108.

20     In addition, in advising Plaintiff regarding the securities and portfolios of securities at

21  issue, Defendants made material misrepresentations and omissions by virtue of their failure to

22  exercise reasonable care or competence in communicating information to Plaintiff.

23                                   109.

24     Defendants' conduct created a foreseeable risk that Plaintiff would invest in securities

25  and portfolios of securities and would sustain losses as a result thereof.

26

Page 40 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067


EXHIBIT E
PAGE 42 OF 50

 

110.

As a direct result, Plaintiff invested in the securities and portfolios of securities at issue.

111.

OFI directly or indirectly controlled OFI Private and OFDI.  OFI is therefore jointly and severally liable to the same extent as OFI Private as OFDI pursuant to ORS 59.137(2).

112.

Defendants' violations of ORS 59.135 caused the Oregon Trust actual damages in excess of $36.2 million.

113.

Pursuant to ORS 59.137(1) Plaintiff is entitled to recover from Defendants, jointly and severally, (1) damages in an amount to be proven at trial, which is in excess of $36.2 million, (2) the amount of fees or other remuneration paid to Defendants, and (3) interest as provided in ORS 59.137(1).

114.

Pursuant to ORS 59.137(4), Plaintiff is entitled to an award of its costs and reasonable attorney fees.

## SECOND CLAIM FOR RELIEF
## VIOLATION OF OREGON SECURITIES LAW, ORS 59.115(1)(b) AND 59.135

115.

Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if fully alleged herein.

116.

Defendants sold and/or successfully solicited the sale of the Core Bond Fund shares to the Oregon Trust.

Page 41 - COMPLAINT

EXHIBIT E
PAGE 43 OF 50



 

1                                        117.

2          Defendants sold and/or successfully solicited the sale of these securities in violation of

3     ORS 59.115(1)(b) and 59.135 by:

4               (a) employing a device, scheme and/or artifice to defraud;

5               (b) by engaging in acts, practices and a course of business that operated as a fraud or
                    deceit upon Plaintiff; and/or
6
                (c) by making untrue statements of material fact and omitting to state material facts
7                   necessary in order to make the statements made, in light of the circumstances
                    under which they were made, not misleading, as alleged herein.
8

9                                        118.

10         Plaintiff did not know of the untruth of Defendants' representations and was unaware of

11    Defendants' omissions.

12                                       119.

13         Defendants each participated and materially aided in the sale of securities at issue, and

14    are therefore jointly and severally liable for the violations of ORS 59.115 pursuant to

15    ORS 59.115(3).

16                                       120.

17         OFI directly or indirectly controlled OFI Private and OFDI.  OFI is therefore jointly and

18    severally liable to the same extent as OFI Private and OFDI pursuant to ORS 59.115(3).

19                                       121.

20         Pursuant to ORS 59.115(2)(a), Plaintiff is entitled to recover from Defendants, jointly

21    and severally, rescissionary damages of the consideration paid for the securities, plus interest

22    from the date of the purchase of the securities.  Alternatively, pursuant to ORS 59.115(2)(b),

23    Plaintiff is entitled to recover from Defendants, jointly and severally, rescissionary damages less

24    any amounts received for the securities plus interest in an amount to be proven at trial, which

25    amount is in excess of $36.2 million.

26

Page 42 - COMPLAINT

EXHIBIT E
PAGE 44 OF 50



1          122.

2          Pursuant to ORS 59.115(10), Plaintiff is entitled to an award of its costs and reasonable

3    attorney fees.

4                        **THIRD CLAIM FOR RELIEF**
                          **BREACH OF CONTRACT**

5                        **(Program Management Agreement)**

6

7          123.

8          Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

9    as if fully alleged herein.

10          124.

11          The Oregon Board, on behalf of the Oregon Trust, entered into the PMA with Defendants

12    OFI and OFDI.  OFI Private may also be a party to that contract.

13          125.

14          Pursuant to the PMA, Defendants made a number of certifications, representations and

15    warranties, and assumed numerous contractual duties as detailed in paragraphs 33-38, among

16    others, above.

