Barnes H. Ellis, OSB No. 640325
bhellis@stoel.com
Brad S. Daniels, OSB No. 025178
bsdaniels@stoel.com
STOEL RIVES LLP
900 SW Fifth Avenue, Suite 2600
Portland, OR 97204
Telephone: (503) 224-3380
Facsimile: (503) 220-2480

Attorneys for Defendants OppenheimerFunds, Inc., OppenheimerFunds
Distributor, Inc., and OFI Private Investments Inc.


# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON


| | |
|---|---|
| THE STATE OF OREGON, by and through the OREGON 529 COLLEGE SAVINGS BOARD AND THE OREGON STATE TREASURER on behalf of the OREGON COLLEGE SAVINGS PLAN TRUST, | Case No. 09-CV-06135-HO |
| Plaintiff, | |
| v. | **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** |
| OPPENHEIMERFUNDS, INC., a Colorado corporation; OPPENHEIMERFUNDS DISTRIBUTOR, INC., a New York corporation; and OFI PRIVATE INVESTMENTS INC., a New York corporation, | |
| Defendants. | |

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................... ii

I.     PRELIMINARY STATEMENT ...................................................................... 1

II.     STATEMENT OF FACTS .............................................................................. 4

       A.     The Plaintiffs ......................................................................................... 4

       B.     The Defendants ...................................................................................... 7

       C.     The Program Management Agreement ................................................. 8

       D.     The Declaration of Trust ...................................................................... 11

       E.     Core Bond Fund .................................................................................... 12

       F.     The Complaint ...................................................................................... 15

III.     ARGUMENT .................................................................................................. 17

       A.     SLUSA's Broad Preemption of State Law Claims .............................. 17

       B.     SLUSA Preempts All of Plaintiffs' Claims ......................................... 20

             1.     Plaintiffs' Complaint Alleges a "Covered Class Action" ......... 20

             2.     Plaintiffs' Claims Are Based on State Law ............................... 25

             3.     Plaintiffs' Claims Involve "Covered Securities" ...................... 25

             4.     Plaintiffs Allege a Misrepresentation or an Omission of Material Fact "in Connection with the Purchase or Sale" of Covered Securities ................................................................................... 26

             5.     Plaintiffs' Claims for Breach of Breach of Contract, Fiduciary Duty, Negligence, and Negligent Misrepresentation Are Barred by SLUSA ...................................................................................... 27

       C.     SLUSA's State Savings Clause Does Not Apply to This Action .......... 30

IV.     CONCLUSION ............................................................................................... 32

# TABLE OF AUTHORITIES

Page

## Cases

*Aero Marine Engine, Inc. v. Transporter, Inc.,*
  Civil No. 05-1469, 2007 WL 3128500 (D. Or. Oct. 23, 2007) .................................................27

*Allegis Group Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.,*
  No. Civ. JFM-04-16, 2004 WL 1289862 (D. Md. June 10, 2004)...........................................22

*Araujo v. John Hancock Life Ins. Co.,*
  206 F. Supp. 2d 377 (E.D.N.Y. 2002)...................................................................................29

*Class Plaintiffs v. City of Seattle,*
  955 F.2d 1268 (9th Cir. 1992)...............................................................................................23

*Connall v. Felton,*
  225 Or. App. 266, 201 P.3d 219 (2009) ..........................................................................22, 23

*Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,*
  395 F.3d 25 (2d Cir. 2005)....................................................................................................25

*Dudek v. Prudential Sec., Inc.,*
  295 F.3d 875 (8th Cir. 2002).................................................................................................29

*Falkowski v. Imation Corp.,*
  309 F.3d 1123 (9th Cir. 2002)...............................................................................................18

*Gray v. Seaboard Sec., Inc.,*
  126 F. App'x 14 (2d Cir. 2005)........................................................................................28, 29

*Held v. Prod. Mfg. Co.,*
  286 Or. 67, 592 P.2d 1005 (1979).........................................................................................27

*In re Franklin Mut. Funds Fee Litig.,*
  388 F. Supp. 2d 451 (D.N.J. 2005)........................................................................................26

*Kerrison v. Stewart,*
  93 U.S. 155 (1876) ................................................................................................................23

*Korsinsky v. Salomon Smith Barney Inc.,*
  No. 01 Civ. 6085, 2002 U.S. Dist. LEXIS 259 (S.D.N.Y. Jan. 9, 2002) .................................30

*Kurz v. Fidelity Management & Research Co.,*
  No. 07-cv-709-JPG, 2008 U.S. Dist. LEXIS 45332 (S.D. Ill. June 10, 2008).........................29

*Madden v. Cowen & Co.,*
  556 F.3d 786 (9th Cir. 2009).................................................................................................19

# TABLE OF AUTHORITIES
(continued)

**Page**

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
  547 U.S. 71 (2006) ..................................................................................................*passim*

*Newby v. Enron Corp. (In re Enron Corp. Sec.)*,
  535 F.3d 325 (5th Cir. 2008) ...............................................................................19

*Potter v. Janus Inv. Fund*,
  483 F. Supp. 2d 692 (S.D. Ill. 2007) ....................................................................26

*Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  332 F.3d 116 (2d Cir. 2003) ...........................................................................18, 31

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .............................................................................................18

*U.S. Nat'l Bank v. Guiss*,
  214 Or. 563, 331 P.2d 865 (1958) .......................................................................23

## Statutes, Rules, and Regulations

15 U.S.C. § 77a, *et seq.* ..........................................................................................1

15 U.S.C. § 77p ........................................................................................................1

15 U.S.C. § 77r(b)(1)-(2).........................................................................................26

15 U.S.C. § 78a, *et seq.* ..........................................................................................1

15 U.S.C. § 78bb(f) .................................................................................................1

15 U.S.C. § 78bb(f)(1).................................................................................18, 20, 25, 26

15 U.S.C. § 78bb(f)(1)(A) .......................................................................................27

15 U.S.C. § 78bb(f)(2).............................................................................................19

15 U.S.C. § 78bb(f)(3)(B) ...................................................................................31, 32

15 U.S.C. § 78bb(f)(5)(B) ......................................................................................20

15 U.S.C. § 78bb(f)(5)(B)(i)(I)................................................................................24

15 U.S.C. § 78bb(f)(5)(E)........................................................................................25

15 U.S.C. § 78bb, *et seq.* ........................................................................................1

## TABLE OF AUTHORITIES
(continued)

**Page**

Or. R. Civ. P. 26 A ............................................................................................23

OR. REV. STAT. § 59.115 ....................................................................................27

OR. REV. STAT. § 59.115(1)(b) ......................................................................15, 25

OR. REV. STAT. § 59.135 .............................................................................15, 25, 27

OR. REV. STAT. § 59.137 .............................................................................15, 25, 27

OR. REV. STAT. § 348.844(4) ...........................................................................6, 22

OR. REV. STAT. § 348.849 .................................................................................4, 7

OR. REV. STAT. § 348.853 ....................................................................................7

OR. REV. STAT. § 348.853(1) ...............................................................................4

OR. REV. STAT. § 348.853(3) ...........................................................................5, 9

OR. REV. STAT. § 348.856(1) ...............................................................................6

OR. REV. STAT. § 348.860 ....................................................................................9

OR. REV. STAT. § 348.869 ........................................................................6, 22, 32

Pub. L. No. 105-353, § 2(5), 112 Stat. 3227 (1998) .........................................31

**Other Authorities**

Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, Lecture at the
  Morehouse College, Atlanta, Ga. (Apr. 14, 2009), *available at*
  http://www.federalreserve.gov/newsevents/speech/bernanke20090414a.htm ...........................3

*Did You Know,* College Savings Plan Network, *available at*
  *http://www.collegesavings.org/didYouKnows.aspx* (last visited May 26, 2009) ..................4

H.R. Conf. Rep. No. 105-803, 1998 WL 703964 (1998) ........................................................17, 19

Defendants OppenheimerFunds, Inc., OppenheimerFunds Distributor, Inc., and OFI Private Investments Inc., respectfully submit this memorandum of law in support of their motion to dismiss plaintiffs' claims pursuant to the Securities Litigation Uniform Standards Act, 15 U.S.C. § 78bb *et seq.* ("SLUSA").[1]

## I.    PRELIMINARY STATEMENT.

The Oregon 529 College Savings Board (the "Board"), as trustees of the Oregon College Savings Trust (the "Trust"), brings this action to recover investment losses suffered by the beneficiaries of the Trust (the "Trust Beneficiaries") in connection with the purchase and sale of shares of Oppenheimer Core Bond Fund ("Core Bond Fund" or the "Fund"), an open-end mutual fund. The Complaint alleges six separate causes of action under Oregon state law, each to recover damages in an amount equal to the estimated losses attributable to the diminution in the value of Fund shares held in trust for the Trust Beneficiaries. Each of the six claims is premised upon the same allegations of misrepresentations or omissions in connection with the purchase and sale of shares of the Fund. The Complaint therefore impermissibly asserts state-law claims alleging misrepresentations or omissions in connection with the purchase and sale of a covered security, as defined by SLUSA, and must be dismissed in its entirety.