17          126.

18          Further, Defendants owed Plaintiff the duty of good faith and fair dealing implied in

19    every contract.  Plaintiff had a reasonable expectation that any materials prepared by Defendants

20    pursuant to the PMA would not contain any untrue statement of a material fact or omit to state a

21    material fact necessary to make the statements made therein not misleading in light of the

22    circumstances under which they were made.  Plaintiff also had a reasonable expectation that any

23    information provided by Defendants pursuant to the PMA would not contain any untrue

24    statement of a material fact or omit to state a material fact necessary to make the statements

25    made not misleading in light of the circumstances under which they were made.

26

Page 43 - COMPLAINT

Department of Justice
1162 Court Street, NE
SALEM, OREGON 97301-4096
TEL. (503) 934-4400  FAX (503) 373-7067


EXHIBIT __E__
PAGE **45** OF **50**




1                                          127.

2            Defendants breached the above-described contractual duties, representations, warranties

3    and covenants as alleged herein.

4                                          128.

5            As a direct result of Defendants' breach of contract, Plaintiff has been injured in an actual

6    amount to be proven at trial, which is in excess of $36.2 million.  Plaintiff is entitled to an award

7    of prejudgment interest on this claim.

8                                          129.

9            Plaintiff is entitled to its attorney fees and costs under section 12.1 of the PMA.

10                          **FOURTH CLAIM FOR RELIEF**
                              **BREACH OF FIDUCIARY DUTY**
11

12                                         130.

13           Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

14   as if fully alleged herein.

15                                         131.

16           As Plaintiff's investment advisers and broker-dealer, Defendants owed fiduciary duties to

17   Plaintiff.  Defendants owed Plaintiff the fiduciary duties of care, loyalty, honesty, and full and

18   fair disclosure.  Defendants also owed Plaintiff the duty to comply with all applicable standards

19   of care, including applicable codes of professional conduct.

20                                         132.

21           Defendants breached the fiduciary duties they owed to Plaintiff in the course of advising

22   Plaintiff regarding the Core Bond Fund.  In advising Plaintiff regarding the Core Bond Fund,

23   Defendants made material misrepresentations and omissions by virtue of their failure to exercise

24   reasonable care or competence in communicating information to Plaintiff.

25

26

Page 44 - COMPLAINT

EXHIBIT **E**
PAGE **40** OF **50**



1                         133.

2       Defendants' conduct created a foreseeable risk that Plaintiff would invest in the Core

3  Bond Fund and would sustain losses as a result thereof.

4                         134.

5       As a direct result of Defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff

6  invested, continued to invest, and did not terminate its participation in the Core Bond Fund.

7                         135.

8       As a direct result of Defendants' breaches of fiduciary duties owed to Plaintiff, Plaintiff

9  has been injured in an actual amount to be proven at trial, which is in excess of $36.2 million.

10  Plaintiff is entitled to an award of prejudgment interest on this claim.

11               **FIFTH CLAIM FOR RELIEF**
**NEGLIGENCE**

12

13                      136.

14       Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs

15  as if fully alleged herein.

16                      137.

17       As Plaintiff's investment advisers and broker-dealer, Defendants had a duty to exercise

18  reasonable care and competence in obtaining and communicating information to Plaintiff and in

19  advising Plaintiff regarding the Core Bond Fund.

20                      138.

21       Defendants breached the duties they owed to Plaintiff in the course of advising Plaintiff

22  regarding the Core Bond Fund. In advising Plaintiff regarding the Core Bond Fund, Defendants

23  made material misrepresentations and omissions by virtue of their failure to exercise reasonable

24  care or competence in communicating information to Plaintiff.

25

26

Page 45 - COMPLAINT



EXHIBIT E
PAGE 47 OF 50

 

139.

Defendants' conduct unreasonably created a foreseeable risk that Plaintiff would invest in the Core Bond Fund and would sustain losses as a result thereof.

140.