From 2004 until the present, OppenheimerFunds, Inc. (together with its subsidiaries, "OFI") has been the program manager for the Oregon 529 College Savings Plan (the "OCS

---

[1] SLUSA added identical language to both the Securities Act of 1933, 15 U.S.C. § 77a, *et seq.*, and the Securities and Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* *See* 15 U.S.C. § 77p; 15 U.S.C. § 78bb(f). For purposes of convenience, only the provisions added to the 1934 Act are cited in this Memorandum.

Page 1 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Plan").[2]  The Board, having statutory responsibility to administer the OCS Plan, as well as fiduciary duties to the Trust Beneficiaries, was ultimately responsible for choosing proper investments for Oregonians endeavoring to save for their children's college educations.  OFI's relationship with the Board was and is a common endeavor in which OFI, in good faith, recommended to the Board, for its approval, investments that by all indications were well-suited to the Board's goals.  The Board then approved each of those investments.

As part of its effort to provide the Board and families of Oregon with the best possible investments to fit their needs, OFI recommended Core Bond Fund as one ingredient of an overall allocation plan for OCS Plan portfolios beginning in 2004.  From 2004 through 2007, the Fund performed extremely well, with positive total returns of approximately 4.9% in 2004, 2.35% in 2005, 4.48% in 2006, and 4.49% in 2007.  In 2008, however, performance of Core Bond Fund fell dramatically, most significantly in the fall of 2008.  These extraordinary declines were deeply regrettable for everyone involved, particularly for those Trust Beneficiaries expecting to withdraw funds for tuition expenses in the near term because they may have lost the opportunity to benefit from improved market conditions (including those the Fund has experienced so far this year).  The magnitude of the 2008 Fund declines, however, was not reasonably foreseeable to anyone, including OFI, as that year was one of great distress for investors everywhere around the globe.  In fact, 2008 was a year of unpredicted and unprecedented market losses, as the subprime mortgage crisis gave way to a global credit crisis, that in turn led

---

[2]  As alleged in the Complaint, the Oregon 529 Network provides two methods for investment of funds: (1) a "direct-sold" option and (2) an "advisor-sold" option.  Compl. ¶ 23. Consistent with the use of the term in the Complaint, the term "OCS Plan" as used herein refers to both the "direct-sold" and "advisor-sold" options.

Page 2 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

to what has been described as the largest recession in the United States since the Great Depression.[3]

While the declines in Core Bond Fund are, by definition, the result of adverse price movements in the securities selected by the Fund portfolio managers, this action erroneously alleges that the losses suffered by the Trust Beneficiaries resulted from fraud perpetrated by OFI. Indeed, the Board has elected to frame this Complaint entirely around allegations that OFI's misrepresentations and omissions about Core Bond Fund are the root cause of the Trust Beneficiaries losses—and to ignore completely the unmanageable and interconnected market forces that provided the catalysts for those losses. The Board's apparent panic in the face of public and political outcry at the losses of Oregon college savings plans, and its resulting rush to blame those losses solely on OFI's alleged fraud, also ignore (without so much as a hint of contriteness) its own knowing and close participation in the very same investment decisions. Those issues of course will ultimately be resolved on the merits on a more complete record. Today, however, the Board's approach requires that the Complaint be dismissed in its entirety because all of the claims alleged are preempted by federal law in the form of SLUSA.

---

[3] *See* Ben S. Bernanke, Chairman, Board of Governors of the Federal Reserve System, Lecture at the Morehouse College, Atlanta, Georgia (April 14, 2009), *available at* http://www.federalreserve.gov/newsevents/speech/bernanke20090414a.htm ("The financial crisis, the worst since the Great Depression, has severally affected the cost and availability of credit to both households and businesses.").

Page 3 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## II.    STATEMENT OF FACTS.

### A.    The Plaintiffs.

State-sponsored tax-advantaged college tuition savings plans structured pursuant to Section 529 of the Internal Revenue Code ("529 Plans") are an extremely important investment vehicle for families across the United States.  529 Plans are offered in each of the fifty states and the District of Columbia.  These plans are structured similarly to meet the Internal Revenue Code requirements, and a large number of trustees, program managers, investment companies and distributors manage these plans.  529 Plans are sold to investors across the country and are not necessarily limited to the citizens of a single state.  More than ten million 529 Plan accounts have been opened, and more than $100 billion invested.  *See, e.g., Did You Know,* College Savings Plan Network, *available at http://www.collegesavings. org/didYouKnows.aspx* (last visited May 26, 2009). This lawsuit is brought "on behalf of" thousands of plan investors (referred to in the Complaint as "families and children saving for college") in one such plan, the OCS Plan, and Plaintiffs are seeking to recover, as damages, the total amount of OCS Plan investor losses in 2008 relating to their purchases of Core Bond Fund shares, allegedly more than $36 million.  The claims are brought by the Board, as Trustees of the Trust, on behalf of the OCS Plan investors, who are the Trust Beneficiaries.

The Board was created by statute to administer the OCS Plan.  OR. REV. STAT. § 348.849.  The Board's powers, duties and functions with regard to the OCS Plan include, among other things, an obligation "[t]o establish, develop, implement and maintain the Oregon 529 College Savings Network in a manner consistent with" Oregon law and Section 529 of the Internal Revenue Code.  OR. REV. STAT. § 348.853(1).  The Board is obligated:

Page 4 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

> To maintain, invest and reinvest the funds contributed into the network consistent with the investment restrictions established by the board. The investment restrictions shall be consistent with the objectives of the network, and the board shall exercise the judgment and care then prevailing that persons of prudence, discretion and intelligence exercise in the management of their own affairs with due regard to the probable income and level of risk from certain types of investments of money, in accordance with the policies established by the board.

OR. REV. STAT. § 348.853(3).

The Board also serves as Trustees of the Trust, and, as such, is suing on behalf of the Trust Beneficiaries to recover their investment losses. The Trust was established by a Second Amended and Restated Declaration of Trust Establishing Oregon College Savings Plan Trust, dated June 4, 2004 (the "Declaration of Trust"),[4] "for the benefit of beneficiaries of the [OCS Plan] who shall be designated in accordance with the terms hereof." Decl. of Trust, at 1. The Trustees of the Trust are the Board (not individual members of the Board, but the Board in its entirety as comprised from time to time), acting as fiduciaries with respect to the Trust Beneficiaries. *Id.* §§ 1.1, 1.4(m). The Trustees manage the Trust and have all powers necessary and convenient to carry out the purpose of the Trust. *Id.* § 3.1. This includes the power to sue on behalf of the Beneficiaries. Additionally, "[a]ll assets comprising the Trust and its Portfolios shall, at all times, be considered as assets held by the Trustees as fiduciaries [for the benefit of the Trust Beneficiaries] and title thereto shall be vested solely in the Board as Trustees." *Id.* § 3.2. While

---

[4] A copy of the Declaration of Trust is attached as Exhibit 1 to the Affidavit of Barnes H. Ellis in Support of Defendants' Motion to Dismiss ("Ellis Affidavit"). All Exhibits to which this Memorandum refers are attached to the Ellis Affidavit (hereinafter, "Ellis Aff., Ex. __"). All page references are made to the original pagination of the document when available. Defendants request that the Court take judicial notice of those documents. *See* Defendants' Request for Judicial Notice Related to Motion to Dismiss filed herewith (citing authority and documents).

Page 5 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

the Trust Beneficiaries therefore have no direct legal title to assets held in Trust (as in most

trusts), they nonetheless can appear in a court proceeding brought on their behalf by the Trustees.