As a direct and foreseeable result of Defendants' conduct, Plaintiff has been injured in an actual amount to be proven at trial, which is in excess of $36.2 million. Plaintiff is entitled to an award of prejudgment interest on this claim.

## SIXTH CLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

141.

Plaintiff incorporates and realleges the allegations contained in the preceding paragraphs as if fully alleged herein.

142.

As Plaintiff's investment advisers and broker-dealer, Defendants had a special relationship with Plaintiff. Defendants had a duty to exercise reasonable care and competence in obtaining and communicating information to Plaintiff.

143.

In the course of their business relationship with Plaintiff, Defendants supplied false information to Plaintiff regarding the Core Bond Fund and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, as alleged herein. Defendants failed to exercise reasonable care in obtaining information regarding the Core Bond Fund and/or in providing the information to Plaintiff regarding the Core Bond Fund.

144.

Plaintiff justifiably relied on Defendants' misrepresentations and omissions in investing in the Core Bond Fund.

Page 46 - COMPLAINT

EXHIBIT __E__
PAGE __48__ OF __50__






1                                                                 145.

2          Plaintiff sustained damages as a result of their reliance on Defendants' misrepresentations

3    and omissions.

4                                                                 146.

5          As a direct and foreseeable result of Defendants' negligent misrepresentations and

6    omissions, Plaintiff has been injured in an actual amount to be proven at trial, which is in excess

7    of $36.2 million. Plaintiff is entitled to an award of prejudgment interest on this claim.

8                                            **PRAYER FOR RELIEF**

9          WHEREFORE, Plaintiff prays for judgment as follows:

10         A.     Awarding Plaintiff compensatory damages in an amount in excess of $36.2

11   million and in an exact amount to be proven at trial;

12         B.     Awarding Plaintiff its costs and expenses for this litigation, including reasonable

13   attorneys' fees and expert witness fees pursuant to ORS 59.137(4) and ORS 59.115(10) and

14   Section 12.1 of the PMA;

15         C.     Awarding Plaintiff prejudgment interest at the statutory rate of 9%; and

16         D.     Awarding Plaintiff such other and further relief as may be deemed just and proper

17   under the circumstances.

18

19

20

21

22

23

24

25

26

Page 47 - COMPLAINT



EXHIBIT E
PAGE 49 OF 50




1  **VII.   JURY DEMAND**

2  Plaintiff hereby demands a trial by jury as to all issues.

3  DATED this 13th day of April, 2009.

4                                        JOHN R. KROGER
                                         Attorney General

5

6                                        By: /s/

7                                          **Keith S. Dubanevich,** OSB No. 975200
                                           Special Counsel, Office of the Attorney General

8                                          **Frederick M. Boss,** OSB No. 911424
                                           Division Administrator, Civil Enforcement

9                                          **Simon Whang,** OSB No. 035282
                                           Assistant Attorney General

10
                                         Oregon Department of Justice

11                                       1162 Court Street NE
                                         Salem, OR 97301-4096

12                                       Telephone:    (503) 934-4400
                                         Facsimile:    (503) 373-7067

13                                       Email:        keith.dubanevich@doj.state.or.us
                                                       fred.boss@doj.state.or.us

14                                                     simon.c.whang@doj.state.or.us

15                                       and

16                                       **Keith A. Ketterling,** OSB No. 913368
                                         **Scott A. Shorr,** OSB No. 961873

17                                       **Jennifer A. Wagner,** OSB No. 024470
                                         STOLL STOLL BERNE LOKTING & SHLACHTER P.C.