Under the terms of the Trust, Trust Beneficiaries are deemed to be "before the tribunal" in any

action affecting the assets of the Trust where the Trustees are parties:

> In any judicial proceeding affecting any property or security
> constituting, in whole or in part, a Portfolio,[5] each Participant and
> Designated Beneficiary shall be deemed to be *fully represented by
> the Trustees* for all purposes if the Trustees shall be parties to such
> proceeding, and *as such, duly before the tribunal in which such
> proceeding shall be pending.*

*Id.* § 12.5 (emphasis added).

Conversely, the State of Oregon itself has no interest in this lawsuit. The State of

Oregon has no proprietary interest in the assets of the Trust, which are held in trust for the

benefit of the Trust Beneficiaries and for no other purpose. *See, e.g.,* OR. REV. STAT. § 348.869

("The State of Oregon has no proprietary interest in the contributions or earnings of the Oregon 529

College Savings Network."); *see also* OR. REV. STAT. § 348.856(1) ("The Oregon 529 College

Savings Network Fund is established in the State Treasury, separate and distinct from the General

Fund."); OR. REV. STAT. § 348.844(4) (the Trustees merely hold the "contributions and earnings

. . . in trust for the benefit of designated beneficiaries and account owners . . . and for no other

benefit, use or purpose."). Neither is the State of Oregon a beneficiary of the contract at the center

of the relationship and the Complaint, *i.e.,* the June 4, 2004 Program Management Agreement (the

---

[5] "Portfolio(s)" is defined in the Declaration of Trust to mean "the Trust portfolio(s)
which invest in mutual funds and other investment vehicles, that the Board may authorize the
Trust to offer and in which the Trust invests contributions and earnings thereon." Decl. of Trust
§ 1.4(j).

Page 6 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS**

"PMA").[6]  PMA § 18.8 ("The provisions of this Agreement are solely for the benefit of OFI, OFDI

and the Board, as well as the Trust, and nothing in this Agreement shall be construed to give any

other person . . . any legal right or equitable remedy or claim under or in respect of this Agreement

or any provision contained herein.").  As it has no interest in these proceedings, the State of

Oregon is not a proper party and its presence on the caption has no impact on the claims.

The Treasurer, as such, likewise has no interest in the outcome of this lawsuit.  The

Treasurer has no statutory authority with regard to management of the OCS Plan beyond his

authority as a member of the Board and his authority to appoint members of the Board.  *See, e.g.,*

OR. REV. STAT. §§ 348.849 (Oregon 529 College Savings Board; membership); 348.853

(Board powers and duties; establishment of network; rules).  The Treasurer has no rights under

the PMA beyond the rights of the Board.  The Treasurer has no rights under the Declaration of

Trust beyond the rights of the Board.  Indeed, the Treasurer is only relevant in this case in his

capacity as a member of the Board, and the Board, in turn, is only relevent as Trustees for the

Trust.  At best, the identification of the Treasurer as a named plaintiff in this action is merely

redundant of the Board's position.  Accordingly, the Oregon State Treasurer, in his capacity as

such, has no interest in the outcome of this litigation, is not a proper party, and his presence on

the caption also has no impact on the claims.

**B.**     **The Defendants.**

OppenheimerFunds, Inc., an investment advisor registered with the United States Securities

and Exchange Commission ("SEC"), is a Colorado corporation with its principal place of business

in New York.  As of December 31, 2008, OFI managed funds with more than six million

---

[6] The PMA is attached as Exhibit 2 to the Ellis Affidavit.


Page 7 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
       DISMISS**

shareholder accounts and is one of the nation's largest and most respected asset management companies. In June 2004, the Board appointed OFI as program manager for the OCS Plan.

OppenheimerFunds Distributor, Inc. ("OFDI"), a subsidiary of OFI, is a New York corporation with its principal place of business in New York. OFDI is a securities broker-dealer registered with the SEC and is a member firm of Financial Industry Regulatory Authority, Inc. ("FINRA"). At all times relevant to this matter, OFDI acted as the principal underwriter and distributor for Core Bond Fund. Pursuant to the PMA, OFDI was appointed to serve as the exclusive distribution agent for trust instruments relating to the OCS Plan. PMA § 6.1.

OFI Private Investments Inc. ("OFIPI"), a subsidiary of OFI, is a New York corporation with its principal place of business in New York and helps high net worth individuals, institutions and nonprofit organizations work toward their financial goals. OFIPI offers a diverse range of tailored investment products and services, including separately managed accounts as well as program and investment management services to 529 college savings and prepaid plans. OFIPI is alleged in the Complaint to have been delegated responsibility as program manager for the OCS Plan under the PMA.

## C.    The Program Management Agreement.

The PMA was executed by OFI, OFDI and the Board on June 4, 2004, and created duties both for OFI and the Board with regard to the management of the assets of the Trust and the investment policy for the OCS Plan.

Pursuant to the PMA, OFI, as the exclusive program manager, was required, "in accordance with the Investment Policy and the terms of the Declaration of Trust, [to] invest and manage assets of the Trust as investment agent of the Board . . . subject to the Board's direction." PMA § 4.1. The "Investment Policy" refers to "the investment policy of the Board with

Page 8 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

respect to the OCS Plan." *Id.* Art. I. OFI was required to, and did, deliver "to the Board . . . a

proposed Investment Policy with respect to the OCS Plan." *Id.* § 3.2(c). The Board was required

to "[adopt] such Investment Policy with such changes from the Investment Policy submitted as

are reasonably acceptable to OFI and the Board." *Id.* Before OFI could officially begin its

duties, the Board was also responsible for reviewing and approving the Investment Policy. *Id.*

§ 3.2(g).

The Board, moreover, retained supervisory authority and responsibility for investment

decisions. Consistent with this supervisory role, if the Board was unhappy with how a given

investment was performing, it had the power under both the PMA and statute to require OFI to

substitute the fund:

> If an Underlying Fund significantly under performs relative to its
> performance benchmark for a significant period of time as
> determined by the Board, the Board may, *in its sole discretion* after
> consultation with OFI, *require OFI* to either substitute a
> comparable Underlying Fund managed by OFI or Vanguard Funds,
> as the case may be, or, if necessary, substitute a comparable
> Underlying Fund managed by an OFI Group Entity or an entity not
> affiliated with OFI. OFI shall be responsible for determining that
> the investment objectives, policies, and practices of the Underlying
> Funds in which the Trust assets are invested are *consistent with the
> Board's investment policy* and applicable law. The Board reserves,
> however, the right to *require OFI to substitute a comparable
> Underlying Fund at any time in order to address emergent or
> extraordinary conditions* that relate to a trust investment and to
> preserve the Board's authority to administer the investments of the
> Program as required by ORS 348.853(3).

PMA § 5.2(b) (emphasis added); *see also* OR. REV. STAT. § 348.860 ("The board, *in the

exercise of its sole discretion* and without liability, may remove the network's funds from any

financial institution and reinvest the funds in a similar or different investment alternative at

Page 9 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS**

another financial institution pursuant to a contract, agreement or arrangement") (emphasis added).[7]

In addition to granting the Board a broad supervisory role over how the Plan funds were invested, the PMA also effectively eliminated any cause of action based on its terms by any party other than the Board itself. The PMA provides that "nothing in this Agreement shall be construed to give any other person (including, but not limited to any [Trust Beneficiary] or other OFI Group Entity) any legal or equitable right, remedy or claim under or in respect of this Agreement." PMA § 18.8. Because pursuant to the PMA the Trust Beneficiaries may not bring suit in their own name (least of all against the *Board* for the role it played in the selection and retention of Core Bond Fund), the Board is bringing suit against OFI to attempt to vindicate the Trust Beneficiaries' claimed rights.

---

[7] The Board has exercised this authority. *See* Ellis Aff., Ex. 4 ("Minutes of the Oregon 529 College Savings Board Meeting of January 24, 2008"). On this occasion, the Board made a request to OFI to propose a reconfiguration of the OCS Plan Portfolios. Notably, the request was prompted by the Board's opinion that the OCS Plan was **too conservative**. As reflected in the minutes of the January 24, 2008 meeting of the OCS Plan Board, Mr. Parker, the Executive Director, reported as follows:

> "[Mr. Parker] was going to work with Oppenheimer to determine how some of the portfolios could be reconfigured, adding more equity exposure in the early years . . . . *When researching other states' plans, Mr. Parker discovered that the current OCSP portfolios are quite conservative in comparison.* Oppenheimer will present a portfolio change proposal at the April 24, 2008 Board meeting."

*Id.* at 2 (emphasis added). As a consequence of this process, OFI proposed that certain Plan Portfolios have increased exposure to equity funds and reduced exposure to the Core Bond Fund.