18                                       209 SW Oak Street, 5th Floor
                                         Portland, OR 97204

19                                       Telephone:    (503) 227-1600
                                         Facsimile:    (503) 227-6840

20                                       Email:        kketterling@stollberne.com
                                                       sshorr@stollberne.com

21                                                     jwagner@stollberne.com

22                                       Attorneys for Plaintiff

23                                       Trial Attorneys:   Keith S. Dubanevich, OSB No. 975200
                                                            Keith A. Ketterling, OSB No. 913368

24

25

26

Page 48 - COMPLAINT




EXHIBIT **E**
PAGE **50** OF **50**

```
                                    SRB  5/14/09  3:00 PM
Remote Case Register. Marion County Circuit Court      Status Open
Case#...... 09C14018 Oregon State Of/Oppenheimerfunds Inc
                     Civil Contract
```

```
Case Filed Date.....  4/13/09   Starting Instrument.. Complaint
Case Started Date...  4/13/09   Originating From..... Original filing
At Issue Date.......            Previous Court.......
First Setting Date..            Previous Court Case#.
Trial Scheduled Date            Master Case Number...
Trial Start Date....            Relation to Master...
Length of Trial.....            Amount Prayed for.... $.00
Disposition Date....            Termination Stage....
Final Order Date....            Termination Type.....
Reinstated Date.....

                                Judgment Type........
                                Judgment Status......
                                Judgment Volume/Page.
```

| | ROLE | PLAINTIFF | ATTORNEY |
|---|---|---|---|
| 1 | Plaintiff | Oregon State Of | Dubanevich Keith S |
| | Act by thr | Oregon 529 College Savings Boa | |
| 2 | Plaintiff | Oregon State Treasurer | Dubanevich Keith S |
| | On Behalf | Oregon College Savings Plan T | |

| | ROLE | DEFENDANT | ATTORNEY |
|---|---|---|---|
| 1 | Defendant | Oppenheimerfunds Inc | |
| 2 | Defendant | Oppenheimerfunds Distributor I | |
| 3 | Defendant | OFI  Private Investments Inc | |

| | ENTER DT | FILE DT | EVENT/FILING/PROCEEDING | SCHD DT | TIME | ROOM |
|---|---|---|---|---|---|---|
| 1 | 4/13/09 | 4/13/09 | Complaint | | | |
| | | | Violation of The Oregon | | | |
| | | | Securities Law | | | |
| 2 | 4/13/09 | 4/13/09 | Assigned Scheduled | 4/13/09 | | LEA |
| | | | Judge Ashcroft | | | |
| 3 | 4/16/09 | 4/16/09 | Notice/Rule 7 - 63   Scheduled | 6/22/09 | | LEA2 |
| | | | service | | | |
| 4 | 4/16/09 | 4/16/09 | Notice/Rule 7 - 91   Scheduled | 7/22/09 | | LEA2 |
| | | | answer | | | |
| 5 | 5/13/09 | 5/13/09 | Proof of Service | | | |
| | | | CS-SUMMONS | | | |
| | | | DEF    2 Oppenheimerfunds Distri | | | |
| | | 4/20/09 | Served | | | |
| | | | ******** END OF DATA ******** | | | |

EXHIBIT  F
PAGE  1  OF  1

1                       CERTIFICATE OF SERVICE

2         I hereby certify that I served the foregoing **NOTICE OF REMOVAL** on the following

3  named person(s) on the date indicated below.

4      [ x ]   mailing with postage prepaid

5      [  ]   hand delivery

6      [  ]   facsimile transmission

7      [  ]   overnight delivery

8  to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s)

9  at their last-known address(es) indicated below.

10     Keith S. Dubanevich
Fredrick M. Boss
11     Simon Whang
Oregon Department of Justice
12     1162 Court Street NE
Salem, OR  97301-4096
13

14     Keith A. Ketterling
Scott A. Shorr
15     Jennifer A. Wagnner
Stoll Stoll Berne Lokting & Shlachter P.C.
16     209 SW Oak Street, 5th Floor
Portland, OR  97204
17

18     DATED: May _15_, 2009.
19

20                   STOEL RIVES LLP

21

22                   Barnes H. Ellis, OSB No. 640325
Brad S. Daniels, OSB No. 025178
23                   *bhellis@stoel.com*
*bsdaniels@stoel.com*
24

25                   Attorney for Defendants OppenheimerFunds,
Inc., OppenheimerFunds Distributor, Inc.,
and OFI Private Investments Inc.
26

Page  1  -  CERTIFICATE OF SERVICE