Page 10 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**D.    The Declaration Of Trust.**

The Declaration of Trust established the OCS Plan Trust for the benefit of the Trust

Beneficiary investors.  The Declaration of Trust establishes the Board's role as trustees of the

Trust assets, *see* Decl. of Trust, § 1.1 ("Board shall be the Trustees of the Trust"), and explains that

the Trust was created to "carry out, promote, and operate the OCS Plan" so that participants in the

OCS Plan could better save for higher education tuition and expenses.  *Id.* § 1.2.  Speaking in the

imperative, the Declaration of Trust dictates that the Trustees, *i.e.*, the Board, *"shall manage* the

Trust, and the Trustees *shall have all powers necessary* to . . . carry out the purpose of the Trust."

*Id.* § 3.1 (emphasis added).

The Trust Beneficiaries have no direct legal interest in the assets purchased by the Trust;

title to those assets is held exclusively by the Trustees.  When a Plan Beneficiary makes a

contribution into his/her OCS Plan "account," what he/she is actually purchasing is an interest in

a portfolio which invests in mutual funds and other securities that the Board may authorize the

OCS Plan to offer.  *See* Ellis Aff., Ex. 3 (April 20, 2007 Oregon College Savings Plan, Plan

Description and Participation Agreement, at 6 (the "Beneficiary Participation Agreement")).

When opening an account, the Plan Beneficiary acknowledges his/her understanding that he/she

owns interests in a portfolio, and that he/she does not have a direct beneficial ownership interest

in the mutual funds or other instruments held by that portfolio and, therefore, does not have the

rights of an owner or shareholder of such mutual funds or other instruments.  *See id.* at Appendix

A, ¶ 6(j).

Although the Trust Beneficiaries therefore would not have standing to assert a direct

claim affecting the assets of the Trust, the Trustees certainly do, and the Declaration of Trust

explicitly provides that when that happens, in "any judicial proceeding affecting any property or

Page 11 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS**

security constituting, in whole or in part, a Portfolio, each [Trust Beneficiary] shall be deemed to be fully represented by the Trustees for all purposes if the Trustees shall be parties to such proceeding, and as such, *duly before the tribunal in which such proceeding shall be pending.*" Decl. of Trust § 12.5 (emphasis added). The Trust Beneficiaries are therefore "duly before" this Court, represented by the Trustees, by virtue of the only means available to them to assert their claims.

### E.    Core Bond Fund.

Core Bond Fund, a retail mutual fund with net assets of more than $2 billion, has been available in the OCS Plans from the start of OFI's relationship with Oregon in 2004. Prior to 2008, the Fund was well regarded, as were the Fund's managers. Indeed, Core Bond Fund was in the top performance quartile for its peer group for five straight calendar years. Beginning in the second half of 2007, however, the Fund's performance, impaired by market forces, suffered. Plaintiffs are now seeking to recover those investment losses on behalf of the Trust Beneficiaries on the basis of alleged misrepresentations or omissions of material fact regarding the Core Bond Fund.

Core Bond Fund's stated investment objective is to seek "total return by investing mainly in debt instruments." *See* Ellis Aff., Ex. 10, at 3 (Core Bond Fund April 29, 2008 Prospectus) (the "2008 Prospectus"). The Fund's managers invest in a mix of mortgage and asset-backed securities, high-grade and high-yield corporate bonds, agency debentures and Treasuries. *Id.* at 3-5. Consistent with the Fund's well-disclosed investment strategy, the Fund also uses derivative instruments, including total return swaps and credit default swaps, to seek higher investment returns or manage investment risks. *Id.* at 5.

Page 12 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

The management of Core Bond Fund has been remarkably transparent.  Public

disclosures regarding strategy, risks and investments have been robust.  By way of example, the

Fund's public disclosures in 2007-08 made clear, among other things, the following:

- As of June 30, 2007, "[regarding mortgage-backed securities] we have increased our level of mortgage spread risk based on our belief that the return expectations for this sector are currently favorable" Ellis Aff., Ex. 13, at 9 (June 30, 2007 Management Commentaries and Semi-Annual Report).

- As of June 30, 2007, "we believe commercial mortgage-backed securities (CMBS) continue to offer attractive return potential at currently favorable price levels . . . [a]s such, we've added to this allocation at what we believe to be an opportune time to do so." *Id.*

- As of December 31, 2007, "[u]nfortunately, as we added exposures in response to the market turmoil, the market events that occurred soon after that point pressured the portfolio's non-Treasury, or 'spread,' investments enough to impair its full-year performance." Ellis Aff., Ex. 14, at 6 (December 31, 2007 Management Commentaries and Annual Report).

- As of December 31, 2007, "we believe select areas of the market have been unduly shunned as a result of the sub-prime mortgage crisis despite still-sound fundamental underpinnings, such as AAA-rated commercial mortgage-backed securities (CMBS) and AAA-rated non-agency residential mortgages backed by prime borrowers . . . [a]s such, we have increased our exposure to these spread securities . . . ." *Id.* at 7.

- As of December 31, 2007, "we are confident that our decision this year to increase our exposure to specific areas of the high-yield credit sector, particularly short maturity bonds, will reap long-term rewards." *Id.* at 8.

- As of December 31, 2007, "[t]he greater part of our difficulties occurred from mid-October through the end of November, after we had begun to add exposures in response to what appeared to be opportunities, but then market liquidity deteriorated further . . . ." *Id.* at 11.

- As of December 31, 2007, "[a]nother detractor to performance was the composition of our investment-grade credit allocation . . . [i]n this area of the portfolio, we had emphasized financial bonds . . . unfortunately . . . spreads on financials widened dramatically and their values dropped." *Id.*

- As of December 31, 2007, "our decision to increase our allocation to high-yield bonds detracted from short-term returns after mid-October." *Id.*

Page 13 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

- As of December 31, 2007, "performance suffered as a result of our decision late in the year to add to the portfolio's CMBS and non-agency mortgage holdings." *Id.* at 12.

- As of June 30, 2008, "our underweighted exposure to Treasury securities detracted from performance." Ellis Aff., Ex. 15, at 6 (June 30, 2008 Management Commentaries and Semi-Annual Report).

- As of June 30, 2008, "exposure to non-agency residential mortgages, however, detracted from returns. Although our holdings in this arena are generally backed by prime loans, risk wary investors imposed higher premiums on these mortgages, which are perceived to be riskier than agency MBS." *Id.*

- As of June 30, 2008, "we added to our CMBS exposure when bond prices in this sector had dropped, a decision which benefited the Fund when spreads narrowed slightly in June. However, despite this improvement, these mortgages substantially underperformed Treasuries for the period at-large." *Id.*

- As of June 30, 2008, "while our overall investment-grade credit holdings reaped flat results, our emphasis on longer-term, high-quality financials bonds at the expense of industrial debt hurt us." *Id.*

- As of June 30, 2008, "Based on our outlook, we have increased our overall exposure to the residential mortgage market. Spreads are currently at historically wide levels, a trend we believe will shift once investors' appetite for incremental risk returns. Moreover, we've added to this position at a time when these securities are, in our opinion, priced cheaply." *Id.* at 7.

The Fund's public filings likewise included robust disclosure regarding the use of derivatives and associated risks, including the following disclosures regarding the use of credit default swaps specifically:

- "The Fund can use derivatives to seek higher investment returns or to manage investment risks (for example, hedging against other portfolio investments)." Ellis Aff., Ex. 10, at 5 (2008 Prospectus).

- "Derivatives also present the risk of leverage. Leverage exists when an investor achieves the right to a return on a total investment amount that exceeds the cash amount the investor contributed in making the investment. The Fund's use of certain economically leveraged derivatives can result in a loss substantially greater than the amount invested in the derivative itself.

Page 14 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Certain derivatives have the potential for unlimited loss, regardless of the size of the initial investment. When the Fund uses derivatives for leverage, a shareholder's investment in the Fund will tend to be more volatile, resulting in larger gains or losses in response to the fluctuating prices of the Fund's investments. The Fund has limits on the amount of certain types of derivatives it can hold. However, using derivatives can cause the Fund to lose money on its investments and/or increase the volatility of its share prices." *Id.* at 5-6 (2008 Prospectus).

- "The Fund enters into financial instrument transactions (such as swaps . . . and other derivatives) that may have off-balance sheet market risk. Off-balance sheet market risk exists when the maximum potential loss on a particular financial instrument is greater than the value of such financial instrument, as reflected in the Fund's Statement of Assets and Liabilities." *Id.* at 138.

- "The Fund may enter into credit default swaps on a single security or basket of securities . . . . If there is a credit event (for example, bankruptcy or failure to timely pay interest or principal), the purchaser will exercise the contract and will receive a payment from the seller of the contract equal to the notional value of the credit default swap contract less the value of the underlying security." *Id.* at 144.

In addition, detailed securities holdings information, including detail regarding specific derivatives positions, was fully disclosed in the Fund's annual, semi-annual and quarterly reports. *See* Ellis Aff., Exs. 7, 8, 9, 11, 12 and 16. Losses in the Fund in 2008 are deeply regrettable, but they were not caused by any alleged misrepresentation or omission of material fact regarding the Fund's strategy, risks or investments.

## F.    The Complaint.

The Complaint alleges six causes of action, for (1) violation of Oregon Securities Law, OR. REV. STAT. § 59.137; (2) violation of Oregon Securities Law, OR. REV. STAT. §§ 59.115(1)(b) and 59.135; (3) breach of contract; (4) breach of fiduciary duty; (5) negligence; and (6) negligent misrepresentation. Compl. ¶¶ 105-46. All of these claims are predicated on the same factual background and seek the same damages—Trust Beneficiary losses on shares of Core Bond Fund. *See id.* ¶¶ 21-104. At the core of the factual allegations is a common series of

Page 15 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

alleged misrepresentations and omissions with regard to Core Bond Fund, including the

following allegations:

- failure to disclose that Core Bond Fund "had become a hedge-fund like investment fund that took excessive risks through speculative investment strategies" and was "no longer an appropriate investment for anyone seeking conservative investments or protection of principal," *id.* ¶ 6;

- failure to disclose that "the risks the fund had undertaken exposed it to substantial losses," *id.*;

- failure to disclose that "Core Bond Fund had engaged in a new strategy of investing in high-risk derivatives (credit default swaps and total return swaps) and mortgage-backed securities that were not designed to protect principal or obtain minimal growth but to achieve outsized returns through extraordinary risks that had the potential for (and ultimately resulted in) staggering losses," *id.*;

- failure to disclose that "Core Bond Fund was actually managed according to a more aggressive strategy by which it took far greater risks than initially disclosed," *id.*;

- failure to disclose that "Core Bond Fund investment managers ignored the warnings of its own risk managers when the Fund exceeded its risk controls and risk budget in April 2008," *id.*; and

- failure to disclose that "the Core Bond Fund changed its risk controls and risk metrics in order to allow it to take even greater risks," *id.*

As the foregoing makes clear, at the heart of this case is a dispute over whether or not

OFI's representations and disclosures to the Board[8] and all other investors in the Core Bond

---

[8] Pursuant to the terms of the PMA, the Board held quarterly meetings to review performance of the OCS Plan funds. At the October 23, 2008 Board meeting, OFI made a presentation to the Board regarding the performance of Core Bond Fund. OFI provided a detailed explanation of securities invested in by Core Bond Fund, and explained in good faith that very high returns could be realized by staying in the Fund if the market returned to its May 2008 level as many expected it to do. The Board's independent consultant endorsed OFI's explanation for the poor recent performance as "good and accurate" and explained that funds other than Core Bond were performing equally poorly in that climate. *See* Ellis Aff., Ex. 5 ("Minutes of the Oregon 529 College Savings Board Meeting of October 23, 2008"). He also conceded that he
(continued . . .)

Page 16 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Fund misled plaintiffs to invest in the Fund. That dispute is governed exclusively by federal law. Tellingly, plaintiffs were plainly concerned about that reality when drafting their Complaint, as they took the unusual step of devoting nearly an entire page of their Complaint to an attempt to avoid, preemptively, exclusive federal jurisdiction over their claims. *See* Compl. ¶ 19 ("The claims alleged in this Complaint *are not* subject to removal from state court under the Securities Litigation Uniform Standards Act . . . .") (emphasis added). Plaintiffs' arguments attempting to evade exclusive federal jurisdiction are, as we explain below, in error. Accordingly, plaintiffs' state-law claims must be dismissed in their entirety.

## III.    ARGUMENT.

### A.    SLUSA's Broad Preemption Of State Law Claims.

The Securities Litigation Uniform Standards Act ("SLUSA") is the product of a concerted effort by Congress to bring broad-reaching uniformity and fairness to representative securities actions in the form of traditional class actions and otherwise. Citing concerns ranging from the rampant commencement of non-meritorious actions, to vexatious discovery requests, manipulative plaintiffs' attorneys, and deliberate targeting of deep-pocketed defendants, Congress began in 1995 to address what it perceived as a fundamental crisis in securities ligation with the Private Securities Litigation Reform Act (the "PSLRA"). *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006) (describing the legislative history of PSLRA). The PSLRA instituted substantive and procedural protections, by, for example, establishing

---

(. . . continued)
found the losses unexpected and attributable to the extraordinary market environment, and thereafter actually recommended that the Trust retain Core Bond in its portfolios, albeit in reduced concentrations. *Id.* The Board chose to retain Core Bond Fund in its portfolios through the end of 2008.

Page 17 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

heightened pleading requirements and imposing automatic discovery stays pending motions to dismiss. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320-21 (2007). An unintended effect of this new legislation, however, was that plaintiffs' attorneys increasingly effected end-runs around the PSLRA by filing securities claims in state rather than federal courts. *See* H. R. Conf. Rep. No. 105-803, 1998 WL 703964, at *14 (1998) ("Prior to the passage of the [PSLRA], there was essentially no significant securities class action litigation brought in State court").

In a deliberate response to these tactical end-runs, Congress enacted SLUSA in 1998 to preempt the *entire field* of state-law securities class actions, bringing nearly all mass-plaintiff securities litigation within the umbrella of the PSLRA, with only limited, specifically-enumerated exceptions. 15 U.S.C. § 78bb(f)(1); *Spielman v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 332 F.3d 116, 122-24 (2d Cir. 2003) (Congress intended SLUSA to effect total preemption); *Falkowski v. Imation Corp.*, 309 F.3d 1123, 1128 (9th Cir. 2002) (same). In so doing, Congress intended to "prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives" of the PSLRA. *Dabit,* 547 U.S. at 86. SLUSA, therefore, exists to protect Congress' desire for "national standards for securities class action lawsuits involving nationally traded securities." *Id.* at 87 (internal quotation marks and citation omitted).

In analyzing cases under SLUSA, the Supreme Court's conviction that SLUSA should not be construed narrowly has been clear and unequivocal. *Id.* at 86 ("The presumption that Congress envisioned a broad construction follows not only from ordinary principles of statutory construction but also from the particular concerns that culminated in SLUSA's enactment"). A

Page 18 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

"narrow reading of the statute would undercut the effectiveness of the [PSLRA] and thus run contrary to SLUSA's stated purpose, viz., to prevent certain State private securities class action lawsuits alleging fraud from being used to frustrate the objectives of the [PSLRA]." *Id.* (internal citations and quotation marks omitted). To leave no doubt as to the broad sweep of SLUSA's preemptive force—and foreseeing plaintiffs' attempts to circumvent SLUSA just as they avoided the PSLRA—Congress provided clear guidance to courts:

> While the committee believes that it has effectively reached those actions that could be used to circumvent the reforms enacted by Congress in 1995 as part of the Private Securities Litigation Reform Act, *it remains the Committee's intent that the bill be interpreted broadly to reach mass actions and all other procedural devices that might be used to circumvent the class action definition.*

*Newby v. Enron Corp. (In re Enron Corp. Sec.)*, 535 F.3d 325, 338 (5th Cir. 2008) (emphasis in original) (*quoting* S. Rep. No. 105-182, 1998 WL 226714, at *8 (1998)). Congress further expressed its frustration that a "*single state* can impose the risks and costs of its peculiar litigation system on all national issues. The solution to this problem is to make Federal court *the exclusive venue* for most securities fraud class action litigation involving nationally traded securities." H.R. Conf. Rep. No. 105-803, 1998 WL 703964, at *1 (emphasis added; footnote omitted).

To achieve its goal of complete preemption, Congress provided two closely-related statutory rules. SLUSA explicitly: (a) provides for removal jurisdiction over any covered class action brought erroneously in state court, and (b) requires courts to dismiss all covered claims upon removal. 15 U.S.C. § 78bb(f)(2); *see also Madden v. Cowen & Co.,* 556 F.3d 786, 792-93 (9th Cir. 2009) ("[A]ny suit removable under SLUSA's removal provision, § 77p(c), is precluded under SLUSA's preclusion provision, § 77p(b) . . . ."). Consistent with this clear Congressional

Page 19 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

intent, courts should read SLUSA's terms broadly and flexibly to effect Congress' will to ensure that securities actions brought on behalf of large classes of beneficiaries are brought under federal law, and in the only place such actions may be brought, the federal courts. As we explain below, this action therefore must be dismissed so that plaintiffs may, consistent with the terms of the PSLRA, re-plead their claims either as (1) federal securities-law claims or (2) as different state-law claims which do not implicate SLUSA's preemptive scope.

**B.    SLUSA Preempts All Of Plaintiffs' Claims.**

Under SLUSA, a securities action is preempted if four conditions are satisfied: (1) the action is a "covered class action," (2) the claims are based on state law, (3) the action involves a "covered security," and (4) the claims allege a misrepresentation or omission of material fact "in connection with the purchase or sale" of the security. 15 U.S.C. § 78bb(f)(1). All of the claims in Plaintiffs' Complaint meet each of those conditions precisely.

**1.    Plaintiffs' Complaint Alleges a "Covered Class Action."**

SLUSA defines a "covered class action," in relevant part, as:

(i) any single lawsuit in which--

(I) damages are sought *on behalf of* more than 50 persons or prospective class members, and questions of law or fact common to those persons or members of the prospective class, without reference to issues of individualized reliance on an alleged misstatement or omission, predominate over any questions affecting only individual persons or members[.]

15 U.S.C. § 78bb(f)(5)(B) (emphasis added). This action is a covered class action because (1) damages are sought on behalf of more than fifty persons—namely, the thousands of Trust Beneficiaries, and (2) common questions predominate—plaintiffs collectively allege to have suffered harm in connection with the sale and subsequent management of Core Bond Fund.

Page 20 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

As the Complaint states repeatedly, this action was brought to recover damages on behalf of the Trust Beneficiaries who lost money due to their investments in the Core Bond Fund.  The Complaint, in fact, is replete with references to the beneficiaries of any recovery, including the following references from the section of the Complaint entitled "Introduction and Nature of the Action" alone:

- "Defendants agreed to provide the [OCS Plan] with investment and program management services that would *benefit families saving for their children's higher education*," Compl. ¶ 1 (emphasis added);

- "The Investment Policy made perfectly clear . . . that *college savings Trust Beneficiaries* who wished to be in an Ultraconservative or Conservative portfolio would be provided conservative investments . . .," *id.* ¶ 2 (emphasis added);

- "OFI agreed to provide bond funds that would be conservative investments *to protect [Trust Beneficiaries] against the volatility of equity securities* in [the moderate, balanced and more aggressive] portfolios," *id.* (emphasis added);

- "OFI owed fiduciary duties . . . as an investment adviser that provided investment advice intended to benefit the Trust and, *ultimately, families and children saving for college*," *id.* ¶ 3 (emphasis added);

- "These were high-risk bets that were *plainly inappropriate for those saving for college or in college*," *id.* ¶ 5 (emphasis added);

- "Core Bond Fund was particularly inappropriate for anyone who was in-college or within a few years to college . . . *when families and individuals needed immediate or imminent access to their money*," *id.* ¶ 6 (emphasis added);

- "OFI portfolio managers decided they would . . . place 'big bets' *with the college savings plan's and other investors' money*," *id.* ¶ 6 (emphasis added);

- "Not until late October of 2008, after the Oregon Trust (*and thereby families' college savings accounts) had already lost millions* as a result of its investment in the Core Bond Fund . . .," *id.* ¶ 8 (emphasis added); and

- "Through this action, the Oregon Board, on behalf of the Oregon Trust, *seeks to recover the damages suffered by* the Oregon Trust and *the many Oregon families who lost substantial amounts of their college savings as the result of Defendants' wrongdoing*," *id.* ¶ 10 (emphasis added).

Page 21 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Consistent with these allegations, the measure of damages sought in each count in the Complaint

is the same, *i.e.*, the "more than \$36.2 million" the Trust Beneficiaries allegedly lost on their

Core Bond Fund investments.

It is true that the Complaint is styled as an action brought "on behalf of the Trust."

Compl. ll. 2-3. This is an appropriate means for the Trustees of the Trust—namely the Board,

which includes the Treasurer—to assert claims on behalf of the Trust Beneficiaries. But the

Court should not be confused by the styling of the Complaint—neither the State of Oregon, the

Treasurer himself (other than in his role as a member of the Board) nor the Trust itself can assert

the claims alleged in the Complaint. The Trust is not a legal entity on whose behalf legal claims

may be brought; instead it is a legal relationship between the Trustees, *i.e.*, the Board, and the

Trust Beneficiaries, embodied in and defined by the trust instrument. *See Connall v. Felton*, 225

Or. App. 266, 270, 201 P.3d 219 (2009) (defining trust as an "equitable obligation"); *see also*

*Allegis Group Inc. Contractors Health Plan Trust v. Conn. Gen. Life Ins. Co.*, No. Civ.

JFM-04-16, 2004 WL 1289862, at \*2 (D. Md. June 10, 2004) ("A trust generally is not

recognized as a separate legal entity with the capacity to sue or be sued in its own name.") (citing

cases and secondary authorities). Neither the State of Oregon nor the Treasurer has any legal

interest in the disposition of the Trust's assets. *See* OR. REV. STAT. § 348.869 ("The State of

Oregon has no proprietary interest in the contributions or earnings" of the Trust . . . the "Board is

the trustee of the contributions and earnings"). The Trustees merely hold the "contributions and

earnings . . . in trust for the benefit of designated beneficiaries and account owners . . . *and for no*

*other benefit, use or purpose* ." OR. REV. STAT. § 348.844(4) (emphasis added). Accordingly,

this action, brought to recover damages suffered by Trust Beneficiaries "on behalf" of the Trust,

Page 22 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

is necessarily an action brought by the Trustees "on behalf" of the Trust Beneficiaries, who

number far greater than the requisite fifty.[9]

This conclusion is compelled not just by the statutory framework defining the OCS Plan

itself, but is also well grounded in long standing common-law trust principles. Under Oregon

law, "[a] trust is an equitable obligation . . . placed on a person by reason of a confidence placed

in her or him to hold the property for the benefit of some other person." *Connall*, 225 Or. App.

at 270 (*citing Shipe v. Hillman*, 206 Or. 556, 562, 292 P.2d 123 (1956)). A trustee is in a

fiduciary relationship with the trust beneficiaries and must act in the beneficiaries' interest. *See*

*U.S. Nat'l Bank v. Guiss*, 214 Or. 563, 588, 331 P.2d 865 (1958) ("The relation between the

trustee and beneficiary being a fiduciary relation, the trustee must not in any way take advantage

of his position. The parties are not dealing at arm's length and the trustee is bound to consider

not only his own interest but that of the beneficiary as well." (internal quotation marks and

citation omitted)). Consistent with these general principles, courts have specifically recognized

that, in an action relating to trust property, trustees sue on behalf of the beneficiaries of the trust,

who are normally bound by the judgment. *See Kerrison v. Stewart*, 93 U.S. 155, 160 (1876)

("[T]he trustee is in court for and on behalf of the beneficiaries; and they, though not parties, are

bound by the judgment, unless it is impeached for fraud or collusion between him and the

adverse party."); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1283 (9th Cir. 1992) ("A

trustee will not be disabled from binding the trust beneficiaries to a judgment unless there is

fraud or collusion between the representative and the adverse party."); *see also* Or. R. Civ. P. 26

---

[9] As of December 31, 2008, for example, there were approximately 2,500 accounts in the "Conservative" and "Ultra-Conservative" investment portfolios in the OCS Plan alone. *See* Ellis Aff., Ex. 6, at 3 (Presentation, Oregon 529 College Savings Board Meeting 4th Quarter 2008).

Page 23 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

A (allowing trustee of express trust to bring suit "without joining the party for whose benefit the action is brought"). Those principles establish that trustees act *on behalf* of trust beneficiaries when they seek damages to remedy harms to trust assets in accordance with the terms of the relevant trust instrument.

The governing trust instrument here was obviously constructed on the basis of these established principles. Specifically, the Declaration of Trust defines the Trust in this action and contains unmistakably clear language on this point: Section 12.5 (entitled Representation by the Trustees in Judicial Proceedings) provides that in any judicial proceeding involving a portfolio (where shares of the Core Bond fund were held), each Trust Beneficiary shall be deemed "to be fully represented by the Trustees for all purposes" and is, "as such, *duly before the tribunal in which such proceeding shall be pending*." *Id.* (emphasis added). Accordingly, not only are the Trustees suing on behalf of the Trust Beneficiaries, but those same beneficiaries are in fact "duly before" this Court.[10]

Plaintiffs' action therefore is, in substance, a mass-plaintiff action brought directly by the Trust Beneficiaries and is *precisely* the sort of state court securities litigation Congress intended to prevent when it enacted SLUSA. This conclusion is underscored by the fact that this case is

---

[10] In fact, this is the *only means* by which the Trust Beneficiaries could come to this or any other Court to have their claims heard. Under the Trust Agreement and the PMA, the Trust Beneficiaries do not own title to the securities and cannot sue on their own behalf for securities violations—the Trust Agreement provides that the Trustees are to own legal title to the securities, although, as noted above, that ownership is statutorily defined to be *exclusively* for the benefit of the Trust Beneficiaries. *See* PMA § 18.8. Accordingly, this action is brought on behalf of more than fifty people and meets SLUSA's numerosity requirement. *See* 15 U.S.C. § 78bb(f)(5)(B)(i)(I) (a class action is covered by SLUSA if "damages are sought on behalf of more than 50 persons or prospective class members").

Page 24 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

brought by one of the more than ninety college tuition savings plans, which, in the aggregate, along with their professional managers and distributors, manage over $100 billion in investments for more than ten million accounts opened nationally. In analyzing SLUSA preclusion, Courts should be guided by the substance rather than the form of a claim. *Dabit v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 395 F.3d 25, 34 (2d Cir. 2005), *rev'd on other grounds by* 547 U.S. 71. Here, a large group of claimants are the beneficiaries of a single securities fraud lawsuit brought on their behalf. That lawsuit has been aimed against a presumed deep-pocket defendant, with over $36 million in aggregated damages at stake, and is clearly subject to the potential abuses foreseen by Congress when enacting the PSLRA and SLUSA.

### 2.    Plaintiffs' Claims Are Based On State Law.

SLUSA preempts actions that are "based on the statutory or common law of any State." 15 U.S.C. § 78bb(f)(1). In their complaint, Plaintiffs assert six grounds for relief: (1) violation of Oregon Securities Law, OR. REV. STAT. § 59.137; (2) violation of Oregon Securities Law, OR. REV. STAT. §§ 59.115(1)(b) and 59.135; (3) breach of contract; (4) breach of fiduciary duty; (5) negligence; and (6) negligent misrepresentation. Compl. ¶¶ 105-46. Each claim is based on state law. Accordingly, SLUSA's "state law" condition is satisfied.

### 3.    Plaintiffs' Claims Involve "Covered Securities."

SLUSA defines a "covered security" as a "security that satisfies the standards for a covered security specified in paragraph (1) or (2) of section 18(b) of the Securities Act of 1933, at the time during which it is alleged that the misrepresentation, omission, or manipulative or deceptive conduct occurred." 15 U.S.C. § 78bb(f)(5)(E). Section 18(b) of the 1933 Act defines a "covered security" as including securities traded on a national exchange or "a security issued

Page 25 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

by an investment company that is registered, or that has filed a registration statement, under the Investment Company Act of 1940." 15 U.S.C. § 77r(b)(1)-(2).

Plaintiffs' Complaint is premised on allegations relating to the Core Bond Fund. *E.g.* Compl. ¶ 105 ("Defendants sold the Oregon Trust securities and shares in the Core Bond Fund in violation of ORS 59.137 by . . . employing a device, scheme and/or artifice to defraud . . . and/or . . . making untrue statements of material fact and omitting to state material facts."). The Core Bond Fund is a series of Oppenheimer Integrity Funds ("OIF"), and shares of the Core Bond Fund are issued by OIF. *See* Ellis Aff., Ex. 10 (2008 Prospectus). Those shares are "covered securities" because OIF is a registered investment company under the Investment Company Act of 1940. *See also Potter v. Janus Inv. Fund,* 483 F. Supp. 2d 692, 696 (S.D. Ill. 2007) ("the claims before the Court involve 'covered securities' within the meaning of SLUSA, specifically, registered mutual fund shares"); *In re Franklin Mut. Funds Fee Litig.,* 388 F. Supp. 2d 451, 471 (D.N.J. 2005) (citing 15 U.S.C. § 78bb(f)(5)(E) and holding "mutual fund shares are 'covered securities'"). Accordingly, Plaintiffs' complaint satisfies SLUSA's "covered security" condition.

### 4.     Plaintiffs Allege A Misrepresentation Or An Omission Of Material Fact "In Connection With The Purchase Or Sale" Of Covered Securities.

SLUSA preempts claims that allege: (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security. 15 U.S.C. § 78bb(f)(1). The "background, the text, and the purpose of SLUSA's pre-emption provision" all support an expansive interpretation of the "in connection with" requirement. *Dabit*, 547 U.S. at 74.

Page 26 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

Here, plaintiffs allege violations of OR. REV. STAT. §§ 59.115, 59.137, and 59.135, which by their terms require allegations that meet the SLUSA requirement.[11]  Compl. ¶¶ 106, 117.  The Complaint therefore specifically alleges in these claims that OFI "sold the Oregon Trust securities and shares in the Core Bond Fund . . . by making untrue statements of material fact and omitting to state material facts."  *Id.*  "In addition," the Complaint continues, "in advising Plaintiff regarding the securities and portfolios of securities at issue, Defendants made material misrepresentations and omissions."  *Id.* ¶ 108.  These allegations plainly assert a misrepresentation or omission in connection with the sale of a security and could not fit more squarely within SLUSA's scope.

### 5.    Plaintiffs' Claims for Breach of Breach Of Contract, Fiduciary Duty, Negligence, And Negligent Misrepresentation Are Barred By SLUSA.

Plaintiffs may be tempted to argue that SLUSA preemption does not apply to their causes of action sounding in common law tort and contract (the "Common Law Claims").  That would be a mistake.

SLUSA preempts any claim alleging "a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security."  15 U.S.C. § 78bb(f)(1)(A).  Plaintiffs' purported causes of action for breach of fiduciary duty, negligence, and negligent

---

[11] The key elements of those claims are: (1) employing any device, scheme or artifice to defraud; (2) making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (3) engaging in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. *See* OR. REV. STAT. § 59.135 *et seq.*  Oregon state securities laws parallel federal securities laws. *See, e.g., Held v. Prod. Mfg. Co.*, 286 Or. 67, 71, 592 P.2d 1005 (1979) ("[P]arties agree that ORS 59.135 is similar to federal Rule 10b-5."); *Aero Marine Engine, Inc. v. Transporter, Inc.*, Civil No. 05-1469, 2007 WL 3128500, at *3 n.2 (D. Or. Oct. 23, 2007) ("State securities laws parallel the federal laws and are to be interpreted consistently with the federal laws.").

Page 27 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

misrepresentation are all predicated on precisely the same facts as their securities fraud claims. Each claim seeks redundant damages. Each claim alleges a misrepresentation or omission in connection with the purchase of Core Bond Fund shares. *See* Compl. ¶¶ 106, 117, 126, 132, 138, 143. Each claim alleges, in identical language, that "in advising Plaintiff *regarding the Core Bond Fund*, Defendants made *material misrepresentations and omissions*." *Id.* ¶¶ 132, 138, 143 (emphasis added).

Similarly, the heart of plaintiffs' contract claim alleges OFI was contractually bound not to provide any information that would contain "any untrue statement of a material fact or omit to state a material fact" with regard to materials provided in connection with the Core Bond Fund as required by the PMA. *Id.* ¶ 126. Plaintiffs could scarcely have selected clearer wording to reinforce the "connectedness" of their common law claims to their securities allegations regarding the Core Bond Fund. Where the factual allegations regarding non-securities claims are the same as those giving rise to state-law securities claims preempted by SLUSA, the non-securities claims too are precluded. *Gray v. Seaboard Sec., Inc.*, 126 F. App'x. 14, 17 (2d Cir. 2005).

Even if the factual overlap were not nearly so complete, these claims would be preempted. As discussed above, in keeping with SLUSA's broad scope, courts have interpreted the "in connection with" language quoted above expansively. *Dabit*, 547 U.S. at 74. In *Gray v. Seaboard*, the Second Circuit Court of Appeals analyzed a district court's determination that a negligence claim and a contract claim were not barred by SLUSA based on the "in connection with" language. 126 F. App'x. at 17. The plaintiffs in that action alleged that defendant providers of investment advice misrepresented their qualifications, which induced plaintiffs to

Page 28 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

pay higher fees associated with advice regarding the purchasing of securities. Reversing the district court's determination, the Second Circuit held that the alleged breach of contract consisted "precisely of the provision of . . . investment advice" which was at the heart of plaintiffs' misrepresentation claims. *Id.* at 17. The court found the "breach caused damages through transactions in securities" and "therefore alleges a misrepresentation in connection with the purchase or sale of a security." *Id.*

Likewise, in *Kurz v. Fidelity Management & Research Co.*, the plaintiffs, contending that SLUSA did not preempt their breach of contract claim, argued the conduct they complained of was not undertaken "in connection with the purchase or sale of a covered security" because plaintiffs already owned their mutual fund shares at the time of the misstatements constituting the alleged breach. No. 07-709, 2008 U.S. Dist. LEXIS 45332, at *11 (S.D. Ill. June 10, 2008). Rejecting plaintiffs' argument and finding their breach of contract claim alleged a cause of action "in connection with" a misrepresentation, the court wrote, "Plaintiffs invested in Defendants' mutual funds because they believed Defendants' material misstatements . . . . Therefore, Defendants' misstatements coincide with Plaintiffs' purchase of a covered security." *Id.*; *see also Dudek v. Prudential Sec., Inc.*, 295 F.3d 875, 880 (8th Cir. 2002) (preempting all causes of action where "the essence of [the complaint] is the unlawful marketing of [securities]"); *Araujo v. John Hancock Life Ins. Co.*, 206 F. Supp. 2d 377, 384-85 (E.D.N.Y. 2002) (holding that breach of contract and unjust enrichment claims are preempted where a plaintiff generally alleges fraud in connection with the purchase or sale of securities).

The same analysis applies here. Plaintiffs claim OFI breached the very contract in which (1) plaintiffs agreed to purchase the securities at issue here; and (2) OFI agreed to advise

Page 29 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

plaintiffs regarding those securities. The alleged "breaches" are OFI's supposed "untrue statement[s] of material fact." Compl. ¶ 136. Accordingly, the alleged breaches are "in connection" with the purchase of a security. This Court should not permit plaintiffs to repackage their securities claims as breach of contract claims in an attempt to circumvent the broad application of SLUSA. *See Korsinsky v. Salomon Smith Barney Inc.,* No. 01 Civ. 6085, 2002 U.S. Dist. LEXIS 259, at *11 (S.D.N.Y. Jan. 9, 2002) (holding non-securities claims precluded under SLUSA because "[a]lthough the complaint clearly states that 'this is not an action for fraud,' it outlines several instances of alleged misrepresentations"). Accordingly, the Common Law Claims are barred by SLUSA along with plaintiffs' state-law securities claims.

**D.      SLUSA's State Savings Clause Does Not Apply To This Action.**

As noted above, plaintiffs' concern about SLUSA preemption is starkly reflected on the face of their Complaint. Specifically, plaintiffs affirmatively allege that this action is not subject to SLUSA because SLUSA "specifically preserves state-court claims brought, as here, by states and political subdivisions thereof." Compl. ¶ 19. Plaintiffs' remarkably defensive allegations, however, flatly misstate the law. SLUSA provides a partial exemption from its terms for state governments engaging in *regulatory or enforcement* actions *on their own behalf.* The savings clause serves the valuable purpose of exempting state-government regulatory actions to *enforce* a state's own securities laws when the real party in interest is the state itself. Such is plainly not the case here. The actual terms of the statute provide:

> (B) State actions
>
> (i) In general. Notwithstanding any other provision of this subsection, nothing in this subsection may be construed to preclude a State or political subdivision thereof or a State pension plan from bringing an action involving a covered security ***on its own behalf***, or as a member of a class comprised solely of other States, political

Page 30 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

subdivisions, or State pension plans that are named plaintiffs, and
that have authorized participation, in such action.

15 U.S.C. § 78bb(f)(3)(B) (emphasis added).  Further underscoring its intent to provide states

only with the ability to enforce their own securities laws in a regulatory capacity, Congress stated

its aims specifically:

> [I]n order to prevent certain State private securities class action
> lawsuits alleging fraud from being used to frustrate the objectives
> of the Private Securities Litigation Reform Act of 1995, it is
> appropriate to enact national standards for securities class action
> lawsuits involving nationally traded securities, while preserving
> the appropriate *enforcement powers of State securities regulators*
> and not changing the current treatment of individual lawsuits.

SLUSA, Pub. L. No. 105-353, § 2(5), 112 Stat. 3227, 3227 (1998) (emphasis added); *see also*

*Spielman*, 332 F.3d at 124 (SLUSA was intended as a balance between maintaining national

standards for securities class action lawsuits "preserving the appropriate *enforcement powers* of

State securities *regulators*") (emphasis added).

Plaintiffs do not plead claims that fall within SLUSA's narrow carve-out.  The Complaint

does not allege that the State of Oregon or a political subdivision thereof seeks to bring suit as a

member of a class comprised solely of other States.  Nor does it allege that the State of Oregon

or a political subdivision thereof brings suit *on its own behalf*; in fact, it specifically alleges to

the contrary.  Compl., lines 1-3 ("Plaintiff State of Oregon, by and through the Oregon 529

College Savings Board and the Oregon State Treasurer *on behalf* of the Oregon College Savings

Plan Trust alleges as follows:") (emphasis added) (internal parentheticals omitted); *id.* ¶ 10

("Through this action, the Oregon Board, *on behalf of the Oregon Trust*, seeks to recover the

damages suffered by the Oregon Trust and the many Oregon families who lost substantial

amounts of their college savings") (emphasis added).

Page 31 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO
DISMISS**

Nor are the current pleadings an oversight, because the State of Oregon is not suing as a securities regulator and could not recover damages for the Trust Beneficiaries "on its own behalf." The State of Oregon, by statute, has "no proprietary interest in the contributions or earnings" of the Trust, which are completely segregated from state funds. OR. REV. STAT. § 348.869. This is not, therefore, an action for recovery on behalf of a state or political subdivision thereof, but as noted above, necessarily an action on behalf of the Trust Beneficiaries. The fact that this is a private action styled as a public one does not change the fact that this action's sole purpose is to vindicate the rights of private account holders. Because the claims plaintiffs assert in this action are not brought by a "State or political subdivision *on its own behalf*," 15 U.S.C. § 78bb(f)(3)(B) (emphasis added), SLUSA's state action savings clause does not bar dismissal of plaintiffs' claims.

## IV.    CONCLUSION.

For the reasons outlined above, the Complaint should be dismissed.

DATED: May 26, 2009                    STOEL RIVES LLP

/s/ Barnes H. Ellis
Barnes H. Ellis, OSB No. 640325
bhellis@stoel.com
Brad S. Daniels, OSB No. 025178
bsdaniels@stoel.com
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480

Attorneys for Defendants OppenheimerFunds,
Inc., OppenheimerFunds Distributor, Inc., and
OFI Private Investments Inc.

Page 32 – **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

## CERTIFICATE OF SERVICE

I hereby certify that I served the foregoing **MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS** on the following named person(s) on the date indicated below by

    ☐  mailing with postage prepaid

    ☐  hand delivery

    ☐  facsimile transmission

    ☐  overnight delivery

    ☐  email

    ☒  notice of electronic filing using the Cm/ECF system

to said person(s) a true copy thereof, contained in a sealed envelope, addressed to said person(s) at his or her last-known address(es) indicated below.

Keith S. Dubanevich
Fredrick M. Boss
Simon Whang
Oregon Department of Justice
1162 Court Street NE
Salem, OR  97301-4096

Keith A. Ketterling
Scott A. Shorr
Jennifer A. Wagner
Stoll Stoll Berne Lokting & Schlachter PC
209 SW Oak Street, 5th Floor
Portland, OR  97204


DATED:  May 26, 2009.

STOEL RIVES LLP


  /s/ Barnes H. Ellis              
Barnes H. Ellis, OSB No. 640325
bhellis@stoel.com
Brad S. Daniels, OSB No. 025178
bsdaniels@stoel.com
Telephone:  (503) 224-3380
Facsimile:  (503) 220-2480


Page 1 – **CERTIFICATE OF SERVICE**